2352

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. JENNIFER L. THURSTON


UNITED STATES OF AMERICA,     )
                               ) 1:20-cr-00238-JLT-SKO
           Plaintiff,     )
                               ) Jury Trial, Day 11
      vs.                  )
                               )
KENNETH BASH, et al.        )
                               ) Volume 11
          Defendants.    ) Pgs. 2352 - 2559, inclusive
                             )


Fresno, California            Tuesday, February 4, 2025


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  RACHAEL LUNDY, CSR, RMR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2353

**APPEARANCES OF COUNSEL:**

For the                 **STEPHANIE STOKMAN**
Government:            Assistant U.S. Attorney
                      2500 Tulare Street, Rm. 4401
                      Fresno, California  93721

                      **JARED ENGELKING**
                      Department of Justice
                      1301 New York Avenue, N.W.
                      Washington, DC 20005

                      **JAMES ROBERT CONOLLY, GOVT**
                      U.S. Attorney's Office
                      501 I Street, Suite 10-100
                      Sacramento, CA 95814

For Defendant          Law Offices of Andrea Luem
Johnson:               Attorneys at Law
                      400 South Forth Street, Suite 500
                      Las Vegas, Nevada  89101
                      BY:  **ANDREA LEE LEUM, ESQ.**

                      Law Offices of Ryan J. Villa
                      5501 Eagle Rock Avenue NE
                      Suite C2
                      Albuquerque, NM 87104
                      BY:  **RYAN J. VILLA, ESQ.**

For Defendant          Fisher & Byrialsen, PLLC
Clement:               Attorneys at Law
                      99 Park Avenue
                      New York, NY 10016
                      BY:  **JANE FISHER-BYRIALSEN, PHV**

                      Ruhnke And Barrett
                      29 Broadway, Suite 1412
                      New York City, NY 10006
                      BY:  **JEAN DE SALLES BARRETT, PHV**

For Defendant          Law Office of Kenneth Alan Reed
Stinson:               406 W 4th Street
                      Santa Ana, CA 92701-4505
                      BY:  **KENNETH ALAN REED, ESQ.**

2354

## INDEX

**GOVERNMENT'S WITNESSES**:

**BRIAN JAMES RAPINOE**
DIRECT EXAMINATION RESUMED BY MR. ENGELKING    2380

**MEGAN GARZA**
DIRECT EXAMINATION BY MR. CONOLLY              2383
CROSS-EXAMINATION BY MR. REED                  2427
CROSS-EXAMINATION BY MS. DE SALES BARRETT      2439
CROSS-EXAMINATION BY MR. VILLA                 2447

**BRANDON BANNICK**
DIRECT EXAMINATION BY MS. STOKMAN              2464
CROSS-EXAMINATION BY MR. VILLA                 2526
CROSS-EXAMINATION BY MS. DE SALES BARRETT      2535
REDIRECT EXAMINATIONBY MS. STOKMAN             2546
RECROSS-EXAMINATION BY MR. REED                2550

## EXHIBITS

* * * * *

**GOVERNMENT'S**                               Received

1417 to 1421                                   2398
1291                                           2479
1292                                           2480
1294                                           2483
1288, page 2                                   2494
1289, page 2                                   2499

**DEFENDANT'S**

* * * * *

1   Tuesday, February, 4, 2025                    Fresno, California

2   8:00 a.m.                                     Jury Trial Day 11

3       (The following proceedings were held in open court:)

4           THE COURT:  Is everyone ready to begin?  We're going

5   to start with the Juror 74 this morning in Seat 5.  Let's go

6   ahead and bring him in.

7           MS. DE SALES BARRETT:  Your Honor, and once we're --

8   sorry.  And once we're done with the jury, we have some legal

9   issues to raise with the Court.

10          THE COURT:  All right.

11      (Juror 74 enters the courtroom.)

12          THE COURT:  Good morning, sir.  So we received an

13  email -- telephone voicemail from you yesterday.  It sounds

14  like you've had some changes in your circumstances.  Can you

15  tell me about what's going on?

16          JUROR 74:  Yes, Your Honor.  So basically, uh,

17  originally when I started this -- so I have a sibling who was

18  able to take care of my mother.  So the problem was, like, a

19  while ago my mother broke her arm, sadly.  And one of the

20  problems was at first she needs to be in a cast, but then

21  after she removed her cast, you know, that was ordered by the

22  doctor, she had muscle atrophy.

23          And the problem is that, uh, she basically only has

24  one arm, and the worst part is that the broken arm was her

25  primary arm.  So she was only able to use her left arm

1    specifically.  And what that basically means is that she could

2    no longer cook by herself.  The pan is typically too heavy.

3    Anything is really too heavy, even something as basic as just

4    water.  Like, even like a cup of water, we only at most fill

5    it up about 30 percent so it's not too heavy for her to pick

6    up, just to give you an idea of, like, how difficult it is to

7    work around the house.

8            She is a daycare provider, so one of the things she

9    does is cook for definitely a lot of children on top of that,

10   but she has somebody that's at the house because -- you know,

11   full of a lot of children, it tends to get pretty dirty.  We

12   have to make sure it's a safe environment for the kids.  So

13   because of that, she definitely needs me.

14           At first, I did try to work with my brother, you

15   know, wait for him so I could schedule, see if I can figure

16   something out, like maybe I could just be at the house early,

17   just cook food for her early.

18           But the problem's that -- we also just learned this

19   today as well, but she actually doesn't have a lot of things

20   other than food as well.  So the idea of me being able to come

21   over here for even longer is basically impossible.  There's

22   nothing I really could have done.  We've already tried

23   discussions and nothing will work out pretty much.

24           THE COURT:  Now, how long has the cast been off your

25   mom's arm?

1          JUROR 74:  Roughly three to four weeks.

2          THE COURT:  Is she getting therapy or something to

3     try to address that muscle atrophy?

4          JUROR 74:  Yeah.  She was getting physical therapy,

5     but the problem is it didn't help out a lot, like, there

6     hasn't been any progress at all.  And it has become a concern.

7     We are seeing doctors' appointments to resolve it but nothing

8     is working.

9          THE COURT:  Okay.  And now you said your brother had

10    been helping.  What's the change in his circumstances?

11         JUROR 74:  So basically -- so he has a girlfriend,

12    basically.  And she got him a job, and it was really a

13    good-paying job.  And my twin has -- like, he has a ton of

14    debt, like thousands of dollars of debt.  And he has to work

15    now, because collections is already collecting money from him.

16    And, uh, my family members that lives in the household, my dad

17    and my mother and my brother, they definitely don't make

18    enough income when it comes to managing his own debts, let

19    alone my parents' debts.

20         THE COURT:  Now, before your mom broke her arm, was

21    she the only one who worked in the daycare in the home or did

22    she have other helpers?

23         JUROR 74:  She was able to do it by herself, correct.

24         THE COURT:  So it was just her?  She did everything?

25         JUROR 74:  Yes.  Like, we did help out, but she could

1    definitely do it by herself back then, like, definitely.

2              THE COURT:  How many children does she have in the

3    home?

4              JUROR 74:  A lot.  Like, probably roughly 12 to 15.

5    Because some of the kids sometimes don't show up because --

6              THE COURT:  So doesn't she -- well, I don't know what

7    her license is, but usually 12 is the max for one person,

8    right, 12-to-1 ratio?

9              JUROR 74:  Yes, but it's just that the family -- yes,

10   to answer your question.  So we took care of kids, like, in

11   the past, so that's the model -- like, if we have extra space,

12   like, we'll be able to take care of more.  But if we're

13   doing that, they're going to have to need me to be there.  But

14   the vast majority of the time, it's 12 or less.

15             THE COURT:  Okay.  And do you normally work?  I'm

16   sorry.  I don't recall.

17             JUROR 74:  No.  No, I don't.

18             THE COURT:  Okay.  And I'm sorry, also I forgot, what

19   city do you live in?

20             JUROR 74:  Lindsay.

21             THE COURT:  So when you leave here in the afternoons

22   to get home, what time do you usually get there?

23             JUROR 74:  Like, 2:50.

24             THE COURT:  2:15?

25             JUROR 74:  50, 50.

1           THE COURT:  Close to three o'clock?

2           JUROR 74:  Yeah.  Yeah.

3           THE COURT:  What time do those kids normally go home?

4           JUROR 74:  So, uh, we don't know, like to answer your

5    question properly.  But so they all, like, go to times, like,

6    differently, if that makes sense.  Like, sometimes they leave

7    at 4:30; three of them leaves at, like, 7:00; and then, like,

8    most of them leaves by 5:00 p.m.

9           THE COURT:  Is it true that your mom provides them

10   breakfast, lunch, and some of them dinner, even?

11          JUROR 74:  Yes, definitely.  That's what we do for

12   all of them as well.  And some of them eats more than others,

13   so --

14          THE COURT:  What time does your brother have to go to

15   work?

16          JUROR 74:  He goes at work at roughly 7:30, yeah,

17   7:30.

18          THE COURT:  And what time does he get home?

19          JUROR 74:  So he is doing training right now, so it

20   goes -- so right now he goes home at 5:00 p.m.  But he did

21   tell me that, like, uh, it could potentially change in three

22   weeks, you know, once his training is over.  But it's probably

23   only going to be, like, an hour less, if anything, at most.

24          THE COURT:  So maybe it would be more like 7:30 to

25   4:00 at the best?

2360

1          JUROR 74:  Yes.

2          THE COURT:  Okay.  And does he work every day?

3          JUROR 74:  Uh, yes, Monday through Friday.

4          THE COURT:  Now, your father, as I understand it, is

5     a truck driver, right?

6          JUROR 74:  Yes, ma'am.

7          THE COURT:  Now, tell me, does he come home every

8     night?

9          JUROR 74:  Basically, no.  He's gone for the majority

10    of the, like -- like, of the months, like, uh -- he is, like,

11    you can kind of imagine he's not there most of the time.  He's

12    rarely there, that's the thing.  He's basically always

13    working.

14         THE COURT:  He's a long-haul trucker?

15         JUROR 74:  Yes, ma'am.

16         THE COURT:  Sometimes he's gone the week; sometimes

17    it is -- sometimes more than a week?

18         JUROR 74:  Yes, definitely, yeah.  There's been times

19    when he's been gone over four months.

20         THE COURT:  Oh, okay.

21         JUROR 74:  Yeah.

22         THE COURT:  And you said in your home it's only you,

23    your brother, your mom, and your dad when he's there?

24         JUROR 74:  I have pets too but --

25         THE COURT:  We're not going to count that.

1           All right.  Is there -- are there any other family

2    members that could help out at home until we know for sure

3    what your brother's work schedule is going to be?

4           JUROR 74:  Sadly, no, because all of them, not only,

5    like, do their jobs that require them to be, like, longer, but

6    they live hours away, five hours away to be exact.

7           THE COURT:  And you said that it's necessary for your

8    brother to work because of his debts, but does he also intend

9    to contribute to the family's household?

10          JUROR 74:  Yes.

11          THE COURT:  So you're saying that the mom -- your

12   mom's daycare and your dad's job just isn't enough to take

13   care of everyone?

14          JUROR 74:  Normally it would.  Like, if there was no

15   debts at all then, yes, it definitely would.  But the problem

16   is that my twin went to AC SU, and that's got, like, the debt

17   was, like, pretty bad.

18          And then they bought a car.  I did disagree with that

19   decision, buying a new car, honestly, but they did buy it and

20   now in debt because of it, and they have a house debt as well.

21          THE COURT:  Your parents bought a car and a house, is

22   that who you're talking about?

23          JUROR 74:  They bought a house, like, before I was

24   even born, but they haven't paid it off yet.

25          THE COURT:  Okay.

1          JUROR 74:  But --

2          THE COURT:  So the cost of the house, I mean, that

3   seems that that's probably been the same since you -- they've

4   had the house for so long.  And then they recently bought a

5   car, you said?

6          JUROR 74:  Yes.

7          THE COURT:  Okay.  And then they are trying to help

8   your brother pay off his debt from schooling.

9          JUROR 74:  Uh, I wouldn't say -- well, no on that

10  last part.

11         THE COURT:  Okay.

12         JUROR 74:  He's basically paying his own debt by

13  himself, but it's just that he is helping out my mother when

14  it comes to rent.

15         THE COURT:  Okay.  And so your brother's got the

16  school debt.  Does he have other debt too?

17         JUROR 74:  No, no.

18         THE COURT:  All right.  But it's gotten to the point

19  where he's going into collections as a result of not being

20  able to pay his school debt?

21         JUROR 74:  Correct.  And it does make him pretty

22  nervous.  Sadly, this is a huge issue with my family, but all

23  of us have an issue with anxiety.  Like, it' really badly, and

24  it's -- judging for my mom and my twin brother most notably,

25  they become extremely nervous, like extremely, extremely

1    nervous, and it does kind of like, you know, make me feel bad,
2    because, like, it really hurts them, like it genuinely does,
3    yeah.
4              THE COURT:  Okay.
5              Ms. Stokman, do you have any comments -- or any
6    questions?  I'm sorry.
7              MS. STOKMAN:  I have no questions.
8              THE COURT:  Mr. Reed, do you have questions?
9              MR. REED:  No questions, Your Honor.
10             THE COURT:  For Mr. Clement, any questions?
11             MS. FISHER-BYRIALSEN:  No, Your Honor.
12             THE COURT:  For Mr. Johnson?
13             MS. LUEM:  No, Your Honor.
14             THE COURT:  All right.  Thank you, sir.  If you'll
15   step back in the jury room, we'll get right back to you.
16             JUROR 74:  Okay.
17             THE COURT:  All right.  Comments about
18   Juror Number 5, Ms. Stokman.
19             MS. STOKMAN:  Yes.  I think he's made out a hardship
20   due to the mother's health condition.  She needs help, sounds
21   like, functioning throughout the day, let alone the other job
22   functions that she has to provide for the kids at the daycare.
23   But it sounds like, at the very least, she needs somebody with
24   her for her own care.
25             THE COURT:  All right.  Mr. Reed, do you have

2364

1  comments?

2       MR. REED:  Well, the trial doesn't have the same

3  estimate that it did when we were selecting him as a juror.

4  There's a pretty good chance the government will rest either

5  this week or sometime next week, but my gist of my listening

6  to him is that he doesn't want to be here.  Just the way he --

7  I mean, everything had another reason.  It was, you know, even

8  got down to the animals that he has.

9       So, you know, I'm -- I'll submit on the issue, but it

10 doesn't sound like he wants to be here.  I don't necessarily

11 think it rises to the level considering where we are right now

12 but normally jurors that don't want to be here don't normally

13 vote for the defense.  So that's my interpretation of that.

14      THE COURT:  So your position is what then?

15      MR. REED:  My position is, I don't think that it's --

16 I don't think it rises to the level of cause.

17      THE COURT:  Okay.

18      MR. REED:  And I don't think it rises to the level of

19 hardship, considering the amount of time the trial is, but I

20 am just me.

21      THE COURT:  All right.  For Mr. Clement, comments?

22      MS. DE SALES BARRETT:  No, Your Honor.

23      THE COURT:  For Mr. Johnson?

24      MS. LUEM:  Your Honor, we take the position that that

25 does not rise to a level of a hardship.  It's -- this is all

1    stuff that's been going on.  He's been able to deal with it

2    and his family.  And I think based on the government's

3    representation that they expect to be done with their case

4    probably by the end of this week, I don't think it's going to

5    be a significant issue such --

6            THE COURT:  Well, maybe if we bring him in and tell

7    him, because understanding that from the government, I still

8    don't understand how long the trial is going to be.  So you

9    guys seem to have a better idea of that.  How many more weeks

10   are we talking?

11           MS. LUEM:  Well, it depends on the government.  If

12   they are done this week --

13           THE COURT:  Well, if they are done this week.

14           MS. LUEM:  If they are done this week, then I expect

15   our case will take a couple of days, at most.

16           THE COURT:  And for Mr. Clement, is that the -- are

17   you all saying that's the entire defense or is there --

18           MS. DE SALES BARRETT:  That's the entire defense.

19           THE COURT:  Mr. Reed, do you agree with that?

20           MR. REED:  Yes.

21           THE COURT:  All right.  That seems to make a

22   difference.  Let me see -- let's bring him back in and see if

23   he can make it work for -- in two weeks at the most and see.

24       (Juror 74 enters the courtroom.)

25           THE COURT:  All right.  So thank you for coming back

1    in.  You know what, I've looked up and seen the jury, you look

2    to me like you have really been paying attention to what is

3    happening and engaged in the evidence.  So I really would hate

4    to lose you as a juror.

5           Let me tell you this and see if it makes a

6    difference, it looks to me probably this trial will be done

7    next week.  So that's much faster than we thought.

8           So my question to you is:  Can you and your family

9    make it work for about two more weeks?  And what I was

10   thinking is, I realize your mom needs help with a lot.  Could

11   you do things like prep the meals in the morning, and it could

12   be reheated in the microwave?  You know, do it at night, do

13   the cleaning at night, that kind of thing?  Could you make it

14   work for two more weeks?

15          JUROR 74:  I will do everything I can to be here.  I

16   could definitely do that.  I can figure this thing out.

17          THE COURT:  Okay.  And I would ask you not to share

18   anything we've discussed with the rest of the jurors.  All

19   right?

20          JUROR 74:  Okay.

21          THE COURT:  Okay.  Thank you, sir.

22          JUROR 74:  Uh, this is horrible timing, I do

23   apologize.  I did told them, like they asked me why, like,

24   Well, was I -- I was, like, I was requesting.  So like --

25          THE COURT:  That's fine.  I just mean, what I don't

1    want you to do is go back and say, Hey, we're going to be done

2    in two weeks, everybody.  Yay.

3             JUROR 74:  Okay.

4             THE COURT:  Because things happen, I mean -- but

5    that's what I anticipate now.  But if, for, example, I have a

6    heart attack this morning and I'm in the hospital, the trial

7    is going to go longer.

8             So, you know, I just don't want to make them think

9    that it's going to be -- until we -- until I have a better

10   handle on it.  But that's my sense, is it's probably going to

11   be done by next week.  Okay?

12            JUROR 74:  You sure I'm not going to be questioned

13   right now, like, through that door?

14            THE COURT:  You can just say, Hey, Judge Thurston is

15   mean and she says don't talk.

16            JUROR 74:  I hear you.  Okay.

17            THE COURT:  Thank you very much, sir.

18            JUROR 74:  I'm not saying, Your Honor, I'll be here

19   too.

20            THE COURT:  Okay.  Thank you much.

21       (Juror 74 exits the courtroom.)

22            THE COURT:  Okay.  Ms. Barrett, I think you had

23   some -- some issues?

24            MS. DE SALES BARRETT:  Yes, Your Honor, this is in

25   reference to Mr. Rapinoe.  In reviewing, we have been provided

1  with grand jury transcripts from his testimony in the

2  Southern District of California in San Diego.  And during the

3  course of his testimony --

4          Oh.  I'm sorry?

5          THE COURT:  Mr. Reed?

6          He can't -- she can't hear Ms. Barrett.  Just, if you

7  could -- okay.  Great.  Okay.

8          MS. DE SALES BARRETT:  Do you need me to start again?

9  Yes.

10          During the course of his testimony in that -- in that

11  matter, he testified that he has a cooperation agreement with

12  the government.  I emailed the government and the government's

13  position is because it's in a different district that they

14  don't have any obligation to provide us with that cooperation

15  agreement.  I heartily disagree with that.  The government is

16  the government.

17          THE COURT:  Well, the government isn't just the

18  government but the DOJ is the DOJ.

19          Ms. Stokman, here's the trouble.  I mean, if he's

20  testifying now in a cooperation agreement with that -- I'm

21  seeing you shake your head no, but the defense gets to verify.

22  I guess I'm having a hard time understanding why that's not.

23          MS. STOKMAN:  Judge, that was a separate matter that

24  was investigated years ago, we were not a part of that

25  investigation or anything to do with his position with the

1    Southern District back then.

2           The cooperation agreement that he had back then with

3    the Southern District, it's my understanding that it's no

4    longer in existence but also that had nothing to do with this

5    case and this investigation.

6           We -- we had the transcripts of testimony because

7    while we were investigating charges for this indictment, we

8    were able to obtain those, but there's -- there was nothing

9    else that we were -- that we obtained from the

10   Southern District.  And because we had possession of prior

11   statements that he had made, we handed those over in the

12   *Jencks* production.

13          So there's no cooperation agreement in this case.

14   That cooperation agreement from the Southern District has

15   nothing to do with his testimony here or his involvement in

16   the charges in this case.

17          And what we did have we turned over, and we turned

18   all of this over back in the initial November 1st, I think,

19   *Jencks* production.  So this has been something that counsel

20   has been able to view and know about since then.

21          And so a last-minute request for this is also not an

22   appropriate time frame to be asking for this.  But we don't

23   have that information.  We were not part of any of those

24   agreements.

25          THE COURT:  Did his testimony relate to the

1    Aryan Brotherhood?

2            MS. STOKMAN:  Yes.  Because that was a separate

3    investigation that Southern District was doing and they

4    actually never charged based upon the testimony they had in

5    the grand jury.

6            THE COURT:  Ms. Barrett, your comments?

7            MS. DE SALES BARRETT:  Yes, Your Honor.

8            First of all, Mr. Rapinoe testifies before the grand

9    jury and is questioned about the actual tape-recorded

10   conversations with Mr. Clement.  And he testifies about the

11   Aryan Brotherhood, he testifies about the structure, he

12   testifies about his prior conviction, and he testifies

13   specifically, "I am not being federally prosecuted."

14           At this point, he has already been charged with EDD

15   fraud and a whole host of other things.  I believe he

16   testified here that that was his arrest in November of '20.

17           THE COURT:  Can I just stop you one second?

18           MS. DE SALES BARRETT:  Yeah.

19           THE COURT:  So he at that time had been charged with

20   the EDD fraud he's talking about in this case?

21           MS. STOKMAN:  He -- at that time, he had been charged

22   with the EDD fraud on the state side that he -- he testified

23   to having a conviction on.  It was the same EDD time frame

24   that the Southern District was looking at their case.

25           So that information, whatever they were -- whatever

1    they were promising him back then had nothing to do with the

2    case here he actually was convicted on the state side for that

3    EDD fraud.

4         And the -- it's not accurate that he spoke about any

5    recorded conversations that we've addressed in this trial

6    because those came after the fact.  Those were not in

7    existence yet at the time of his testimony in the grand jury.

8         THE COURT:  But what I hear Ms. Barrett saying is he

9    did testify as to statements, communications he had with

10   Mr. Clement.

11        MS. STOKMAN:  Those have not been addressed here in

12   this -- in this testimony, and they weren't the recorded

13   statements that are at -- we've been playing here.

14        THE COURT:  Right.  I'm not suggesting that, but I am

15   suggesting he's got statements, apparently, that he's

16   attributing to Mr. Clement.  It seems like that has some basis

17   for possible impeachment.

18        I guess I am troubled by the argument that because

19   you don't have it, it's not within your control.  Because the

20   DOJ is the DOJ.

21        MS. STOKMAN:  It's not exactly that easy, Judge, when

22   it comes from office to office.  But I will say that we did

23   provide that grand jury transcript because we had it, and he

24   had testified in the grand jury.  So if there were statements,

25   counsel obviously has those in order to use for impeachment

1    because he was under oath under that proceeding and made

2    statements in that.  So --

3         THE COURT:  Right.  But what if he lied?  You know,

4    what if the cooperation agreement says something that -- I

5    don't know what it says.  I don't -- I don't know.  But the

6    trouble is, the fact that he swore something previously, it

7    just means that.

8         Ms. Barrett, do you have additional comments?

9         MS. DE SALES BARRETT:  No, Your Honor.

10        MS. LUEM:  Your Honor, if I may add, Mr. Rapinoe on

11   the stand testified about EDD fraud that he was committing on

12   behalf of the Aryan Brotherhood, specifically Misfit or

13   Andrew Collins, and that seems to be the subject matter in all

14   of these prior transcripts.  I mean, it goes exactly the same

15   issue.

16        THE COURT:  Yeah.  I think we all agree on that.

17   That's right.

18        MS. LUEM:  Right.  And he does state at one point

19   that he was cooperating with the both the state and federal

20   government, and it doesn't appear that he was never prosecuted

21   in relationship to anything to do with this case.  Certainly,

22   there are references to recorded calls.  So I think all of --

23   all of his cooperation agreements should be turned over.

24        In addition, Judge, we found out for the first time

25   while he was on the stand that he's a paid informant.  The

1    government provided one -- one payment receipt from the ATF.

2    It's hard to imagine that's the only one that he received, but

3    I'll take their word for it if they say that's true.

4         We did not, however, receive his confidential

5    informant contract that he has to sign with the ATF when they

6    sign up an informant.  It's standard practice, and we should

7    be entitled to see that, Judge, because he does have to make

8    certain promises in order to be used as a confidential human

9    informant, and we do not have that.

10        THE COURT:  Is there a contract that ATF has with

11   him?

12        MS. STOKMAN:  Judge, that contract -- yes.  But it

13   exists under his CI file, which is not readily available.

14   There are steps that have to be taken:  defense requests, the

15   file has to go through ATF counsel, and we have to arrange for

16   a certain procedure for defense counsel to view that.  That

17   was never requested.

18        This isn't the first time that it's come up that he

19   was a paid informant.  During the production of *Jencks*

20   material relating to this witness in November, the beginning

21   of November of 2024, there were ATF reports that indicated he

22   was a paid informant, and this is why those conversations

23   regarding the drug trafficking were being had, that they were

24   recorded.

25        And as this Court knows, counsel for Mr. Clement had

1  that information long before the *Jencks* production on

2  November 1st.  So this information has been provided to

3  counsel for a very long time, and it's the first time that

4  we're being asked about his CI file.  So at this point,

5  that -- that procedure is going to take some time, and it was

6  never requested of the government before.

7         THE COURT:  What about the receipts?  Was he paid

8  only one time, or was there more times?

9         MS. STOKMAN:  Yes, one time.

10         MS. LUEM:  And, Your Honor, on behalf of Mr. Johnson,

11  we were not aware that he was a paid informant.  He barely

12  even mentioned Mr. Johnson.  In fact, I didn't even notice it

13  until when he was on the witness stand, so there was no reason

14  for us to go digging around to figure out whether he was or

15  was not.

16         But we are making that request now pursuant to

17  *Jencks*.  He's on the witness stand, he's testified that he's a

18  paid informant, and we believe we're entitled to cross-examine

19  him about his agreement with the ATF.  And if that takes the

20  government some time, then we'll have to just take the time.

21  But I don't see -- this is a confrontation issue that can't be

22  ignored, Judge.

23         THE COURT:  What I hear you say, though, and what

24  Ms. Stokman is saying is that there was a report of some sort

25  that identifies him as an informant.  What is -- do you have a

1    Bates number on that?

2            While you're looking for that, Mr. Reed, I think you

3    have something to say?

4            MR. REED:  Yes.

5            THE COURT:  Let's get that microphone now.

6            MR. REED:  I did wonder about this over the weekend,

7    but not to the extent that either counsel have mentioned.  But

8    I don't understand -- I mean, I've only been doing this for a

9    minute, but if you think that you're being prosecuted by the

10   state and the fed and you only end up with a state case, that

11   in itself -- there's a decision made that that happens.  The

12   government doesn't just decide, Hey, I'm never going to

13   prosecute you, or they don't tell his lawyers that.

14           These are all things that every attorney knows.

15   Every defense attorney knows, if I get you a state case and no

16   fed case, there's an entirely different set of time that you

17   do, because 50 percent -- and especially in a case like this,

18   nobody got killed, nobody got GBI, so that, in and of itself,

19   is the reward, to not be federally prosecuted.

20           I wondered and, actually, was going to deal with some

21   cross-examination on this question with him.  But this new

22   revelation to me, light bulb comes on.  I don't know how the

23   government can take the position, how the US Attorney's Office

24   can take the position, or the DOJ take the position that,

25   because my cousin did it, you don't get to know.  The witness

1    is on the stand in this trial.

2          He wasn't going to be on the stand in that trial.

3    But in this trial, he has testified to things that he talks

4    about, and we haven't gotten there yet, but this dude says he

5    defrauded $750,000.  How do you get to that number and not get

6    a federal case?  There's some paper here that somebody doesn't

7    want to give somebody.  I'm not blaming them.  It's probably

8    not them.  But unfortunately, she's the AUSA in the room and

9    she has the obligation.

10         But because, Judge, I'm telling you, I'm guaranteeing

11   you, unless you're telling me I can't, I read 750,000.  He

12   says John Stinson is upset or these guys are upset about him

13   taking a thousand and somehow cheating them.  What about the

14   thing that got you to 750-?  If it's $20,000 a piece, you

15   divide that by 750,000, that's a heck of a lot more than the

16   Aryan Brotherhood.  How did this guy get to that number?  Or

17   is he just jiving?  If he's just jiving, then, okay, say that.

18   But I'm expecting that's not going to be the answer.

19         THE COURT:  All right.  As to the cooperation

20   agreement, Ms. Stokman, you're going to have to get somebody

21   on the phone.  We need to get a copy of that.

22         MS. STOKMAN:  Judge, I'm just going to point out

23   again that he's not testifying under that cooperation

24   agreement.  The terms of that cooperation agreement would only

25   apply to the Southern District and not the Eastern District.

2377

1   So in terms of using --

2           THE COURT:  Maybe.  I don't know --

3           MS. STOKMAN:  -- that type of information --

4           THE COURT:  -- because I haven't seen it.  Because if

5   it says, in essence, more of an immunity for the -- this

6   issue, then it would apply, wouldn't it?

7           MS. STOKMAN:  Not if this office has not agreed to

8   that.  We have not entered into any agreement with him that he

9   won't be prosecuted and that he's under a cooperation

10  agreement to testify here.

11          THE COURT:  Right.  But I think you-all would have a

12  really hard time taking the position that immunity granted for

13  this act that he discussed in the grand jury and then

14  apparently is discussing here, also EDD fraud, that he doesn't

15  have immunity for that.  But I don't know what it says.  I

16  mean, if it doesn't say anything about that, then that's what

17  it is.  But I don't think that defense should have to guess at

18  what it says.

19          On the other hand, as to that other issue, the

20  contract, it sounds like there was reason -- well, have you

21  located that Bates number?

22          MS. STOKMAN:  I don't have a way to do that.  I can

23  do that at a break, but I do not -- it was in the production

24  of *Jencks* material from November 1st.

25          MS. LUEM:  And I don't know -- I can't seem to find

1   anything on that other than a report that references a CI but

2   not by name.  So it's -- if they've got a Bates number for --

3   for a report that says Rapinoe, then I'd like to see that, but

4   I haven't --

5        THE COURT:  Well, we'll get the Bates number on the

6   break.  But if the defense hasn't had notice of it and hasn't

7   requested it, you can do that now.  The government's now on

8   notice about that, but it's not going to stop us going

9   forward.

10        As to the cooperation agreement --

11        MS. DE SALES BARRETT:  Yeah, but that's --

12        THE COURT:  -- Ms. Barrett, I'm going order that to

13   be produced, but what do you want to do?  You want to move to

14   a different witness or what's your -- can the defense go

15   forward at this point?

16        MS. DE SALES BARRETT:  Your Honor, I believe that we

17   should be able to do our cross-examination once we receive

18   that document.

19        THE COURT:  All right.  Well, we can finish his

20   direct, then?

21        MS. DE SALES BARRETT:  Yes, Your Honor.

22        THE COURT:  To the extent anyone wants to take their

23   cross-examination -- cross-examination now, we can do that;

24   otherwise, he'll have to come back.

25        All right.  Ms. Stokman, I don't know if you can get

1  someone in your office working on that so hopefully we won't

2  have a delay, but at this point, do you wish to call

3  Mr. Rapinoe back to the stand or do you want to move on?

4          MS. STOKMAN:  We'd like to finish his direct

5  examination.  He's -- he's here.

6          THE COURT:  All right.  Let's go ahead and do that,

7  then.

8          Let's -- bring him in, as well as the jurors, then.

9          MR. REED:  Your Honor, can the defense attorneys

10 speak, because if he gets done and you ask, Do we have

11 questions, and we --

12         MS. STOKMAN:  Judge, the jury is coming in.

13         THE COURT:  Yeah.

14         If you want to take a minute and talk, you can still

15 do that.

16     (Jury enters the courtroom at 8:36 a.m.)

17         THE COURT:  All right.  We have -- oops.

18         All right.  Thank you.  We have all of our jury

19 members back in their places.

20         Let's go ahead and recall the witness to the stand.

21                 **BRIAN JAMES RAPINOE**,

22 called as a witness on behalf of the Government, having been

23 previously sworn, testified as follows:

24         THE COURT:  All right.  Thank you.

25         MR. ENGELKING:  Thank you, Your Honor.

DX - Rapinoe - E

2380

1                    DIRECT EXAMINATION RESUMED

2    BY MR. ENGELKING:

3    **Q.**  Just a reminder that you're still under oath.  Okay?

4    **A.**  Yes, sir.  Yes, sir.

5    **Q.**  When we paused last week, we were listening to some phone

6    calls that you had recorded where you testified that you were

7    arranging a methamphetamine deal with Frank.  Do you remember

8    that?

9    **A.**  I do.

10   **Q.**  And you had also testified that Frank was using a --

11   Kenwood's middleman.  Do you remember that?

12   **A.**  I do.

13   **Q.**  Okay.  Did you know the name of the middleman?

14   **A.**  Uh, I believe it was Mike.

15   **Q.**  Had you met Mike before?

16   **A.**  Only through phone conversations.

17   **Q.**  And was this drug deal ultimately successful?

18   **A.**  No, it was not.

19   **Q.**  And why not?

20   **A.**  The deal, Mike never get the product, couldn't get it

21   delivered to me.  There was a mix-up in communication, and I

22   was told the deal was not going to go through.

23   **Q.**  Did you try to meet up with Mike?

24   **A.**  I did.

25   **Q.**  How many times?

2381

1  **A.**  Uh, around -- all -- all day for about a six, seven-hour

2  period of time.

3  **Q.**  And where was -- where was this?  Where did you try to

4  meet him?

5  **A.**  In LA.

6  **Q.**  And this was with ATF, right?

7  **A.**  It was.

8  **Q.**  Just for a moment, I'd like to jump back to the EDD

9  applications that you had testified about.  You had said you

10  were using that Marina address, right?

11  **A.**  I was.

12  **Q.**  And how many -- did you have multiple mailboxes that were

13  using that address?

14  **A.**  I did.

15  **Q.**  And was that 108 and 109?

16  **A.**  Yes.

17        MR. ENGELKING:  Okay.  Can we pull up Exhibit 1806.

18  And this has already been admitted.

19     (Audio played in open court.)

20  BY MR. ENGELKING:

21  **Q.**  So do you remember this call?

22  **A.**  I do.

23  **Q.**  And was this when you were trying to arrange that drug

24  deal that we just discussed?

25  **A.**  It was.

1   **Q.**  Are you being paid by the government to testify today?

2   **A.**  Uh, no.

3   **Q.**  What, if any, concerns do you have about testifying today?

4   **A.**  I fear for my life, the life of my family, uh, but I no

5   longer want to be a part of anything I used to be a part of.

6   I don't believe in any of it anymore, so I'll have to live

7   with the decisions that I've made.

8              MR. ENGELKING:  No further questions, Your Honor.

9              THE COURT:  Counsel, do you wish to reserve your

10  cross-examination at this time?

11             MS. DE SALES BARRETT:  We'll reserve at this time,

12  Your Honor.

13             MR. REED:  Yes, Your Honor.

14             THE COURT:  And?

15             MS. LUEM:  Yes, Your Honor.

16             THE COURT:  All right.  Thank you, sir.  You can step

17  down at this time.

18             All right.  Next witness, please.

19             MS. STOKMAN:  Government calls Megan Garza.

20             THE CLERK:  Please raise your right hand.

21                         MEGAN GARZA,

22  called as a witness on behalf of the Government, having been

23  first duly sworn, testified as follows:

24             THE WITNESS:  I do.

25             THE CLERK:  Go ahead, have a seat and please state

2383

1    your full name for the record and spell your last name.

2            THE WITNESS:  Megan Garza.  Last name is G-a-r-z-a.

3            THE CLERK:  Thank you.

4                       DIRECT EXAMINATION

5    BY MR. CONOLLY:

6    Q.   Good morning, Ms. Garza.  Can you tell us, please, where

7    you work?

8    A.   Yes.  I work for the California Employment and Development

9    Department.

10   Q.   And what is your current position there?

11   A.   I'm a criminal investigator.

12   Q.   How long have you been doing that?

13   A.   Two years.

14   Q.   And before working with EDD, what -- where were you

15   working?

16   A.   Prior to that, I worked for seven years for the

17   California Department of Insurance.  And prior to that, from

18   2006 to 2016, I worked for the Reedley Police Department as a

19   patrol officer and a detective.

20   Q.   And a what?

21   A.   And a detective.

22   Q.   And when you worked for the California Department of

23   Insurance what was your -- what was your job there?

24   A.   I was a detective there as well.

25   Q.   And you can pull that microphone closer to you, if that's

1    easier.

2           So you mentioned that you are a criminal investigator

3    within EDD.  What are your main responsibilities in that job?

4    What are your main duties?

5    A.  We investigate various programs of unemployment,

6    disability, and employer tax insurance fraud.

7    Q.  And the fraud, that applies to all three of those -- or

8    sorry, all of those categories?

9    A.  Yes.

10   Q.  And for unemployment fraud, just briefly, how do people do

11   that?

12   A.  Uh, there's various ways of doing that.  Uh, often we can

13   investigate either a single person, who sometimes lie about

14   being employed and then being unemployed to collect

15   unemployment benefits.  And then often we see cases that are

16   referred to as imposter fraud where one person or various

17   people can obtain various social security numbers in different

18   ways and file unemployment claims through the EDD under

19   multiple social security numbers that have been obtained in

20   various different ways.

21   Q.  And sometimes do people claim that they are unemployed for

22   reasons that might not be true?

23   A.  Yes.

24   Q.  And how would that work?

25   A.  Some will say that they were employed by a certain

1   employer that they maybe were not employed with at all.  So
2   sometimes that -- the fraud will lie in that.  Sometimes they
3   will say that they have had a certain job duty or job
4   description that they did not have.
5           Oftentimes, prior to COVID, independent contractors
6   were not able to file for unemployment, but after COVID
7   happened, they were able to.
8           Oftentimes we'll see just several claims filed at one
9   time with inaccurate information as to who the employer is,
10  who the job is, who the claimant is.
11  **Q.**  And if -- if a person is simply not working, does that --
12  is that, just by itself, qualify as being unemployed for the
13  purpose of benefits?
14  **A.**  No.  So to obtain benefits, you have to meet some
15  stipulations to receive the benefits.  You have to have the
16  ability to work, to go to an everyday job.  If you are
17  unemployed legitimately, you have to be looking for a job, and
18  you have to be -- you have to accept a job if one comes up, if
19  you're offered a job.
20  **Q.**  So presumably, you would have to be available --
21  **A.**  Yes.
22  **Q.**  -- to work?
23  **A.**  Correct.
24  **Q.**  And so typically, what information does a person, just in
25  brief, have to submit to EDD to file for unemployment

1    benefits?

2    **A.**  Uh, there's an initial application that can be done

3    online, or it can be mailed in.  It's referred to as a

4    DE 2501, but it's basically an initial application that's

5    submitted.

6          Most of time now they're done online, and then it

7    goes through a claims process once it's submitted.

8    **Q.**  And would that include some basic personal identifying

9    information?

10   **A.**  Yes.  A name, a birthday, and social security number.

11   **Q.**  Does EDD also ask for a mailing address?

12   **A.**  Yes.

13   **Q.**  Does EDD --

14         As part of that initial process?

15   **A.**  Yes.  Because they -- the benefits that they receive have

16   to go to a certain address for them to receive them.

17   **Q.**  Does EDD typically verify those mailing addresses?

18   **A.**  No.

19   **Q.**  Now, you mentioned that you were a criminal investigator.

20         And how do cases come to you or to your department

21   for investigation?

22   **A.**  Uh, they can come in a couple different ways.  The most

23   common way is through -- somebody that works in claims can see

24   a pattern or some type of element of fraud, and they will

25   refer it to a supervisor that supervises the criminal

Di Ganzza E

2387

1   investigations unit.  So it goes through like a queue process

2   of supervisors so it can be issued to an investigator that

3   way.  And then oftentimes various other law enforcement

4   agencies will call and explain some elements of fraud that

5   they believe could be happening.  And so oftentimes we'll open

6   a joint investigation with that agency to work the case that

7   way.

8   Q.  And you said the cases get referred to an investigator.

9   Is that an investigator like yourself?

10  A.  Yes.

11  Q.  So when you receive a referral like this, what do you do

12  to investigate the possibility of a fraudulent claim?

13  A.  Uh, it depends on the type of investigation.  Oftentimes,

14  if we have several different fraudulent claims that we're

15  looking at, we have a unit that can provide address runs on a

16  particular address.  They can provide runs on a particular

17  social security number, a particular name, a particular

18  employer.  So we request those runs for records and then begin

19  the investigation based on what's returned to us.

20  Q.  Can you explain, please, what a run is?

21  A.  Yes.  So, like, the most common run that we would do --

22  sometimes we do, like, a doctor run if we suspect a doctor is

23  involved in some type of fraud.  And the run is basically a

24  records check of how many claims have been filed, whether --

25  to that doctor.

1          If we do an address run, it can be a run on one

2   particular address to see how many claims have been filed at

3   that particular address.

4   Q.   So is it fair to say that that's a search that is run

5   through EDD databases?

6   A.   Yes.

7   Q.   So you would be searching for a particular address and

8   seeing how often it had come up or where it had come up?

9   A.   Correct.

10  Q.   Can -- now, are prison inmates eligible to receive

11  unemployment benefits?

12  A.   No, because they are unable to accept any work.

13  Q.   And at some point -- at some point in this case, was an

14  investigation referred to you for potential EDD unemployment

15  fraud?

16  A.   Yes, by my supervisor.

17  Q.   Okay.  And what was your understanding of what you were to

18  investigate in this case?

19  A.   Initially, I was told to focus on particular addresses of

20  where the records checks or the runs, the address runs, had

21  already been done, and there were some red flags about two

22  particular addresses, that several claims had gone to these

23  two particular addresses.  And so I was told to focus on those

24  addresses to begin with.

25  Q.   And do you recall what those addresses were?

2389

1   **A.**  Yes.  I remember it was on Morena Boulevard, Spaces 108

2   and 109 in San Diego.  I don't remember the address numbers.

3   **Q.**  Okay.  Would that be 1395 Morena Boulevard?

4   **A.**  Yes.

5   **Q.**  Okay.  And you said Spaces 108 and 109.

6   **A.**  Yes.

7   **Q.**  What does that indicate to you?

8   **A.**  A mobile home community.

9   **Q.**  And did you end up investigating claims related to those

10  addresses?

11  **A.**  Yes.

12  **Q.**  And what steps did you -- what were your first steps that

13  you took, to the extent you haven't already discussed them?

14  **A.**  Just to have -- to have the run -- the runs or the records

15  checks done on those particular two spaces to see how many

16  claims came back to those particular two spaces.

17       The reason that we were looking at them was because

18  typically you average in one particular home, uh -- I mean,

19  average would be two to maybe ten adults, at the most, that

20  live at the residence.

21       Between those two spaces, there were 34 claims filed

22  total, which is a large number of claims to go to one address.

23  Because typically you wouldn't find that that many adults live

24  at one -- one or two locations, even.

25  **Q.**  And so who did you ask to do this run on these addresses?

1   **A.**  We have what's called a CIU unit.

2   **Q.**  What's that?

3   **A.**  I don't recall what it stands for, but they are basically

4   responsible for our records checks that we request.

5   **Q.**  And when you request them, they then gather up documents

6   and provide them to you?

7   **A.**  Yes.  There's -- there's those, and then there's also the

8   unemployment division that we can go through.  And they can --

9   they can -- they can provide the address runs, and then they

10   also provide all the documents pertaining to each claim.  So

11   we'll receive a copy of the claim, any notes that are attached

12   to the claim based on any activity that has occurred during

13   the course of the claim.

14   **Q.**  What sort of activity?

15   **A.**  If the claimant has possibly called into EDD and spoken

16   with someone in claims or an analyst, sometimes that person

17   will note that in the notes.  And so they provide us with

18   those notes so that we can see what's been going on during the

19   course of the claim.

20   **Q.**  And what other documents would you be provided with?

21   **A.**  We would receive the application.  There are forms --

22   there's certification forms that the claimant has to supply to

23   EDD every two weeks.  And basically, they have to certify --

24   if they're receiving unemployment benefits, they have to

25   certify every two weeks with EDD that they are still not

1   working and still -- and still eligible to receive those

2   benefits.  So they have to report if they are working, if they

3   have looked for work, if they've accepted work or not, and if

4   they have, how many hours have they worked and who the

5   employer is.

6   Q.  Do you also receive documentation related to address

7   changes?

8   A.  Yes.

9   Q.  What does that look like?

10  A.  Those would be part of the notes that I referred to.  And

11  so if a claimant were to call into EDD and change their

12  address, it would reflect on those notes.

13  Q.  Okay.  So you mentioned that you found 34 claims related

14  to these two addresses.

15          Did you have a chance to review the names on those

16  claims?

17  A.  Yes.

18  Q.  And on that list of people, did you see the name

19  John Stinson?

20  A.  Yes.

21          MR. REED:  Objection.  Hearsay.

22          THE COURT:  Overruled.

23  BY MR. CONOLLY:

24  Q.  And how much had -- how much did the claims indicate

25  Mr. Stinson had been paid?

DX Ganza E

2392

1    **A.**  Uh, approximately 19,000.

2           MR. REED:  Objection.  Actually, I'll deal with it on

3    cross.  I apologize, Your Honor.

4    BY MR. CONOLLY:

5    **Q.**  And on those -- the claim -- in the claims that you

6    reviewed, did you see the name Francis Clement?

7    **A.**  Yes.

8           MS. DE SALES BARRETT:  Objection.  Your Honor, may we

9    approach?  We had this conversation before.

10          THE COURT:  Right.  I think it is a different area.

11          MS. DE SALES BARRETT:  Yes, Your Honor, but --

12          THE COURT:  I understand what you're raising.  The

13   objection is overruled.

14          Go ahead.

15   BY MR. CONOLLY:

16   **Q.**  And how much had Mr. Clement been paid in benefits?

17   **A.**  He did not receive any benefits.

18   **Q.**  Okay.  And did you see the name Brian Rapinoe?

19   **A.**  Yes.

20   **Q.**  And how much had he been paid?

21   **A.**  Approximately 38,000.

22   **Q.**  And, sorry, you mentioned a zero dollar amount paid to

23   Mr. Clement.  Are all claims filed paid?

24   **A.**  No.  They'll go through a claims process, and in that

25   claims process, they'll determine whether the claimant is

1   eligible or not to receive benefits.

2   **Q.**  And just to clarify, these were three of the names that

3   returned to the addresses Morena Boulevard, Number 108 and

4   109?

5   **A.**  Yes.

6   **Q.**  Okay.  But you said there were 34 names to those

7   addresses, so there were approximately 30-some other names; is

8   that fair to say?

9   **A.**  Yes.

10  **Q.**  Okay.  And when you did that run of claims, you mentioned

11  that you received documents in response --

12  **A.**  Yes.

13  **Q.**  -- from other departments within EDD?

14  **A.**  Yes.

15  **Q.**  And those are documents on which you typically rely when

16  you're doing your investigation?

17  **A.**  Yes.

18  **Q.**  And in -- you had a chance to review those documents as

19  you were doing your investigation, correct?

20  **A.**  Yes.

21  **Q.**  Okay.  If I could have you turn in the binders -- I

22  believe it's Binder 2 of 2.  If you can please turn to

23  Tab 1417.

24  **A.**  Okay.

25  **Q.**  And if you could look at Tabs -- the documents behind

DY Ganza C

2394

1    Tabs 1417 through 1421, please.

2    **A.**   Did you want me to look at all or go one by one?

3    **Q.**   If you could take a quick look at all five of those

4    documents, please.

5    **A.**   Okay.

6    **Q.**   And do you recognize these documents?

7    **A.**   Yes.

8    **Q.**   And are they documents that you received in the course of

9    your investigation?

10   **A.**   Yes.

11   **Q.**   And are they accurate copies of those documents, as best

12   you see them?

13   **A.**   Yes.

14   **Q.**   Okay.  And did you -- do you alter these documents in any

15   way after you receive them?

16   **A.**   No.

17          MR. CONOLLY:  Okay.  Your Honor, at this time I would

18   move to admit Exhibits 1417 through 1421 and to have

19   permission to publish them to the jury.

20          THE COURT:  Objections?

21          MS. DE SALES BARRETT:  Objection, Your Honor, to 1417

22   through -19.

23          THE COURT:  Ms. Luem, any objections?

24          MS. DE SALES BARRETT:  There's no supporting that the

25   named person --

2395

1          THE COURT:  I think we're going to talk about that in

2     just a second.

3          Ms. Luem, do you have comments?

4          MR. VILLA:  We join, Your Honor.

5          THE COURT:  All right.  Mr. --

6          MR. REED:  Join, Your Honor.

7          THE COURT:  All right.  Counsel, let's talk about

8     this at sidebar.

9          MR. CONOLLY:  Okay.

10        (Sidebar commences.)

11         THE COURT:  All right.  So as I understand the state

12    of affairs, Mr. Rapinoe has said he used this address -- these

13    space numbers to submit these EDD claims with names provided

14    by, at least, Misfit.

15         MS. DE SALES BARRETT:  Yes, uh-huh.

16         THE COURT:  Uh, so these documents are not offered

17    for the truth; is that true?

18         MR. CONOLLY:  That -- that is correct, Your Honor.

19    As far as the information that the user has inputted.  In this

20    case here, these documents are business records, which have

21    been adopted by the entity in the normal course of their

22    investigation.

23         She, as a custodian of these documents, is saying,

24    This is what the documents looked like as I received them.

25         THE COURT:  All right.  Comments.

1           MS. DE SALES BARRETT:  Yes, Your Honor.  First of

2    all, the documents are being offered for the truth of the

3    document itself.  And the name on the -- of the individual, of

4    Mr. Clement, on this document is false.  He never filed it.

5    There's no evidence that he filed it.  In fact, his name is

6    spelled wrong on the document.  So we object to these

7    documents being produced.  There's no reason for producing

8    them.  She's already testified to the procedures and to how

9    it's done.  And, you know, so we object to having documents

10   with Mr. Clement's name on them.

11          THE COURT:  Mr. Villa, you objected as well.  I don't

12   know what your standing is, but I want to hear.

13          MR. VILLA:  I just -- I join Ms. Barrett in the same

14   reason, Your Honor, and I think there's -- well, whether or

15   not it's a business record, there's hearsay information that's

16   put on that this witness cannot authenticate or justify.

17          THE COURT:  Again, as I understand it, the documents,

18   business records, the contents, are not offered for the truth

19   because we know there's no dispute.  None of these people here

20   filled these documents out.  We know, at least from

21   Mr. Rapinoe's testimony, that he did it.  And so I guess I'm

22   still troubled by what the basis is.

23          Mr. Reed, do you have comments?

24          MR. REED:  No.  I -- if you're going to make standing

25   the issue, I don't have standing --

1          THE COURT:  I'm not going to do that.

2          MR. REED:  -- I don't have a standing.

3          THE COURT:  I mean, there's still a Count 1 issue

4   because --

5          MR. REED:  Right.

6          THE COURT:  So to that the extent, anybody can say

7   whatever they want.

8          MR. REED:  I don't know that I would appreciate the

9   custodian of records.  It appears, though, this is something

10  that was sent to her and she's relying on it.

11         MR. CONOLLY:  Well, she is indeed relying upon it.

12  She becomes the custodian of the investigation records, but in

13  addition to that, she's getting it from what she understands

14  to be a reliable custodian within the department.  We believe

15  that is sufficient.

16         MR. REED:  These are not the investigation records.

17  These are the records that instigated the investigation.  The

18  investigation records, we do not have.

19         MR. CONOLLY:  They -- they become the -- but they've

20  been incorporated into her investigation.  She said she

21  reviewed them as part of that investigation.

22         MR. REED:  Okay.  All right.  But we do not have the

23  investigation records.  You would agree with that, right?  We

24  don't have a report written by her, right?

25         MR. CONOLLY:  I'm not aware of a report.

1          MR. REED:  We'll find out in five minutes when I ask

2     her, but we don't have one.

3          MR. CONOLLY:  All right.

4          THE COURT:  All right.  At this time, the objection

5     is overruled.

6        (Sidebar ends.)

7          THE COURT:  So 1417 to 1421 will be admitted.

8        (Government's Exhibits 1417 to 1421 were received.)

9          MR. CONOLLY:  I'm sorry, just to clarify, that was

10        1417 through 1421?

11          THE COURT:  Correct.

12          MR. CONOLLY:  Thank you.

13          Could we have Exhibit 1417 up on the screen, please.

14          And if we could zoom in on the text part of the

15     document, please.

16     BY MR. CONOLLY:

17     **Q.**  Can you tell us, please, what we're looking at?

18     **A.**  Is this -- this would be one of the two-week certification

19     forms that was completed.  Appears to be handwritten, so it

20     was likely mailed in.  And these are completed by each

21     claimant, and they have to -- they have to provide answers to

22     the Questions 1 through 6 on the --

23          MS. DE SALES BARRETT:  Objection, Your Honor, to

24     "completed by each claimant."

25          THE COURT:  Will you clean that up, Mr. Conolly.

1            The objection is sustained.

2            MR. CONOLLY:  Certainly.

3   BY MR. CONOLLY:

4   Q.  Is it the understanding -- sorry.  Is it your

5   understanding and from language on this form that it is

6   supposed to be the claimant who is filling out this form?

7   A.  Yes.

8   Q.  And the signature there at the bottom is intended to

9   indicate that it is, in fact, the claimant filling out the

10  form?

11  A.  Yes.

12  Q.  Thank you.

13            With this form in --

14            MS. DE SALES BARRETT:  Objection.

15            THE COURT:  One second, Mr. Conolly.

16            MS. DE SALES BARRETT:  Objection, Your Honor.

17  Misrepresentation of the facts.

18            THE COURT:  I think we need another question on this,

19  Mr. Conolly.  I agree.

20  BY MR. CONOLLY:

21  Q.  It is your understanding from this form that, by its

22  language, it indicates that the claimant is supposed to be the

23  one filling out the form; is that correct?

24  A.  Yes.

25  Q.  And could you read for us, please, the paragraph just

DX Garza C

2400

1  above the signature at the bottom?

2  **A.**  It states:

3        "I understand the questions on this form.  I know the

4        law provides penalties if I make false statements or

5        withhold facts to receive benefits.  My answers are

6        true and correct.  I declare under penalty of perjury

7        that I am a US citizen or national or an alien in

8        satisfactory immigration status and permitted to work

9        by USCIS.  I signed this form after the latest date

10       for I which am claiming benefits."

11 **Q.**  And is it --

12       MS. DE SALES BARRETT:  Objection, Your Honor.  It

13 still doesn't clarify the issue.

14       THE COURT:  Right.  I think we're going to go to

15 another question.

16 BY MR. CONOLLY:

17 **Q.**  But you yourself don't know who is actually filling out

18 the form, correct?

19 **A.**  Correct.

20 **Q.**  And the -- in a form like this, would you have -- or in

21 the file that this certification would be in, have you matched

22 the name with a social security number?

23 **A.**  Yes.

24 **Q.**  Okay.

25       MS. DE SALES BARRETT:  Objection, Your Honor.

PX Ganza C

2401

1          THE COURT:  The legal grounds?

2          MS. DE SALES BARRETT:  Pardon me, Your Honor?

3          THE COURT:  What are the legal grounds?

4          MS. DE SALES BARRETT:  It's still misrepresentation

5    of the fact here.

6          THE COURT:  Which you can bring up on

7    cross-examination.

8          Overruled.

9          Go ahead.

10   BY MR. CONOLLY:

11   **Q.**  In your experience with EDD fraud, does it -- does it

12   happen that people committing fraud will fill out forms in

13   other people's names?

14   **A.**  Yes.

15   **Q.**  And I believe that this exhibit is multipage.

16          MR. CONOLLY:  If we could go to the next page of it,

17   please.

18   BY MR. CONOLLY:

19   **Q.**  And so this -- this is another certification from the same

20   file?

21   **A.**  Yes.  Different dates.

22   **Q.**  Okay.  And how often do you say these certifications

23   needed to be filled in?

24   **A.**  Every two weeks of -- if you look at the form, to the

25   right, it labels it first week and second week, and it will

DX Ganza E

2402

1  provide the dates that each week begins and ends.

2  **Q.**  The screen is a touch screen.

3         MR. CONOLLY:  Could we zoom in on the text, please.

4  BY MR. CONOLLY:

5  **Q.**  And the screen is a touch screen.  If you can just circle

6  the -- once it's zoomed in.

7  **A.**  Okay.

8  **Q.**  Could you circle the dates you were just referring to

9  there.

10  **A.**  Yes.  (Witness complies.)

11  **Q.**  So I'd just like the record to reflect the witness has

12  circled what is labeled as the first week and the second week

13  at the top right of the form.

14         Under the dates that you've just circled, what are

15  those "yes" "no" boxes?  What -- what are they for?

16  **A.**  Those are to answer Questions 1 through 6 that are listed

17  on the left.

18  **Q.**  Okay.  And what do those questions, just in brief, what do

19  those questions look for?

20  **A.**  It asks if the employee or the claimant is able to work

21  and if they have been working for work and if they've accepted

22  work or refused work.

23  **Q.**  And the claimant needs to -- these certifications need to

24  be sent in every two weeks, you mentioned?

25  **A.**  Yes.

1          MR. CONOLLY:  If we can just have the next page, and

2     we won't do every page.  I just wanted to clarify something.

3          And if we can zoom in, please.

4     BY MR. CONOLLY:

5     Q.  It looked like on the last form none of the boxes had

6     actually been written in.  But in this one they -- they have

7     been.

8          MR. CONOLLY:  Thank you.

9     BY MR. CONOLLY:

10    Q.  So here we see the "yes," "no" answers of whoever it is

11    that's filling out this form?

12    A.  Yes.

13    Q.  And down here in the middle of this table, I'm circling

14    the words "self" in both lines.  What do those indicate?

15    A.  That would imply that the person filling out the form is

16    alleging that they are self-employed.

17    Q.  And in this -- this box to this column to the right of

18    that, can you tell us, please, what that indicates?

19    A.  So that would indicate that the person filling out the

20    form was no longer able to work due to the COVID pandemic.

21          MR. CONOLLY:  If we can have Exhibit 1418 on the

22    screen, please.  If we can zoom in on the top half of that

23    page, please.

24    BY MR. CONOLLY:

25    Q.  Can you tell us, please, what this document is?

1   **A.**  So this would be part of the notes that I mentioned

2   earlier that the unemployment unit provides when we request

3   documentation, and this would be an address change that was

4   completed.  Sorry.

5         So initially -- so the claimant name on this form is

6   provided as Francis Clement.  So it would show at some point

7   that his address was 1395 Morena Boulevard, Number 108 in

8   San Diego, and then effective on November 18th of 2020, he

9   changed it to the address of 5230 Fiore Terr, Apartment K118

10  in San Diego.

11  **Q.**  Okay.  So approximately nine, nine and a half months,

12  then, after the original claim was filed, this address changed

13  was requested?

14  **A.**  Correct.

15  **Q.**  And, again, you don't know from work or do you know from

16  these notes who specifically requested that change?

17  **A.**  No, I do not.

18         MR. CONOLLY:  All right.  If we could move on to

19  Exhibit 1419, please.  If we can zoom in on the text.

20  BY MR. CONOLLY:

21  **Q.**  Can you tell us, please, what that document is?

22  **A.**  Yes.  So this is the initial online application for

23  Francis Clement.  This would be the initial application filed

24  to file the claim with the EDD.

25  **Q.**  And so sort of in the middle near the top, I'm circling

2405

1    the mailing address.  That's the address of

2    1395 Morena Boulevard, Space 108, correct?

3    **A.**  Yes.

4    **Q.**  Okay.  And, again, you -- would you have any way of

5    knowing looking at this who actually filled out the form?

6    **A.**  No.

7    **Q.**  And -- do these -- sorry.

8         MR. CONOLLY:  If we can still -- yes, Exhibit 1419

9    up, please.

10   BY MR. CONOLLY:

11   **Q.**  Does it give a reason either on this page -- and this is

12   also a multipage document -- either on this page or on

13   following pages, does it give a reason that the person filling

14   out the form is claiming unemployment?

15   **A.**  Yes.  It should be on the next page, I believe.

16   **Q.**  Okay.

17        MR. CONOLLY:  If we can go to the next page.

18   BY MR. CONOLLY:

19   **Q.**  And you can also follow along in the binder if that's

20   easier.  It's 1419.

21        MR. REED:  I think that was 1419.  The next page was

22   1420.

23        MR. CONOLLY:  No, it would be page 2 of 1419.

24        MR. REED:  I see what you're saying.

25        MR. CONOLLY:  If we can zoom in.  Thank you.

1    BY MR. CONOLLY:

2    **Q.**  Do you see on here a reason for claiming eligibility for

3    unemployment benefits?

4    **A.**  Yes.  It shows reason not working is laid off or no work

5    due to the COVID pandemic.

6    **Q.**  Okay.  On the screen in front of you, could you either

7    circle or underline what you have just read?

8    **A.**  (Witness complies.)

9    **Q.**  Okay.  Thank you.  Just let the record reflect that in the

10   upper right of the screen, under "reason not working," it says

11   "laid off/no work."  And then next to the heading

12   "Self-Attestation Type" it reads:

13          "You had a definite date to start a job but cannot

14          reach that job as a direct result of the COVID-19

15          public health emergency."

16          MR. CONOLLY:  And we may -- if we can go back to the

17   previous page, please.

18   BY MR. CONOLLY:

19   **Q.**  Is there somewhere on the form that it indicates the

20   original date of the claim?

21   **A.**  Yes.  So it was submitted on July 31st of 2020.  Uh, that

22   might not necessarily be the actual claim date, though.

23   **Q.**  What might determine whether there was a difference

24   between the submitted date or the actual claim date?

25   **A.**  So sometimes if a claimant has waited a few weeks to file

DX Ganza C

1    the claim, but they show the last day worked, sometimes the

2    claim date will go back to the last day that was worked and

3    the benefits will begin that date.  So sometimes the benefits

4    will be retroed back to the date that they stopped working.

5    But if they waited a week or two to actually submit it, then

6    they will get the money for the time that they waited or the

7    benefits for the time they waited.

8    **Q.**  And so in the address change form we saw an original date

9    of February of 2020 when the original address was submitted.

10   This is obviously, you know, a few months after that.  Is it

11   that kind of delay that might cause this difference in dates?

12   **A.**  Yes.

13         MR. CONOLLY:  All right.  We can take that down,

14   please.  And I just have two more documents to show you.

15         If we could have Exhibit 1420 on the screen, please.

16   If we could zoom in on that top portion, please.

17   BY MR. CONOLLY:

18   **Q.**  So this looks similar to an exhibit we were just looking

19   at.  Can you tell us, please, what this is?

20   **A.**  Yes.  This would also be a part of the notes that we

21   request from unemployment.  And this particular claimant is

22   for a John Stinson.  And at some point he initially -- it was

23   initially filed that he lived at 1395 Morena Boulevard

24   Number 109 in San Diego.  And effective June 13th of 2020 his

25   address was changed to 1395 Morena Boulevard, Space 108 in

1   San Diego.

2   **Q.**  So same street number but moved to a different space, fair

3   to say?

4   **A.**  Correct.

5          MR. CONOLLY:  Thank you.  If you could take that

6   down, please, and put up Exhibit 1421.  If we could zoom in on

7   the text.

8   BY MR. CONOLLY:

9   **Q.**  So can you tell us, please, what this document is and

10  whose name is on it?

11  **A.**  Yes.  This is another claim filed, the initial application

12  by -- claimant name is John Stinson.

13  **Q.**  And we see here next to mailing address, what I'm circling

14  is that same address at 1395 Morena Boulevard, Number 109?

15  **A.**  Correct.

16  **Q.**  And does it -- and on the second page would it also give a

17  reason for claiming unemployment?

18  **A.**  Yes.

19          MR. CONOLLY:  And if we could have the second page,

20  please.  And if we could just zoom in on the text as best we

21  can.

22  BY MR CONOLLY:

23  **Q.**  And so I'm circling next to reason for not working and I'm

24  circling the self-attestation type.  Is it fair to say that

25  those are the same as the last -- the last one of these online

DX Ganza E

2409

1    application reports that we saw, that those are the same?

2    A.   Yes.

3    Q.   So the reason for not working "laid off/no work," and the

4    self-attestation type is -- the text is:

5           "You had a definite date to start a job that is no

6           longer available as a direct result of the COVID-19

7           public health emergency"?

8    A.   Correct.

9    Q.   On this form would it also indicate who the person's

10   employer is or was?

11   A.   Yes, it can.

12   Q.   And where would we see that?  And if it's not on this

13   page, I'm happy to turn to another page.

14   A.   It's possibly on the next page, if one was provided.

15           MR. CONOLLY:  Okay.  If we can have the --

16           THE WITNESS:  I can look.

17   BY MR. CONOLLY:

18   Q.   Okay.  Do you see it there?

19   A.   Yes.

20           MR. CONOLLY:  Okay.  If we could have page 3 up,

21   please.  If we could zoom in, please.

22   BY MR. CONOLLY:

23   Q.   Can you circle on the screen, please, where you see that

24   information?

25   A.   (Witness complies.)

Garza

2410

1   Q.  Okay.  So next to "Ownership Code" it says, "private

2   employer," which you've circled, and then "What is your usual

3   occupation?  Janitorial assistant."  And then next to "Other

4   skills" it says, "supervisor or janitorial service."

5         Once again, is that -- is that information that is

6   filled out -- sorry.  Is that information that is generated by

7   the person who is filling out the form?

8   A.  Yes.

9   Q.  And in your experience, it is -- with fraud, it is common

10  for fraud that other people, other than the ones who are named

11  in these documents, are the ones filling out these forms?

12  A.  Correct.

13  Q.  And then the address they include, is that -- is the

14  mailing address which is not verified, is that -- is that

15  where they would receive the benefits if the claim is

16  accepted?

17  A.  Yes, correct.  Once the benefit is sent out, it's sent to

18  the mailing address provided on the application.

19         MR. CONOLLY:  Okay.  Just one moment, Your Honor.

20         Thank you, Your Honor.  I have no further questions

21  for Ms. Garza.

22         THE COURT:  Ms. Reed --

23         MR. REED:  Yes, Your Honor.

24         THE COURT:  -- I think we might need to have a break

25  at this time, unless you're just going to be a couple minutes?

1          MR. REED:  They need a break.

2          THE COURT:  Okay.  Let's go ahead and take a break.

3    Let's just go at this point, say, about 15 minutes?  All

4    right.  That will put us at 20 till.

5        (Jury exits the courtroom at 9:24 a.m.)

6          THE COURT:  All right.  Let's go ahead and take a

7    break.

8          MS. STOKMAN:  Just before we do that, I just wanted

9    to inform everybody that there was no cooperation agreement in

10   the Southern District of California for the witness.

11         THE COURT:  All right.  Could I get a copy of that

12   grand jury testimony then, so I can take a look at what we're

13   talking about?  But let's take the break.

14       (Recess held.)

15         MS. LUEM:  And, Your Honor --

16         MR. VILLA:  Your Honor, I assume --

17         MS. LUEM:  -- the two reports who, I think, your law

18   clerk -- that we received in the *Jencks* production concerning

19   Mr. Rapinoe, and I just emailed them earlier.  I'm not sure if

20   they've come through to you.

21         THE COURT:  I don't need them.  We need the Bates

22   number so that we can all be on the same page.  And so

23   Ms. Stokman is working on that.

24         MS. STOKMAN:  I think the ones that she's referencing

25   probably are the exact reports, so those Bates numbers are

1    what they -- they are our line 99 and 42, I believe.

2              MS. LUEM:  I believe so.  Yeah, I just emailed them

3    earlier.  And the witness is not referenced by name, he's

4    referenced by his CI number.

5              THE COURT:  Are there other references to the CI

6    number someplace else so that that can be tied up?

7              MS. STOKMAN:  Judge, it's -- so there's two levels to

8    this.  One is that it references an informant.  The informant

9    is the applicable information that should trigger the request

10   long ago for a CI file.

11             When that was produced the file path on the Excel

12   spreadsheet that documented what each document was, was under

13   the name of Brian Rapinoe so that it would be going to his

14   *Jencks* material.

15             That also -- those ROIs, also have screenshots of the

16   text messages between the witness and Defendant Clement that

17   the Court saw and the jury saw and counsel saw here as entered

18   into evidence.  And so that point, it was -- the link has been

19   shown through the production that the government gave.  And in

20   any event, it was very apparent that there was an informant

21   involved in that buy.

22             THE COURT:  Okay.  We're going to --

23             MS. LUEM:  Not a paid informant.

24             THE COURT:  We're going to take a break.  Mr. Johnson

25   is here but Mr. Clement has stepped out and I don't know if he

1    wants to be here for this, so we do need to take the break,

2    unless you're saying he doesn't --

3            MS. FISHER-BYRIALSEN:  You can go ahead.  That's

4    fine.

5            THE COURT:  All right.  Ms. Luem, what were you

6    saying?

7            MS. LUEM:  There is no reference to him being a paid

8    informant.  There's a lot of confidential informants in this

9    case, Judge, and there's not a reference in either one of

10   those ROIs that he's being paid for his cooperation.

11           THE COURT:  But that's not what I heard you say

12   originally.  What you said was you wanted the cooperation

13   agreement.  And I guess what you're trying to say is, a

14   cooperation agreement in which someone is paid looks different

15   than a cooperation agreement when there's not being paid?

16           MS. LUEM:  Right.  It was actually Ms. Clement's team

17   that asked for the cooperation agreement.  I was asking for

18   his ATF contract when they signed him up to be a paid

19   confidential informant, which is something different.

20           THE COURT:  Right.  I'm sorry, I misspoke.  But

21   you're saying that what you have heard so far, the fact that

22   if you connect the dots you get to the particular informant,

23   that there is a different -- that you, in this trial, learn

24   that the person is being paid.

25           How would the steps have been different had you known

1  that earlier on that the person was paid as opposed to not

2  being paid?

3       MS. LUEM:  I would have demanded his contract with

4  ATF, signing him up to be a paid confidential informant.

5       THE COURT:  What would have been the difference in

6  the steps you would need to take for an informant who is paid

7  or not paid?

8       MS. LUEM:  Well, there's -- there's a contract that

9  they sign, an agreement that they make.

10       THE COURT:  No.  I'm sorry, I'm not being clear.

11       MS. LUEM:  No.

12       THE COURT:  For you to get eyes on that document how

13  would the process have been different had you known earlier

14  that the person had been paid?

15       MS. LUEM:  I would have asked the government.

16       THE COURT:  No.  All right.  Anything else, Ms. Luem?

17       MS. LUEM:  No.  I mean, I'm not sure if I'm

18  misunderstanding your question.  I mean, if I had known then

19  that he was being paid, I would have asked the government.

20       THE COURT:  I think you are misunderstanding my

21  question.  So what you're saying is, had you known that the

22  person was paid, you would have sought it.  I understand that.

23       MS. LUEM:  Correct.

24       THE COURT:  What I was trying to is ask you is, how

25  would that process have changed?  Because I'm hearing from

1    Ms. Stokman that the process is you make a request, there's

2    some process, you go down and look at it, and you -- that

3    process, as you understand it, is the same regardless of

4    whether the informant is paid or not paid.  Is that true?

5              MS. LUEM:  No.

6              THE COURT:  Then how is the process different if the

7    informant is paid versus not paid?

8              MS. LUEM:  In my experience, when I find out, and

9    it's happened during trial before, that an informant had been

10   paid for their cooperation, I ask the government to provide

11   their contract with the agency that they were working with,

12   and the government then retrieves that, makes whatever

13   redactions they deem necessary or provides it to the Court,

14   and then that's given to me for cross-examination of that

15   particular witness.

16             THE COURT:  I think I'm not being clear.  I guess,

17   Ms. Stokman, if an informant is not paid, is this agreement

18   still in existence?

19             MS. STOKMAN:  Yes.  And there's no change whether

20   they are paid or they are working off a case.  That has to do

21   with the motivations for coop- -- being an informant.  And I

22   think we're mistaking what a cooperator versus a CI is.  And a

23   CI means that there is a formal contract with a law

24   enforcement agency, which is what is notated within the ATF

25   reports that were produced in early November.

1          MS. LUEM:  It's not notated in the reports that it

2    was a paid --

3          THE COURT:  Right.  I understand that your interest

4    in this has been piqued, and it wasn't piqued before until you

5    learned that the person had been paid.

6          MS. LUEM:  Correct.

7          THE COURT:  You now received the receipt showing

8    whatever that payment was, so you -- and you heard testimony

9    that the person has been paid.  And so now you're making that

10   request.

11         MS. LUEM:  I am.

12         THE COURT:  The government's argument was that this

13   request could have been made before now because you knew that

14   there was an agreement.  And you're just saying, Well, it

15   wasn't interesting to you until you found out that he was

16   being paid.

17         MS. LUEM:  I did not know that there was an agreement

18   for him to be paid.  I understand that --

19         THE COURT:  I understand.  What I'm saying, though,

20   is -- what I'm hearing from the government is the agreement is

21   the same except for what the benefits are set forth in the

22   agreement.

23         If you're being paid, they are going to say you're

24   getting paid.  If you're not being paid, they are going to

25   list whatever benefits you're getting.

1          And you're saying, though, you didn't have a reason

2    or interest in getting or looking at that agreement until you

3    learned that the witness had been paid.  Am I understanding

4    you correctly?

5          MS. LUEM:  That he was a paid confidential informant

6    as opposed to a confidential informant who was working off a

7    case or something to that effect, yes.  I think it's a

8    different contract that's signed.

9          THE COURT:  I'm hearing that it's not.  You seem to

10   say that there is a different contract depending on what the

11   benefit is.

12         MS. LUEM:  That's always been my understanding.

13         MS. DE SALES BARRETT:  Your Honor, if I may.

14         THE COURT:  Yeah.

15         MS. DE SALES BARRETT:  It is not our obligation to

16   find out what is *Jencks*, what is *Giglio*, and what is *Brady*

17   material in the government's file.  It is their obligation to

18   search their files and their obligation to put two and two

19   together to get four that they have material for

20   cross-examination in their file.

21         They had it.  They didn't look for it.  They knew he

22   was paid.  They knew all of this.  And now we're saying that

23   we're going to hold it against the defendants because their

24   lawyers did not figure out that he was a paid informant?

25         THE COURT:  No.  I'm just trying --

2418

1          MS. DE SALES BARRETT:  It's outrageous.

2          THE COURT:  -- to get the facts, and I can't figure

3     it out.  So, Ms. Barrett, maybe you can help me.

4          What I understood, and I'm just trying to understand

5     the context here, is there was information produced at some

6     point that this person was a confidential informant.  And

7     apparently, there was some steps to look through that could

8     have gotten the issue raised before now.

9          Then I hear, but it wasn't interesting or it wasn't

10    of use to the defense until it was learned that the witness

11    was paid.

12         MS. DE SALES BARRETT:  Well --

13         THE COURT:  I'm not asking questions anymore except,

14    do I understand the facts correctly?

15         MS. DE SALES BARRETT:  No.

16         THE COURT:  Okay.  Where --

17         MS. DE SALES BARRETT:  That is -- because that is not

18    why the request is being made, from my perspective --

19         THE COURT:  Okay.

20         MS. DE SALES BARRETT:  -- now.  The request is being

21    made, from my perspective, because I did not figure it out.

22    It is not -- it is not because I missed something or there was

23    something there.

24         THE COURT:  I'm not -- I'm not trying to argue or

25    make anyone defensive.  I'm just trying to figure out the

1    basic framework, and I think maybe the way I'm asking it is

2    causing defensiveness.  I'm just trying to figure out what has

3    happened and what to do from now.

4         So I understood it differently.  Maybe it's just

5    because Ms. Luem had a different argument.

6         You're saying, I should have just gotten the

7    agreement without being requested.

8         Ms. Luem, I understood what you were saying was,

9    yeah, you knew there was a confidential informant, but until

10   you knew that he was paid, that agreement just didn't mean

11   anything to you.  You weren't seeking it at that time, and now

12   you are.

13        MS. LUEM:  Well, I think we were always seeking

14   benefits that were received by cooperators.  Certainly I think

15   all of our previous discovery motions have suggested as such.

16   And I think it's -- because of the number and nature of these

17   witnesses, it's unclear which ones we have cooperation

18   agreements for and which we do not.

19        When he said that he was paid, and I realized we

20   didn't have any receipts, then I think that there was -- there

21   was more inquiry on my part as to the level of his

22   participation.

23        I reached out to Ms. Barrett, and she said that there

24   was not, in fact, any cooperation agreement for this witness

25   in our file.  Because frankly, he wasn't on my radar because

1   he was not implicating Mr. Johnson to the extent that he was

2   Mr. Clement.

3        So I think we're making those requests now, and I

4   don't think timeliness is an issue.  The witness is on the

5   stand, and we can make the request at any point.

6        THE COURT:  So, Ms. Stokman, I think I now understand

7   the argument that they are making is that this is material

8   that should have been produced with *Jencks* because it does --

9   it identifies benefits the witness may receive.

10        And I had understood what you were saying before is,

11   We only have to give them notice it exists, then they have to

12   inquire further and actually get eyes on it, according to this

13   process.

14        The argument as I understand it now is, No, no, no.

15   They don't have to do that.  You have to do it.

16        MS. STOKMAN:  Judge, it's never -- I don't know --

17   and I know this is true for every agency that deals with

18   confidential informants.  A confidential informant file is

19   extremely protected, to the point where US Attorneys' Offices

20   have to make the same request of the agents in order to view

21   those files.

22        And so those files are never part of a *Jencks*

23   production, but they are available if the process is gone

24   through in the way that it needs to for counsel to sit with

25   the agent and view in the agent's presence, and then that file

1    stays.  It never leaves the agency under which it exists.

2           And I know this is true for ATF because that's the --

3    that's the agency at issue here.  But this is also true at

4    FBI, DEA.  They do not produce informant files on the regular

5    because of the confidential nature of what those contain.  And

6    those are always available to be viewed at request of counsel

7    when it comes to any stage of an investigation or a case

8    leading to trial and up to trial.

9           THE COURT:  All right.  Ms. -- Ms. Luem.

10          MS. LUEM:  That's just not my experience, Judge.

11   I've had this exact issue happen during trial, mid-trial with

12   an informant.

13          THE COURT:  Okay.  Mid-trial.  I'm talking about

14   before trial.  Are these, in your experience, these -- these

15   agreements produced with *Jencks*?  Or is it a situation which

16   you are in trial like we are now and then you go, Okay, yeah I

17   need that?

18          MS. LUEM:  The last time it happened, it was

19   mid-trial, and I did receive a copy of the contract -- the

20   informant contract.  I can't remember if it was

21   Homeland Security or ATF or which agency.  But --

22          THE COURT:  Okay.

23          MS. LUEM:  -- it was four or five --

24          THE COURT:  But in your experience, is it produced

25   with a *Jencks* production before trial?

2422

1          MS. LUEM:  I can only speak to the last time this
2     happened for me, and it was during trial that it -- it came
3     up.
4          THE COURT:  Ms. Barrett, have you had the experience
5     when this type of agreement was produced in *Jencks*, or is it a
6     process that we've heard described like Ms. Luem is talking
7     about?
8          MS. DE SALES BARRETT:  I haven't had a case in a
9     confidential informant in years.
10         THE COURT:  And when you did have one years ago --
11         MS. DE SALES BARRETT:  Was in state court.
12         THE COURT:  And when you had that case in state
13    court --
14         MS. DE SALES BARRETT:  I had --
15         THE COURT:  -- was it produced in pretrial or was it
16    produced when it was requested during trial?
17         MS. DE SALES BARRETT:  Well, I practice in the
18    great -- practiced before in the great State of New Jersey
19    where we had open-file discovery.  So I don't think it is
20    comparable to the federal system.
21         THE COURT:  Okay.
22         MS. DE SALES BARRETT:  I have not -- I have not, in
23    all honesty, had a confidential informant in a case that I can
24    recall and those cases were all -- excuse me, very few of
25    those cases were non-capital, non-death penalty cases.

1          THE COURT:  All right.  So I think where we are now

2     is the request has been made.  Can we make arrangements for

3     them to see the file if they choose to attend this afternoon?

4          MS. STOKMAN:  No, because division counsel needs to

5     be involved in that.  The agent is telling me that that can't

6     be done that quickly.

7          THE COURT:  Where is division counsel, and what

8     involvement does that person have to have?

9          MS. STOKMAN:  They're in Dublin, so up north.

10         THE COURT:  And what involvement does that person

11    have to have?

12         MS. STOKMAN:  They have to approve the viewing of the

13    file, which I believe means they have to review it themselves

14    first before they can approve that.

15         THE COURT:  All right.  So somebody needs to get on

16    the phone with that person, tell them that the Court is

17    ordering this to occur.  And if they have something that they

18    need to say, then we will certainly get them on the line and

19    take care of that.

20         In the meanwhile, I would suggest that counsel do

21    research, because I'm going to, too, to find out if this is

22    typical *Jencks* material.  If it is, we're talking about

23    something else.  If it's not, then we've maybe been spending a

24    lot of time talking about something that we didn't need to

25    talk about, meaning do I have to actually spend time about

1    whether the government has failed to produce according to the

2    law, or can we just focus on what has to happen going forward.

3         All right.  Since we've used up all of our time, we

4    do now need to take 15 minutes.  Okay.

5      (Recess held.)

6         MS. STOKMAN:  Judge, I have one thing before we let

7    the jury back.

8         THE COURT:  All right.

9         MS. STOKMAN:  Agent Gonzalez spoke with ATF counsel,

10   and we can send over the informant agreement, a blank one,

11   which is the exact same one that he signed.  This would be,

12   though, under protective order that the Court -- I would be

13   asking to issue orally right now.  They want it for attorneys'

14   eyes only.  That we can do.  And it was -- it's the exact same

15   one that he would have signed and initialed himself.

16        THE COURT:  Does it set forth monetary benefits or

17   anything like that?

18        MS. STOKMAN:  No, because that is not -- I mean, I

19   haven't read through this entire agreement, but Agent Gonzalez

20   is telling me that that wouldn't be detailed in the agreement

21   itself.  It just has conditions of what is expected.

22        THE COURT:  All right.  Let's go ahead and send that

23   over, and I will issue the protective order that that is for

24   attorneys' eyes only.

25        MS. LUEM:  And, Your Honor --

1           MS. DE SALES BARRETT:  Part of that, Your Honor --

2           MS. LUEM:  Sorry.

3           MS. DE SALES BARRETT:  -- will the witness

4   acknowledge that he signed an agreement just like that?

5           MS. STOKMAN:  Yeah.  I mean, he did, so he'll

6   acknowledge that he signed the agreement.

7           MS. DE SALES BARRETT:  He might not acknowledge it.

8           THE COURT:  Well, I mean, if he doesn't, the

9   government will make that representation, it sounds like.

10          MS. STOKMAN:  Yes.

11          THE COURT:  Okay.

12          MS. LUEM:  And, Your Honor, the problem that I have

13  with that, and I'm looking at that agreement right now,

14  because I happen to have it from another case, uh, a blank

15  version of that, there are portions where the informant has to

16  insert the activity or cooperating witness is expected to

17  accomplish.  And so I think there's information that's

18  contained within that report that could be impeachment

19  information, and I think that the Court should be allowed to

20  review that and determine whether or not that should be

21  released to us.

22          MS. STOKMAN:  Judge that's not how ATF's form reads.

23  I don't know what agency Ms. Luem is referring to, but that is

24  not what this one requires.  So I'm sending it now to

25  everybody, including the Court.

1          THE COURT:  I'm -- so it hasn't been sent.

2          So, Ms. Luem, you're looking at something other than

3     what Ms. Stokman is talking about?

4          MS. LUEM:  Yes.

5          THE COURT:  Okay.  Let's wait and get what she's

6     sending over, what Ms. Stokman is saying is what the witness

7     signed.

8          MS. LUEM:  This is -- the form I'm looking at says --

9          THE COURT:  Well, let's just wait.  Let's get the one

10    she's sending you.  It may not be the same.  I don't know.

11         MS. LUEM:  It's ATF Form 3252.2.

12         THE COURT:  And is that the one that she sent you?

13    Does that have that same number on it?

14         MS. STOKMAN:  This form is 325 -- I can't see the

15    file path, but there's no indications of anything other than a

16    signature and initials.

17         MS. LUEM:  Is it the same form?  3252.2?

18         THE COURT:  No.  Let's wait.

19         Have you received it from Mr. Stokman?

20         MS. LUEM:  No.

21         THE COURT:  Let's get that, and then you can compare

22    for yourself and raise that.  If it turns out we're looking at

23    two different things, then we're talking when the jury can be

24    in here, yeah?

25         All right.  Anything that we need to talk about at

CX Garza R

2427

1   this time?

2          MS. DE SALES BARRETT:  No, Your Honor.  Just for the

3   record, Your Honor, I spoke with Mr. Conolly during the break

4   and showed him a copy of the transcript of the grand jury

5   testimony of Mr. Rapinoe, and then I provided it to the Court.

6          THE COURT:  All right.  Thank you.

7          All right.  Let's go ahead and bring the jury in.

8       (Jury enters the courtroom at 9:59 a.m.)

9          THE COURT:  All right.  We have our jury members

10  back.

11         Thank you for your patience.  I'm sorry, one thing

12  just lead to another and time got away from me.

13         If we can have the witness retake her seat.

14                        CROSS-EXAMINATION

15  BY MR. REED:

16  **Q.**  Good morning.

17  **A.**  Good morning.

18  **Q.**  Is it Agent Garza, Investigator Garza, detective; which

19  one is it?

20  **A.**  Investigator is fine.

21  **Q.**  Investigator Garza.  Okay.

22         You currently are an investigator with the

23  California EDD program; is that right?

24  **A.**  Yes.

25  **Q.**  Okay.  Before that, you were a -- a -- excuse me -- a

CX Carranza R

2428

1   criminal investigator for the EDD program?

2   **A.**   I'm -- I'm currently a criminal investigator for EDD.

3   **Q.**   And before that, you were an insurance investigator?

4   **A.**   Detective, yes.

5   **Q.**   Well, were you working for the state at that time or --

6   **A.**   Yes, the California Department of Insurance.

7   **Q.**   Okay.  And then prior to that, you worked for?

8   **A.**   The Reedley Police Department as a patrol officer in

9   the --

10  **Q.**   That's where I missed it.  Someplace I never heard of.

11  You said Reedley?

12  **A.**   Reedley.

13  **Q.**   Somewhere around here, right?

14  **A.**   It is.

15  **Q.**   Yeah.  Okay.  Okay.  So how long have you been state

16  investigator with EDD?

17  **A.**   Two years.

18  **Q.**   So you would have been just coming on during the late

19  COVID thing that happened, right?

20  **A.**   Yes.

21  **Q.**   So you were not around when this investigation was being

22  done, the one that we're talking about?

23  **A.**   When it -- I don't know when this investigation started.

24  I know when I received it.

25  **Q.**   Okay.  So you were actually working for the state at that

2429

1   time?

2   **A.**   I began working for EDD in January of 2023.

3   **Q.**   All right.  Were you part of the task force?

4   **A.**   No.

5   **Q.**   You know what I'm talking about?

6   **A.**   No.

7   **Q.**   Okay.  Well, if I were to state that a whole bunch of

8   state money got stolen during COVID and that a bunch of

9   different agencies got together to try figure out where that

10  money went to, were you part of that thing?

11  **A.**   No.

12           MR. CONOLLY:  Objection.  Foundation.

13           THE COURT:  She answered no.  The objection is

14  overruled.

15  BY MR. REED:

16  **Q.**   Okay.  So this address in San Diego, when you got the

17  case, had all that investigation already been done?

18           MR. CONOLLY:  Objection.  Vague as to "address."

19           THE COURT:  Sustained.

20  BY MR. REED:

21  **Q.**   Okay.  Does the address in Morena, which is the only

22  address that we've spoken about in San Diego since you've been

23  on the witness stand -- right?

24  **A.**   Yes.

25  **Q.**   You know what address I'm speaking of, then, right?

CX-Ganza R

2430

1   A.  Yes.

2   Q.  Using that address as an example, or as the point, when

3   you got that address in the computer run that you testified to

4   in the various exhibits, were you already an investigator on

5   this case?

6   A.  Yes.

7   Q.  Okay.

8         MR. CONOLLY:  Objection as to which case.

9   BY MR. REED:

10  Q.  The case that you're doing.  You're not a federal

11  government agent, right?

12  A.  Correct.  I'm a state --

13  Q.  And you don't work for the Eastern District of the

14  United States, right?

15  A.  No, I don't.

16  Q.  You don't work with any of these people here, correct?

17  A.  No, I don't.

18  Q.  You're an investigator for the State of California?

19  A.  Yes.

20  Q.  Okay.  So the investigation I'm talking about is the one

21  that would come under your purview, which is what you did for

22  your company, or what's your part of the government where you

23  get a paycheck for?

24  A.  Yes.

25  Q.  Okay.  When you got that investigation, to investigate EDD

Cisneroza - R

2431

1   fraud, when you got the paperwork that you testified to, the

2   exhibits that the agent -- the prosecutor spoke of -- 1420,

3   1421, 1419, 1417 -- the ones that you saw, when you saw those

4   documents, were you already investigating EDD fraud?

5   **A.**  Yes.

6   **Q.**  Okay.  When you saw the address of Morena way down in

7   San Diego, did you go down to that address in that house or

8   that mobile home park?

9   **A.**  No, I did not.

10  **Q.**  Okay.  Is there someone in your investigation, in your

11  group, that followed up on that address?

12  **A.**  Not that I'm aware of, no.

13  **Q.**  But you were part of the investigation where that

14  particular address came up?

15  **A.**  Yes.

16  **Q.**  Okay.  What did you do personally?

17  **A.**  I had to review the records, checks for the runs that were

18  completed by the unemployment unit to establish the claims

19  that had been filed at that address.  So I reviewed that

20  documentation.  And then I reviewed -- I had to review

21  documents that were received in regards to each claim.

22  **Q.**  You work out of Sacramento?

23  **A.**  No.  I work out of Fresno.

24  **Q.**  Okay.  So did you ever leave Fresno during your part of

25  the investigation?

1   A.  Yes.  For various duties, yes.

2   Q.  Did you go down to San Diego?

3   A.  No, not San Diego.

4   Q.  Okay.  So let me step back a bit now.

5         I commit EDD fraud.  Okay?  I use someone else's

6   name, I fill out the form, and let's just think of it -- think

7   of an address or a name -- well, we'll just use that one, the

8   Morena address but not the one that's on this case.  Okay?

9   A.  Okay.

10  Q.  And you see that's 34 -- with 34 different names,

11  applications came from that address, and you later on are

12  going to tie that to me, right?  Because I'm there living by

13  myself but I've written all this information out.  You follow

14  me?

15  A.  Okay.

16  Q.  What happens when I send out the application?  How does

17  that work?

18  A.  You mean what process does it --

19  Q.  Yeah, I'm trying to figure out when -- when do I get a

20  check.

21  A.  It has to go through a claims process and get approved to

22  determine whether you're eligible or not.

23  Q.  Right.  And let's say I got past all of that because I

24  write all the good stuff down.  I don't get a check, right?

25         MR. CONOLLY:  Objection.  Vague.

2433

1          THE COURT:  Overruled.

2          You can answer.

3          THE WITNESS:  I'm not familiar with the process that

4    you're asking for.  You're asking me when you receive the

5    benefits?

6    BY MR. REED:

7    **Q.**  Well, you are not aware -- this is during COVID.

8    **A.**  Uh-huh.

9    **Q.**  We can't go anywhere, right?  We don't get to go places

10   during COVID.  How does the EDD give me money?  Do they give

11   it to me by check?  Do I go to a cash machine?  How does that

12   happen?

13   **A.**  The majority of the time you receive it on a debit card.

14   **Q.**  There we go.  So there are 34 different people, so there's

15   34 different debit cards.

16   **A.**  Correct.

17   **Q.**  Okay.  And I have this stuff with me, these debit cards.

18   How do I make those debit cards into paper, into money that I

19   can spend?

20   **A.**  You can go -- the debit cards go through Bank of America,

21   and you can go to a Bank of America ATM and complete a

22   transaction, you can pull out cash if you need to.

23   **Q.**  Oh, but no.  If I did that, the Bank of America credit

24   card machine camera would see my face, right?

25   **A.**  Correct.

CX Garza R

2434

1   **Q.**  That's one of the ways people get caught, right?

2   **A.**  Correct.

3   **Q.**  And you did the investigation on this case, maybe you

4   didn't do the leg work, but you read the file that created

5   this case that we're talking about right now, correct?

6   **A.**  Correct.

7   **Q.**  Now, this case has a name.  What is it?

8   **A.**  It's under Mr. Stinson's name.

9   **Q.**  Really?

10  **A.**  Yes.

11  **Q.**  The entire case is under Mr. Stinson's name?

12  **A.**  The case has to have a title and that --

13  **Q.**  I got that.  I'm just asking you.  You can say yes or no.

14  **A.**  Yes.

15  **Q.**  So all of the case, everything is under Mr. Stinson's

16  name?

17  **A.**  The case title is under Mr. Stinson's name.

18  **Q.**  I'm with you there.  That's fine.  But Mr. Stinson wasn't

19  in San Diego, right?

20  **A.**  I don't know where he was.

21  **Q.**  Okay.  Mr. Stinson is not the person that filled out the

22  form, correct?

23  **A.**  I don't know who filled out the form.

24  **Q.**  Mr. Stinson is not the person that went to the

25  Bank of America and got any money out of the account; is that

CX Garza R

2435

1   correct?

2   **A.**   Not that I'm aware of, no.

3   **Q.**   Because you know the face of the picture on the -- on the

4   individual applications, right?

5   **A.**   There are no photos on the applications.

6   **Q.**   So somebody was able to miracle themselves.  They get a

7   ATM card.  They go to the Bank of America ATM machine, one of

8   the largest banks in our country, and they somehow are able to

9   take money out of an ATM without their face ever being shown.

10  Is that what you're telling me?

11  **A.**   No.  So sometimes if records are requested for bank

12  records, Bank of America is not always able to supply a photo

13  of the transaction.

14  **Q.**   Okay.  That doesn't answer my question.

15         Not always doesn't mean the same as always, and it

16  doesn't mean the same as every time.  Are you telling me that

17  every one of the -- every one of the cards in this case, every

18  time money was taken out, they never ever took a picture?

19         Well, let met back up.  Let me go this way so we can

20  get on the same page.  Why is it that you investigate these

21  things?

22  **A.**   To determine if fraud has been committed.

23  **Q.**   And when fraud has been committed, what is it that

24  happens?

25  **A.**   It can be filed with the court.

Cardoza R

2436

1   **Q.**  Well, that's not -- that's not how that happens.  That's

2   not how that starts.  You're an investigator.  You've been

3   doing this for a long time, since you were at Reedley.

4           Where is it that you as an investigator goes when you

5   think someone has committed a crime?  After you've written

6   your report, after you have collected your evidence, you go to

7   the District Attorney's Office or --

8   **A.**  Yes.

9   **Q.**  -- the federal prosecutor, whatever agency that does the

10  prosecution of what it is you're doing, correct?

11  **A.**  Yes.

12  **Q.**  And when you take them this stuff, you take them enough

13  stuff so they will file a case, correct?

14  **A.**  Correct.

15  **Q.**  And if you tell them that somebody went to the ATM they're

16  going to ask you for a picture, not because they are lazy but

17  because they like to do things the easy way if they can get

18  it.

19          MR. CONOLLY:  Objection.

20          MR. REED:  I'll strike that.  That's my fault.

21  BY MR. REED:

22  **Q.**  If there is a photo and if they think there's a photo out

23  there, are you telling me that the answer, Bank of America may

24  not get it, is going to be enough and you guys just don't

25  look?

CX Ganza R

1  **A.**  I don't know.  That's up to the district attorney.  That's

2  not my decision to make.

3  **Q.**  But you're the one that does the investigation.  You're

4  here to testify about the investigation.  Yes?

5  **A.**  Yes.

6  **Q.**  Did you write a report?

7  **A.**  No.

8  **Q.**  Hmm.  But you were part of this investigation?

9  **A.**  Correct.

10  **Q.**  So you're the person that looked at the computer wrong.

11  So you didn't do the other part of it, like finding out who

12  lives at that Miranda -- or Moreno address, finding out who

13  cashed the money.  You didn't do that part?

14  **A.**  Right.  My responsibility is to look at where the claims

15  went and who's listed on the claims.

16  **Q.**  Okay.  Well, say for the sake of argument that Mr. Stinson

17  is in prison.  Correct me if I'm wrong, but the EDD does not

18  send checks to prison, correct?

19  **A.**  You should not be eligible to receive --

20  **Q.**  I didn't say that.  You've already gotten that part?  Now

21  we're trying to find out where the money goes.  Did the EDD

22  send a check to Mr. Stinson in prison?

23  **A.**  Not on the records that I have, no.

24  **Q.**  Has the EDD ever sent a check to someone who is in prison?

25          MR. CONOLLY:  Your Honor, I'm going to object as

CX Ganza R

2438

1    argumentative.

2              THE COURT:  Sustained.

3    BY MR. REED:

4    **Q.**  Did they send an ATM to Mr. Stinson in prison?

5    **A.**  Not in prison.  Not that I'm aware of, no.

6    **Q.**  Based upon the answers to the questions that were asked by

7    the prosecutor, it appears that you and the prosecutor are of

8    opinion that Mr. Stinson is not the person who filled out the

9    application.

10             MR. CONOLLY:  Objection.  Foundation.

11             THE COURT:  Sustained.

12   BY MR. REED:

13   **Q.**  When the prosecutor asked you who filled out the

14   application and he said, It was someone else other than

15   Mr. Stinson and you agreed to that, doesn't that mean --

16             MR. CONOLLY:  Objection.  That mischaracterizes both

17   question and any answer he's about to state.

18   BY MR. REED:

19   **Q.**  That -- I'll do it another way.

20             Who filled out the application?

21   **A.**  I don't know.

22   **Q.**  Was it Mr. Stinson?

23   **A.**  I don't know.

24   **Q.**  Who got the money?

25   **A.**  I don't know.

Gonzaga DR

2439

1   **Q.**  Was it Mr. Stinson?

2   **A.**  I don't know.

3            MR. REED:  I have no further questions.

4            THE COURT:  Cross-examination, Ms. Barrett?  Thank

5   you.

6                        CROSS-EXAMINATION

7   BY MS. DE SALES BARRETT:

8   **Q.**  So you've already testified that you have no way of

9   knowing whether or not the person whose name appears on the

10  document is the person who completed it, correct?

11  **A.**  Correct.

12  **Q.**  Uh, there's no verification of signatures; is that

13  correct?

14  **A.**  Correct.

15  **Q.**  Uh, I believe, you testified on direct examination, uh,

16  that the social security numbers are verified; is that

17  correct?

18  **A.**  Yes.

19            MS. DE SALES BARRETT:  Uh, can we pull up 1418, I

20  believe?  Can you guys pull it up or -- I'm sorry.

21  BY MS. DE SALES BARRETT:

22  **Q.**  Yeah.  Do you have that on the screen in front of you?

23  **A.**  Yes.

24  **Q.**  Yes.

25            Uh, would you read the social security number that

2440

1    appears at the top?

2    **A.**   It's blacked out.

3    **Q.**   Above it?

4    **A.**   Oh, I'm sorry.  That's 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.

5    **Q.**   And according to your testimony, you verified that that

6    was the correct social security number for it?

7    **A.**   Yeah, so this is not a social security number.  This is an

8    EDD issued number.

9    **Q.**   Why does it say "SSN"?

10   **A.**   So it -- what can happen is if, say, for example, a

11   claimant had their social security number used by someone who

12   is not them and someone else committed fraud under their

13   social security number and that other person received

14   benefits, and another person can file -- the owner -- the

15   actual owner of the social security number can file a

16   legitimate claim, but EDD finds that there's been some fraud

17   committed against their social security number at some point

18   previous in time, EDD will issue them this social security

19   number so that they can receive the benefits under that

20   number.

21   **Q.**   So what --

22            MS. DE SALES BARRETT:  Do we have the original

23   document with the social security number on it?

24            MR. CONOLLY:  We do not have that marked.

25   ///

2441

BY MS. DE SALES BARRETT:

Q.   The 990 number that begins his social security number, where does that come from?

A.   It would be an EDD-issued number.

Q.   That -- do you know the Social Security Administration issues 990 numbers?

A.   I'm not aware.  I know that this is an EDD-issued number.

Q.   Again, I go back, why does it say "social security number" on the top if it's not a social security number?

A.   Through the -- through the EDD database and records, the one person can have two if fraud has been committed against their original social security number that was issued.

Q.   So does this indicate that the EDD picked up fraudulent activity in this particular submission?

A.   My understanding is that it can be red-flagged prior to that but I don't have expertise on how that process works.

Q.   Well, you -- but you personally said you verified the social security number on this account, you personally.

A.   Yes, I will do -- I will check the social security numbers through various databases to make sure it belongs to that person.

Q.   When you go to a state basis, do you -- what name do you put in?

A.   I don't put in a name, I put in the social security number that I have available.

2442

1  **Q.**  And when that database came up, did that database report

2  to you that the social security number belonged to

3  Frances S. Clement?

4  **A.**  Yes.

5  **Q.**  Frances with an "E"?

6  **A.**  I don't recall specifically the spelling, if I noted it

7  differently or not.

8  **Q.**  Are you aware that ordinarily men whose name is Francis

9  spell it with an "I"?

10  **A.**  I'm not aware of that.

11  **Q.**  And that women whose name is Frances spell it with an "E"?

12  **A.**  I'm not -- I'm not aware of that.

13  **Q.**  So, obviously, whoever filled out this fraudulent form

14  wasn't aware of that either?

15          MR. CONOLLY:  Objection.  Lacks foundation.

16          THE COURT:  Sustained.

17  BY MS. DE SALES BARRETT:

18  **Q.**  So at this point are you able to go back to your original

19  records to check the social security number that was included

20  in this document?

21  **A.**  Yes.

22  **Q.**  And how long will that take?

23  **A.**  A couple of hours.  You mean to go somewhere and actually

24  look at it?

25  **Q.**  Like, to just get the number from the -- what was on the

1   document?

2   **A.**  That would take me about five minutes.  To run it, you

3   mean?

4           MS. DE SALES BARRETT:  Your Honor, I ask that that be

5   done at some point during this morning.

6           THE COURT:  We can talk about that in a moment.

7   Let's --

8           MS. DE SALES BARRETT:  Okay.

9           THE COURT:  -- get this witness done.

10  BY MS. DE SALES BARRETT:

11  **Q.**  Okay.  Now you were asked by the government to produce

12  documents related to EDD fraud; is that right?

13  **A.**  Yes.

14  **Q.**  And you were given a particular address to research?

15  **A.**  Right, correct.

16  **Q.**  And how -- how many names and -- applications came up

17  under that address?

18  **A.**  Is it the Space 108 and 109 that you're referring to?

19  **Q.**  Yes.  Yes.

20  **A.**  It was -- it was approximately 34 claims; however, I

21  believe some were duplicates.  So it was not 34 different

22  names, it was different claims, but they have some duplicate

23  names.

24  **Q.**  How many different names?

25  **A.**  I believe about 30.

2444

1   **Q.** And when the government asked you to produce any of those

2   documents, were you asked to produce them all?  All 30?

3   **A.** Yes.

4   **Q.** And were you asked to produce ones in the name of

5   Brian Rapinoe?

6   **A.** Yes.  That name was on there, yes.

7   **Q.** But we don't have that here.  You weren't shown that here

8   in court, were you?

9   **A.** No, I was not.

10       MS. DE SALES BARRETT:  Your Honor, I request the

11  Court take judicial notice of the indictment where

12  Mr. Clement's name is spelled --

13       MS. STOKMAN:  Objection.  Is that sidebar?

14       MS. DE SALES BARRETT:  -- F-r-a-n-c-i-s.

15       THE COURT:  Yeah, let's talk about this at sidebar.

16   (Sidebar commences.)

17       MS. DE SALES BARRETT:  I apologize, Your Honor.

18       THE COURT:  Was there a true name finding made?

19       MR. CONOLLY:  Not that I'm aware of.  We certainly

20  didn't ask for that.

21       THE COURT:  I'm sure there has to be.

22       MR. CONOLLY:  I'll do it right now.

23       THE COURT:  So the indictment says Francis with an

24  "I."

25       MR. CONOLLY:  Uh-huh.

2445

1          THE COURT:  Just -- what's the objection about that?

2          MS. STOKMAN:  I was objecting -- sorry.  Just

3     since -- I'm sorry that I jumped in.  It was the mention of

4     the indictment.  I didn't know where that was going, but we've

5     already discussed not mentioning the indictment.  But, I mean,

6     we don't have an issue with their being given his name in the

7     verdict forms and every other document that exists.

8          THE COURT:  Well, the request is judicial notice.  I

9     mean, it's an established court fact that his name is with an

10    "I."

11         MR. CONOLLY:  Understood and appreciated, Your Honor.

12    But, you know, asking for judicial notice midstream with

13    cross-examination of a witness who's already testified that

14    she doesn't know how he spells his name is tantamount to

15    argument at this point.

16         THE COURT:  Well, it's establishing a fact, which can

17    be done after the witness too, doesn't have to be done in the

18    middle.

19         MS. DE SALES BARRETT:  Of course.  But it does -- it

20    also can be done in the middle.

21         THE COURT:  Right.  But then we're standing here

22    doing this when --

23         MS. DE SALES BARRETT:  I didn't object.

24         THE COURT:  I'm sorry?

25         MS. DE SALES BARRETT:  I didn't object, Your Honor.

2446

1   They did.

2           THE COURT:  What I mean was had this just been

3   brought up and asked for judicial notice before or after this

4   witness, we could have done it at that time.

5           But again, it then gives the appearance that the

6   Court is vouching in some way for the argument that it seems

7   to be making.  So I'll make that -- I'll take judicial notice

8   after we're finished this with witness.

9           MS. DE SALES BARRETT:  Okay.

10      (Sidebar ends.)

11  BY MS. DE SALES BARRETT:

12  **Q.**  Did you verify any of the signatures or review any of the

13  signatures on these documents?

14  **A.**  I did not, no.

15  **Q.**  Okay.  And so you didn't make any comparisons of the

16  documents, one to the other, to see if the signature might

17  have been the same?

18  **A.**  No, I did not.

19  **Q.**  Were all these claims submitted around the same time, all

20  30?

21  **A.**  I don't recall.  I would have to look at the spreadsheet.

22  I don't recall what the dates were.

23          MS. DE SALES BARRETT:  Okay.  Thank you.

24          THE COURT:  Any further cross-examination, Mr. Villa?

25          MR. VILLA:  Yes, Your Honor.

CX Garza Y

2447

CROSS-EXAMINATION

1

BY MR. VILLA:

2

3    **Q.**  Good morning.

4    **A.**  Good morning.

5    **Q.**  For the investigation on -- excuse me -- 1395 Morena, you

6    just testified there was about 34 claims submitted with 30

7    names total?

8    **A.**  Approximately 30, yes.

9    **Q.**  None of those names were Kenneth Johnson, correct?

10   **A.**  I don't recall.

11   **Q.**  And the social security numbers used that -- the real ones

12   that were used were not Kenneth Johnson's social security

13   number either, correct?

14   **A.**  I don't recall that name.

15          MR. VILLA:  Those are all my questions.

16          THE COURT:  Redirect?

17          MR. CONOLLY:  No, Your Honor.  Thank you.

18          THE COURT:  May this witness be excused?

19          MR. CONOLLY:  Yes, Your Honor.

20          MS. STOKMAN:  Yes.

21          MR. REED:  Yes.

22          THE COURT:  All right.  Thank you, ma'am.  You may

23   step down.

24          MS. DE SALES BARRETT:  Your Honor, I believe that we

25   would -- sorry.  I believe Ms. Garza asked -- said that she

2448

1    could check on the social security number on the document.

2         THE COURT:  I think she did say that.  So you're

3    saying you don't wish to excuse her at this time?

4         MS. DE SALES BARRETT:  I would like to wait until we

5    have the number.

6         THE COURT:  All right.  Thank you, ma'am.

7         MR. CONOLLY:  So, Your Honor, to be clear, she is

8    dismissed for now but subject to recall?

9         THE COURT:  Correct.

10        MR. CONOLLY:  Thank you.

11        THE COURT:  All right.  Ladies and gentlemen, I have

12   decided to accept as proved the fact that Francis Clement's

13   name is spelled F-r-a-n-c-i-s, last name C-l-e-m-e-n-t, even

14   though no evidence has been presented on this point at this

15   time.  However, you may accept this fact as true, but you're

16   not required to do so.

17        All right.  Next witness, please.

18        MS. STOKMAN:  Judge, we're going to need a brief

19   break in order for the next witness to come up.

20        THE COURT:  All right.  Ladies and gentlemen, if

21   you'll go ahead and take about a ten-minute break.

22      (Jury exits the courtroom at 10:24 a.m.)

23        THE COURT:  All right.

24        MS. STOKMAN:  Judge, for scheduling reasons, if

25   defense is ready to cross Mr. Rapinoe, we would prefer to put

1  him on the stand right now.  But if not, we would need to have

2  the break anyway, so I'm just wanting to inquire if they're

3  ready to do that.

4         MS. DE SALES BARRETT:  Your Honor, I, myself, have

5  not had an opportunity to look at the document because I was

6  preparing and listening to this witness.  So I would ask that

7  we handle Mr. Rapinoe at a later time when we have had an

8  opportunity to look at that document.

9         THE COURT:  All right.  I think we agree the document

10 that Ms. Luem was referring to earlier is not the document

11 that is at issue.

12        MS. LUEM:  It's the same document.  It's just they

13 have a newer version, so --

14        THE COURT:  All right.  And so it's the newer version

15 that Mr. Rapinoe apparently signed.  So I guess I need to

16 understand -- well, what's the status of the cooperation

17 agreement?

18        MS. STOKMAN:  There isn't one.

19        THE COURT:  Oh, that's right.  You said there wasn't

20 one.

21        MS. STOKMAN:  Yes.

22        THE COURT:  And when I looked at the transcript, he

23 says he was cooperating.  Was there -- am I missing -- is

24 there another reference other than at page 11?  Because I

25 think their representation was that he had entered into a

2450

1   cooperation agreement.

2           Is there another reference to that in this?

3           MS. DE SALES BARRETT:  Only on those three pages is

4   all.

5           THE COURT:  Which three pages?

6           MS. DE SALES BARRETT:  9 through 11.

7           THE COURT:  All right.  It says in here that he was

8   cooperating and -- but I don't see any testimony that he said

9   that entered into a cooperation agreement.  He obviously -- I

10  mean, it looks like he got some benefits for doing this.

11          MS. DE SALES BARRETT:  It says that he won't be

12  prosecuted federally as a result of his cooperation.  Now, I

13  don't know, but that sounds like he has some kind of

14  cooperation agreement, whether it be -- I don't know --

15  verbal, signed.  I don't know.

16          THE COURT:  And, Ms. Stokman, your understanding is

17  that there is no cooperation agreement in the

18  Southern District.

19          MS. STOKMAN:  Correct.  That's what the AUSA in the

20  Southern District informed me this morning when I inquired,

21  that there's no cooperation agreement.

22          For the federal case, I'm not sure what that's

23  referencing, but in any event, there isn't an agreement that

24  he signed that would bind the Eastern District, so he's not

25  under a cooperation agreement here.

1        THE COURT:  Ms. Barrett, other comments?

2        MS. DE SALES BARRETT:  Yes, Your Honor.

3        Your Honor, this is cross-examination based on the

4   expectations of benefit by the person who is testifying.  He

5   had a -- obviously, he believes he had a benefit before, and

6   certainly he would believe that he would continue to have a

7   benefit, or he could believe that.  And -- and that is why the

8   cooperation agreement is important.

9        He also -- he also says, I believe, that he's also

10  cooperating on the state case.  So it is a double cooperation.

11       And I'm honestly surprised that anyone -- I don't

12  know if it's Ms. Wu -- excuse me -- the person who asked the

13  questions of this witness at the time, is the person who's

14  saying there's no cooperation agreement, but I'm surprised

15  that a federal prosecutor would elicit testimony like that in

16  front of a grand jury without having an agreement of some kind

17  and leave it uncorrected.

18       THE COURT:  Well, I guess the question -- or what

19  seems to me to be a logical inference is that he has an

20  agreement with the state, and the federal prosecutor's taking

21  advantage or just dovetailing that, just like we've heard

22  testimony here where the state sat in on witness interviews

23  when there was a cooperating agreement with the federal

24  government.

25       Now, you-all can correct me if I'm wrong, but the law

2452

1   says that the prosecutor must produce cooperating --

2   cooperation agreements within their control.  But I think

3   there's a lot of case law that says state prosecutor -- or

4   state prosecutors, state law enforcement are not within their

5   control.

6          MS. DE SALES BARRETT:  He says he's not going to be

7   prosecuted federally because --

8          THE COURT:  I hear that.  I see that.  I have it

9   right in front of me.  But I don't -- I'm not sure what you

10  want me to do, Ms. Barrett, because the representation is

11  there's not a federal cooperation agreement.  Sounds like

12  there is a state one.  But I guess the remedy here is what I'm

13  interested that you address.

14         Because you seem to think that I have authority to

15  compel or to find some discovery misdeed by the federal

16  prosecutor, and my understanding from federal -- from legal

17  authority is that is not the case.  And I think we agree on

18  that.  I mean, that's not really even beyond dispute, is it?

19         MS. DE SALES BARRETT:  That you don't have the

20  authority to order someone in another district?  You have --

21         THE COURT:  No, no.

22         MS. DE SALES BARRETT:  You're an Article III Judge.

23  You have --

24         THE COURT:  Thank you for that clarification.  I was

25  wondering.

1           What my question was -- and maybe we can just focus

2     on that -- there can be no dispute.  There is no dispute in

3     legal authority that the federal prosecutor does not have

4     control over state prosecutors or state law enforcement

5     agencies.

6           MS. DE SALES BARRETT:  That -- depending on if

7     they're involved in the investigation, that's true.

8           THE COURT:  And in this case --

9           MS. DE SALES BARRETT:  Files against *Whitley* stands

10    for the proposition that in many cases they do where there's a

11    cooperative arrangement.

12          I submit that there is a cooperative arrangement here

13    between the Eastern District and the Southern District offices

14    because they are both dealing with the witness at the same

15    time.  These recordings were made around -- around that time.

16          THE COURT:  Let's -- right.

17          MS. LUEM:  Your Honor, may I just --

18          THE COURT:  No.  Let me just say --

19          MS. LUEM:  I'd like to supplement the record.

20          THE COURT:  Wait.  Here's the trouble:  You-all go

21    for the jugular before I even know someone's in a fight.  I

22    need to know what the fight is before we figure out what the

23    death blow is, and I'm still not understanding that --

24          MS. LUEM:  I would just like to --

25          THE COURT:  Wait.  Wait.

1          What I was told was, Must be a cooperation agreement.

2    He testified there was, testified he was cooperating.

3          So, yeah, that leads me to believe that there's an

4    agreement.  But what now I understand is if there's an

5    agreement, it's not with a federal prosecutor.  It is with

6    maybe the state, I assume.

7          So now I'm just trying to figure out, what are we

8    seeking?  What is it you're asking me to do?

9          MS. LUEM:  Well, this is -- this is where I would

10   just like to supplement what the Court just said, which is

11   that according to ROI 42 that was drafted by Agent Gonzalez,

12   he and San Diego Police Department Detective Robert Schmidt

13   met with ATF confidential informant, who we now know is

14   Mr. Rapinoe, on May 23rd of '22 shortly -- this is two days or

15   three days after he testified in front of a federal grand

16   jury.

17         So this informant is now meeting with a

18   San Diego Police -- State Police Department officer --

19   detective, this ATF agent and this informant, and having a

20   powwow about how he's going to assist in this federal

21   investigation.  That is presumably the time, and I think

22   according to this ROI, that he signs this agreement --

23   informant agreement, and when he's paid after he completes the

24   tasks asked of him by San Diego Police Department detective

25   and ATF Gonzalez.  The payment has both

1    Detective Robert Schmidt, San Diego Police Department's name,

2    and Anthony Gonzalez, special agent with the ATF on it.

3    So this is clearly a joint effort between the

4    detective, case agent from the ATF here, and the San Diego

5    State Police Department to enlist this individual in some sort

6    of a -- whether it's just being given money for information,

7    giving benefits for information.  There's something happening

8    here beyond just this $2,000 payment.  And the witness even

9    said that he was receiving -- that he was cooperating with

10   both the state and federal government.  So --

11   THE COURT:  I think that's my factual understanding

12   too.  But the legal question, again, as I understood it, was

13   would I compel production of the cooperating agreement with

14   the federal prosecutor in San Diego.  And now, as I understand

15   it, that doesn't exist.  So the legal question is, can I force

16   a state prosecutor to produce that, and there -- I mean, if

17   you're going to say to me there's some authority that says I

18   can, then it came out yesterday, and if so, I need that cite.

19   MS. LUEM:  Well, what my understanding is that it's

20   in the custody and control of the government here who's

21   prosecuting this case because they are working directly with

22   them, so they should have access and be able to obtain that as

23   part of the discovery in this case.

24   THE COURT:  And so I'm going to -- we're going to

25   take a couple of minutes and you can get that cite for me that

1  says I have that authority because, every case from the

2  Ninth Circuit, from any circuit, says the fact that they are

3  working together doesn't mean that they have control over that

4  cooperating agreement.

5           If you have something different, let me give you a

6  minute to look for it.  But I have never seen that type of

7  agreement.  Now, if the prosecutor here is running that

8  operation and there's a task force and there's people from

9  both sides, then you're going to have a cooperating agreement

10 in the federal court.

11          I don't know what was happening back then, and I

12 don't think anybody does.  But what I have been told is that

13 the federal prosecutor in San Diego does not have a

14 cooperating agreement -- doesn't have a cooperation agreement.

15 So I think what we're now talking about is can this prosecutor

16 go to that prosecutor because that prosecutor was working with

17 the witness who had a cooperation agreement with the state

18 prosecutor.  I mean, that's as I understand what you're

19 saying.

20          So I'm just asking you, if you've got authority for

21 that, let me see it.  But at this point, I don't see that I

22 can do that.

23          Mr. Reed, it appears to me you have comments.

24          MR. REED:  Yes, on a different subject, assuming

25 we're going forward the way we are, without a cooperation

2457

1    agreement from San Diego, for whatever reason, San Diego is

2    smart enough to figure out not to do it, however you want to

3    do it.

4            What Ms. Stokman said is the thing that I'm concerned

5    about in this trial with my cross-examination.  If Mr. Rapinoe

6    says that, I had a cooperation agreement -- I don't care if

7    it's in writing -- if he think's that, what I don't want when

8    I go down that road, which I will do, is for one of them to

9    pop up and say, Lack of foundation, there's no cooperation

10   agreement.

11           THE COURT:  I guess the question is how you phrase

12   it, because if you say, Do you have a cooperating agreement?

13           Yes, I do.

14           MR. REED:  I won't ask it that way.

15           THE COURT:  Yeah.  It's how you ask it.  If this is

16   what your understanding --

17           MR. REED:  Because -- what he has testified to up to

18   now and which I'm somewhat confused about, I'm not blaming

19   anyone.  It's just the way life is.  Okay.  There's an

20   investigation where the California law spends millions of

21   dollars and nobody wrote it down.  I can live with that.  I'll

22   cross-examine on that.

23           If there are feds there when that guy comes in and

24   they take all his credit cards, like he said happened, and

25   there was some feds there and nobody wrote that down, okay,

1    but I'm going to ask him about that.

2           If he then took thousands -- a thousand dollars out

3    of each one of those cards with an ATM and nobody prosecuted

4    that case, maybe they do that thing different up here than

5    they do in the Central District, but with us, there's --

6    there's photos every time that happens.

7           And nobody wanted to prosecute him in the fed, that's

8    okay also.  I just need him to be able to say that, because I

9    want to argue that's the benefit, is that he didn't get

10   charged.

11          I don't want them popping up, Oh, objection,

12   Your Honor.  No foundation.

13          THE COURT:  Well, he did testify on direct that he

14   wasn't prosecuted federally.

15          MR. REED:  Yes.

16          THE COURT:  But I don't -- I think that's fair game.

17          MR. REED:  But -- and I think it's -- and correct me,

18   because although I'm not usually in the permission thing, I

19   usually do the forgiveness side, but I'm going to kind of want

20   to spend some time on that, because it makes a difference.

21   This guy is talking about how he's running everything outside

22   and done this and that, and that sounds like a big deal to me.

23   And to give that way, without writing it down, I guess it can

24   happen.

25          I can't blame Stephanie Stokman for what happened in

1    San Diego.  I just can't.  If that happened down there, at the

2    end of day if we don't ever get that document, then that's the

3    appellate lawyer's issue.  But for the trial attorney, I want

4    to be able to establish that this was -- the way everybody is

5    playing, this was a very big investigation.  Guys copy --

6    taking names down and things like that, and then this woman

7    comes in and testifies about the computer, and those things

8    are important.  If there -- if this guy is thinking he's

9    sitting on a witness stand in a federal court and doesn't have

10   a lawyer next to him and thinks he cannot be in trouble,

11   that's all relevant for the jury on his truth and veracity.

12        And I don't think a man who has a criminal history

13   from 2011 to 2020, missing only one year with that criminal

14   history, with the things that that creates, if he gets that

15   kind of case in federal court, he thinks he's bulletproof for

16   some reason, and the only reason somebody like him thinks that

17   is because somebody told him that.  There is a bunch of

18   reasons we can't get into that, but I should be able to deal

19   with that factual scenario.

20        THE COURT:  Ms. Stokman, I have to say, when he was

21   testifying, I did wonder, he hasn't been advised of his

22   Fifth Amendment rights.  And when I'm told he doesn't have a

23   cooperation agreement, he testified in the grand jury as well

24   into incriminating information, does he need counsel

25   appointed?

2460

1          MS. STOKMAN:  Judge, he was convicted of this EDD
2     fraud on the state side.
3          THE COURT:  Oh --
4          MS. STOKMAN:  That's what his conviction was.
5          THE COURT:  All right.  All right.  That's where I
6     got lost.
7          And so basically it is a double jeopardy issue.
8          MS. STOKMAN:  Correct.
9          THE COURT:  All right.  Makes sense.
10         So, Mr. Reed --
11         MS. DE SALES BARRETT:  I'm sorry, Your Honor.
12    There's no double jeopardy from the federal government to the
13    state.  The state may have a double jeopardy statute, but the
14    federal government doesn't honor the jeopardy -- doesn't honor
15    a state prosecution granting it jeopardy.  It doesn't happen.
16    It's not double jeopardy.
17         THE COURT:  Mr. Reed, so the issue you were raising
18    is that it seems, to me, if you're asking if one exists,
19    there's a foundation; if you're asking what he understands,
20    he's testified, so I think that we're clear on that.
21         Ms. Barrett, now back to your issue, I think what
22    you're saying is, if there's a statute that otherwise makes
23    that conduct unlawful, the fact that he suffered a conviction
24    does not preclude prosecution but it would preclude
25    prosecution for the same crime.

2461

1          MS. DE SALES BARRETT:  No.  Federal -- federal court

2     prosecutes all the time where state prosecutions have taken

3     place beforehand.  For instance, in cases of capital cases

4     where their state does not succeed in pursuing the death

5     penalty or getting the death penalty, the federal government

6     has sought the death penalty in those cases.

7          THE COURT:  I think the distinction I'm making, and

8     maybe I'm being too subtle, is you can be charged federally

9     but the statute would maybe have a different element.  It

10    would be a different statute based upon the same criminal

11    conduct.  So I get your point.  What you're saying is, he's

12    done all these things, maybe there's a statute under which it

13    comes -- it would give rise to prosecution that is separate

14    from what he was prosecuted for in state court.  What I'm

15    hearing from the government is they don't know that situation.

16    So --

17         MS. DE SALES BARRETT:  Well, how about the

18    racketeering influence and corruption act.

19         MR. REED:  Exactly.

20         THE COURT:  I mean, yeah, as long as that was --

21    Ms. Stokman, what's your comment on that?  I mean, technically

22    that's not beyond the realm.

23         MS. STOKMAN:  No, but it's beyond the realm of what

24    we actually have to prove.

25         THE COURT:  No, no, of course.  But my question is,

1    does he need to be advised, does he need counsel appointed?

2             MS. STOKMAN:  No.  That's not the government's

3    understanding.  If the Court would like us to obtain counsel

4    for him in order to do that, but that's not the government's

5    understanding.  And I'll say again, any cooperation agreement

6    he would have had on the state wouldn't have binded the

7    government -- the federal government here in the

8    Eastern District anyway, and I think that was the Court's

9    original concern, what we were bound by.  And he is under no

10   cooperation agreement here.  He was a paid informant for ATF

11   as soon as anyone from the Eastern District of California

12   became involved with him.

13            THE COURT:  All right.  Anything else at this time?

14            Does anyone need to use the restroom before we call

15   the --

16            MS. STOKMAN:  Okay.  And, Judge, I'm sorry.  Not to

17   just kind of keep harping on this, but is there a time frame

18   in which we believe cross-examination will be ready for this

19   witness?  He comes from quite far away, so that's why I was

20   asking if we could put him back on the stand now.

21            THE COURT:  Ms. Barrett, it sounds like what needs to

22   be looked at is that agreement, but if you need more time, we

23   can -- is there a witness we can do, start, and then maybe go

24   back or do something else?

25            MS. STOKMAN:  If we start the next witness, we'll

2463

1    hopefully have time after that witness is finished, but I'm

2    not -- I'm not sure of that.

3            MS. DE SALES BARRETT:  Your Honor, I think he can be

4    brought back tomorrow.  There are hotels.

5            THE COURT:  Right, I understand, but I guess the --

6    I'm talking from an efficiency standpoint.

7            There's no cooperation agreement.  Your position on

8    the issue is clear.  You want time to look at the informant

9    agreement, which is, as I saw it, is a checkbox form, and

10   that -- I'm not going to stand in your way of that, but

11   Mr. Clement does have two attorneys.

12           Can one of you do that while we bring in another

13   witness, or is that something you do need time overnight to

14   look at?  I'm not suggesting one way or the other.  I just

15   need to know what you can do.

16           MS. DE SALES BARRETT:  I believe we need to confer

17   with one another about this issue because it is something that

18   has just arisen, and I would like to confer with my co-counsel

19   and also with other members of the defense team -- other

20   defense teams.

21           THE COURT:  All right.  Let's go ahead and we'll go

22   to the next witness after a break.  Again, we're now quite a

23   bit past that time.  So let's -- you all need a break, do it,

24   but I'm going to stay here so we can get started as quickly as

25   possible.  So let's go off the record at this point.

2464

1     (Recess held.)

2           THE COURT:  Let's go ahead and bring the jury back

3     in.

4     (Jury enters the courtroom at 10:59 a.m.)

5           THE COURT:  All right.  We have our jury members

6     back.

7           Ms. Stokman, your next witness.

8           MS. STOKMAN:  Yes.  The government calls

9     Brandon Bannick.

10          THE CLERK:  Mr. Bannick, as best you can, can you

11    raise your right hand.

12                        BRANDON BANNICK,

13    called as a witness on behalf of the Government, having been

14    first duly sworn, testified as follows:

15          THE WITNESS:  Yes, I do.

16          THE CLERK:  Please state and spell your last name.

17          THE WITNESS:  Brandon Phillip Bannick, B-a-n-n-i-c-k.

18          THE CLERK:  Thank you.

19          MS. STOKMAN:  And you can move that microphone closer

20    to you if you need to.

21          Thanks.

22                    DIRECT EXAMINATION

23    BY MS. STOKMAN:

24    **Q.**  Good morning.  I think it's still morning.  Can you tell

25    us where you grew up, where you're from?

DX - Bannick - S

2465

1   **A.**   Yes.  I grew up in Hermosa Beach, California.

2   **Q.**   Is that in the Los Angeles area of California?

3   **A.**   Yes.  Yes, it is.

4   **Q.**   And what -- what kinds of things did you do growing up in

5   Hermosa Beach?

6   **A.**   Uh, skateboarding, surfing, just hanging out at the beach

7   a lot.

8   **Q.**   Did there come a point in time in your life where you were

9   arrested for a crime and incarcerated of some sort?

10  **A.**   Yes.

11  **Q.**   How old were you the first time that happened?

12  **A.**   About 13.

13  **Q.**   What was that for?

14  **A.**   It was truancy.  Truancy, and like some drug

15  paraphernalia.

16  **Q.**   So did you get into other trouble as a minor after age 13?

17  **A.**   Yes, yes, I did.

18  **Q.**   What types of things were you in trouble for?

19  **A.**   More like a lot of drug stuff and truancy, stuff like

20  that.

21  **Q.**   Have you also been incarcerated as an adult?

22  **A.**   Yes, I have.

23  **Q.**   How old were you the first time that occurred?

24  **A.**   18.

25  **Q.**   What was that for?

2466

1    **A.**  It was for burglary.

2    **Q.**  How many years or how often have you spent time in prison

3    throughout your life?

4    **A.**  Well, five prison terms, so probably ten years.

5    **Q.**  Were those prison terms felony convictions for the

6    burglary you stated and also for fraud?

7    **A.**  Yes.

8    **Q.**  Do you also have felony convictions for possessing a gun

9    as a felon?

10   **A.**  Yes.

11   **Q.**  And also for possessing drugs for sale?

12   **A.**  Yes.

13   **Q.**  Okay.  Did you ever have any gang affiliation?

14   **A.**  Yes, I did.

15   **Q.**  What was that?

16   **A.**  PENI, PENI Death Squad.

17   **Q.**  When did you become part of PENI?

18   **A.**  About 2019.

19   **Q.**  Did you have interactions with them prior to that?

20   **A.**  Yes.

21   **Q.**  You're currently in custody, right?

22   **A.**  Yes, I am.

23   **Q.**  Did you plead guilty to some crimes in order to be here in

24   custody?

25   **A.**  Yes, I did.

1    **Q.**  What did you plead guilty to?

2    **A.**  I pled guilty to two counts of murder and aid of

3    racketeering and one count of participation in a RICO

4    conspiracy.

5    **Q.**  And that RICO conspiracy, that's referring to a

6    racketeering enterprise?

7    **A.**  Yes, it is.

8    **Q.**  What enterprise was that?

9    **A.**  Aryan Brotherhood.

10   **Q.**  You've entered into a cooperation agreement with the

11   government pertaining to that case; is that right?

12   **A.**  Correct.

13   **Q.**  And what benefits are you potentially receiving through

14   that cooperation agreement?

15   **A.**  Uh, I have not received any benefits as of yet.

16   **Q.**  And do you anticipate potential benefits for that

17   agreement?

18   **A.**  Uh, I believe some sort of time, like, sentence reduction.

19   **Q.**  And before you entered into the cooperation agreement,

20   what was the penalty you were facing on those crimes?

21   **A.**  The death penalty or life in prison.

22   **Q.**  And so eventually you believe that cooperation could

23   reduce the life sentence; is that fair to say?

24   **A.**  Yes.

25   **Q.**  But you don't know how much at this point?

2468

1    **A.**   Right.

2    **Q.**   So you mentioned the Aryan Brotherhood.  Can you tell us

3    what that is.

4    **A.**   It is a White prison gang.

5    **Q.**   Have you ever been an associate of the Aryan Brotherhood

6    or the AB?

7    **A.**   Yes, I have.

8    **Q.**   When was your first exposure to the AB?

9    **A.**   My first prison term in High Desert State Prison.

10   **Q.**   That was when you were around 18?

11   **A.**   Yes.

12   **Q.**   Okay.  And during the time you've been an associate of the

13   AB, have you spoken with made members of the

14   Aryan Brotherhood?

15   **A.**   Yes, I have.

16   **Q.**   Have you learned through your conversations with those

17   brothers and your time in prison about the rules or codes of

18   conduct of the AB?

19   **A.**   Yes, I have.

20   **Q.**   Does the AB have a position on talking to law enforcement?

21   **A.**   Yes.

22   **Q.**   What is that?

23   **A.**   No talking to the law enforcement at all.

24   **Q.**   What happens if you do?

25   **A.**   You could be killed or punished by violence.

Rominick-S

2469

1   **Q.**   Does the AB have a position about lying?

2   **A.**   Yes.

3   **Q.**   What is that?

4   **A.**   You should not lie.

5   **Q.**   Otherwise, what happens?

6   **A.**   Or you can be punished by violence.

7   **Q.**   Does the AB have a position on disobeying an order coming

8   from a brother?

9   **A.**   Yes.

10  **Q.**   And what is that position?

11  **A.**   You're to do what you're told.

12  **Q.**   Or what happens?

13  **A.**   Or you could be punished.

14  **Q.**   Does that punishment sometimes involve death?

15  **A.**   Yes.

16  **Q.**   Does the AB have a position on disrespecting an

17  AB brother?

18  **A.**   Sure, yes.

19  **Q.**   And what is that?

20  **A.**   Do -- absolutely never disrespect any Aryan Brotherhood

21  member.

22  **Q.**   Or what could happen?

23  **A.**   Or you could be killed.

24  **Q.**   When we say "made member" and "brother," are those the

25  same things to you?

1    A.  Yes.

2    Q.  Are there other names that you've learned represent a made

3    AB brother?

4    A.  Just -- yeah, a brother, a member.

5    Q.  Have you heard the term "the brand"?

6    A.  Yes.

7    Q.  What does that refer to?

8    A.  The Aryan Brotherhood.

9    Q.  And have you heard of the term "the tip"?

10   A.  Yes.

11   Q.  And what does that refer to?

12   A.  The Aryan Brotherhood.

13   Q.  Are those references to made brothers of the AB?

14   A.  Yes.

15   Q.  In the course of the time that you were exposed to the AB

16   through your prison sentences and speaking with other

17   brothers, AB brothers, have you learned about the structure of

18   the AB?

19   A.  Yes.

20   Q.  And tell us about that.

21   A.  Once you're a made brother, it's supposed to be like all

22   brothers are equal, but there's a three -- a three-person

23   commission which kind of governs the rest of the brothers;

24   made with -- of three -- three brothers.

25   Q.  How, if at all, does the AB interact with people in gangs

1    such as PENI, street gangs?

2    **A.**  How -- how do they interact with them?

3    **Q.**  Uh-huh.

4    **A.**  Either through incarceration or over the phone.

5    **Q.**  And is there a structure as the AB relates to those street

6    gang members?

7    **A.**  Yes.

8    **Q.**  What's that?

9    **A.**  Uh, any -- I mean, any White street gang or, you know,

10   criminal gang is subject to the rules of the

11   Aryan Brotherhood.

12   **Q.**  And in your experience, when you were in prison, were

13   there rules that you had to follow there?

14   **A.**  Yes.

15   **Q.**  And whose rules were those?

16   **A.**  The Aryan Brotherhood.

17   **Q.**  Do you know what the term "put in work" means or "putting

18   in work"?

19   **A.**  Yes.

20   **Q.**  What is that?

21   **A.**  To either commit acts of violence or make money, pretty

22   much anything in service of them.

23   **Q.**  Of them?

24   **A.**  Of the Aryan Brotherhood.

25   **Q.**  Did you do anything while you were in prison to put in

DX-Barnick-S

2472

1   work for the AB?

2   **A.**   Yes.

3   **Q.**   What types of things?

4   **A.**   Stabbing, assault, selling drugs.

5   **Q.**   Did you do anything on the streets to put in work for the

6   AB?

7   **A.**   Yes.

8   **Q.**   What types of things?

9   **A.**   Uh, robbery, sell drugs, kidnapping, extortion, murder.

10  **Q.**   Of any of those that you mention that made money, what, if

11  anything, happened to the proceeds or the profit of that -- of

12  those criminal ventures?

13  **A.**   You got to kick it up to the brothers.

14  **Q.**   Was there a certain amount that you had to give to the AB?

15  **A.**   Typically -- typically, a third, but it could be more; it

16  could be less.

17  **Q.**   Do you know an individual named John Stinson?

18  **A.**   No.  I do not know him, no.

19  **Q.**   Have you heard of him?

20  **A.**   Yes.

21  **Q.**   And how do you know -- how do you know of him?

22  **A.**   Uh, just through -- through the prison system, and he's --

23  he's a well-known and respected member of The Brand.

24  **Q.**   And have you ever had the occasion to know an AB brother

25  who had contact with John Stinson?

PX 8arnick S

2473

1    A.  Yes.

2    Q.  And who is that AB brother?

3    A.  Matt Hall, Psycho.

4    Q.  Can you tell us just briefly what your relationship was

5    with Matt Hall?

6    A.  He was my like my --

7          MR. REED:  Objection.  If it's related to the

8    previous question --

9          THE COURT:  I'm sorry.  I had trouble.  Did you

10   say --

11         MR. REED:  Oh, I'm sorry.  I didn't turn on my thing.

12         If this is related to the previous question, I don't

13   know what the relevance of this particular question is.

14         THE COURT:  Overruled.

15         Go ahead.

16   BY MS. STOKMAN:

17   Q.  What was your relationship with Matt Hall like?

18   A.  He was like an older brother.

19   Q.  During the course of the time that you knew Matt Hall,

20   were you aware of whether or not he was putting in work for

21   John Stinson?

22   A.  I mean, yeah.

23   Q.  And was he?

24   A.  Yes.

25   Q.  Okay.  And around when was that?

1  A.  Maybe 2015 or '16.

2  Q.  Do you know an individual named Kenneth Johnson?

3  A.  Yes.

4  Q.  How do you know him?

5  A.  Uh, I met him through Matt Hall.

6  Q.  And does he go by any nickname that you're aware of?

7  A.  Yes.  "Kenwood."

8  Q.  Does he have any affiliation with the AB as far as you

9  know?

10  A.  Yes.  He's a member.

11  Q.  Have you ever spoken with Kenneth Johnson yourself?

12  A.  Yes.

13  Q.  Around what time frame would that have been?

14  A.  Uh, from maybe 2019 up until the present.

15  Q.  And did you know him through Matt Hall prior to that time?

16  A.  Yes.

17  Q.  Do you know an individual named Francis Clement?

18  A.  Yes.

19  Q.  How do you know him?

20  A.  Also through Matt Hall.

21  Q.  And do you know if he goes by any nickname?

22  A.  "Frank."

23  Q.  Does he have any affiliation with the AB?

24  A.  Yes.  He's a --

25  Q.  What --

Bannick-S

2475

1    **A.**  -- member.

2    **Q.**  And have you had any personal contact with Frank Clement?

3    **A.**  Yes.

4    **Q.**  Around what time frame was that?

5    **A.**  Around -- about the same, from about 2019 up to the

6    present.

7    **Q.**  Do you know an individual named Robert Eversole?

8    **A.**  Yes.

9    **Q.**  How do you know him?

10    **A.**  I think I met him through Kenwood.

11    **Q.**  And do you know if he goes by any nickname?

12    **A.**  Yes, Rage.

13    **Q.**  Do you know if he had any affiliation with the AB?

14    **A.**  Yes.

15    **Q.**  What's that?

16    **A.**  Uh, he was -- he was an associate -- or yeah.

17    **Q.**  And do you know if he worked for any brothers?

18    **A.**  Yes.  He worked for Kenwood.

19    **Q.**  Do you know an individual named James Field?

20    **A.**  Yes.

21    **Q.**  And how do you know him?

22    **A.**  Uh, I met him our first prison term.

23    **Q.**  What nickname does he go by, if any?

24    **A.**  Suspect.

25    **Q.**  Are you aware of whether or not James Field has any gang

DX-Resnick-S

2476

1   affiliation?

2   **A.**   Yes.   He's a Supreme Power Skin.

3   **Q.**   And that's a street gang?

4   **A.**   Yes.

5   **Q.**   What about Evan Perkins, do you know who that is?

6   **A.**   Yes.

7   **Q.**   How do you know him?

8   **A.**   He's my friend, close friend.

9   **Q.**   And does he go by any nickname?

10  **A.**   Yeah, Soldier.

11  **Q.**   Does he have any affiliation with a criminal street gang?

12  **A.**   Yes, he's PENI.

13  **Q.**   Last one, there's a lot of names.  Do you know an

14  individual named Justin Gray?

15  **A.**   Yes.

16  **Q.**   And who is that?

17  **A.**   Another friend of mine.

18  **Q.**   Does he go by any nicknames?

19  **A.**   Sidetrack.

20  **Q.**   Are you aware of any street gang affiliation that

21  Justin Gray has?

22  **A.**   Yes, with Baby Blue Wrecking Crew.

23  **Q.**   During your personal interactions with Kenneth Johnson,

24  did there ever come an occasion when you were fined by him?

25  **A.**   Yes.

1  **Q.**  And tell us the circumstances around that.

2  **A.**  It could be from not answering the phone or, you know,

3  being late to do something or, yeah, not having certain money

4  that I owed him one time.  Something like that.

5  **Q.**  And so would you -- were you at any point owing a debt to

6  Kenwood?

7  **A.**  Yes.

8  **Q.**  Around what time frame was that?

9  **A.**  From -- probably from 2019 up into -- up until present.

10  **Q.**  How much, around 2020, do you think you owed him?

11  **A.**  I mean, I can't say exactly but it would probably be in

12  the thousands.

13  **Q.**  Around late summer of 2020, did you have any conversations

14  with Justin Gray about the Aryan Brotherhood?

15  **A.**  Uh, I mean, I don't know if -- yeah, yeah.

16  **Q.**  Do you know whether or not Justin owed money to any

17  brothers?

18  **A.**  I don't know if he owed money, no.

19  **Q.**  Did someone else related to him owe money that you were

20  aware of?

21  **A.**  Yeah, his little brother owed money.

22  **Q.**  And do you know who his brother owed money to?

23  **A.**  Either Frank or Kenwood.

24  **Q.**  Has -- do you know whether or not Justin Gray has ever

25  served time in prison?

2478

1   **A.**   Yes.

2   **Q.**   Has he?

3   **A.**   Yes, he has.

4   **Q.**   And do you know if he has ever been celled or shared a

5   cell with an AB brother?

6   **A.**   Yeah, he was celled up with Frank.

7          MS. STOKMAN:  If we can display Exhibit 1009.  It's

8   been admitted already.

9   BY MS. STOKMAN:

10  **Q.**   Do you know who that is in that picture?  Do you recognize

11  him?

12  **A.**   Yes.

13  **Q.**   Who?

14  **A.**   That's Justin Gray.

15         MS STOKMAN:  If we could show just the witness,

16  please, Exhibit 1291.

17  BY MS. STOKMAN:

18  **Q.**   Do you recognize this photograph?

19  **A.**   Yes.

20  **Q.**   And how do you recognize it?

21  **A.**   It's me and Justin Gray in Vegas.

22  **Q.**   And does that accurately depict you and Justin when you

23  took that photograph in Las Vegas?

24  **A.**   Yes.

25         MS. STOKMAN:  Ask to admit Exhibit 1291 and publish

2479

1    to the jury?

2              THE COURT:  Any objection?

3              MS. DE SALES BARRETT:  No objection.

4              MR. VILLA:  No objection.

5              MR. REED:  No objection.

6              THE COURT:  That will be admitted.

7        (Government's Exhibit 1291 was received.)

8    BY MS. STOKMAN:

9    Q.  In this hat -- I mean, sorry, in this picture, you're

10   wearing a hat; right?  Are you the individual wearing a hat?

11   A.  Yes, I am.

12   Q.  Is there a significance to that P on the hat?

13   A.  Yes.  It's --

14   Q.  What is it?

15   A.  It's a Pittsburgh Pirates hat but it's known -- worn by

16   PENI gang members.

17             MS. STOKMAN:  If we can just show the witness only,

18   please, Exhibit 1292.

19   BY MS. STOKMAN:

20   Q.  Do you recognize this photograph?

21   A.  Yes.

22   Q.  And how do you recognize it?

23   A.  It's me and Justin in Las Vegas also.

24   Q.  And is it an accurate depiction of when you took that

25   photograph with Justin in Las Vegas?

2480

1   **A.**  Yes.

2           MS. STOKMAN:  If we could admit and publish 1292,

3   please.

4           THE COURT:  Any objections?

5           MS. DE SALES BARRETT:  No, Your Honor.

6           MR. VILLA:  No, Your Honor.

7           MR. REED:  No objection.

8           THE COURT:  That will be admitted.

9       (Government's Exhibit 1292 was received.)

10  BY MS. STOKMAN:

11  **Q.**  How long have you known Justin?

12  **A.**  Since about 2012.

13  **Q.**  And around what time frame, do you remember, if you

14  remember, were these photos taken?

15  **A.**  That will be 2020.  About December, maybe, of 2020.

16  **Q.**  Okay.  And during 2020, you said you were friends with

17  Justin.  Were you friends with him throughout 2020 or during

18  that time frame?

19  **A.**  Yes, I was.

20          MS. STOKMAN:  Okay.  We can take down.  Thank you.

21  BY MS. STOKMAN:

22  **Q.**  Do you know an individual named Lana Haley?

23  **A.**  Yes, I do.

24  **Q.**  How do you know her?

25  **A.**  I grew up with her.  I've known her practically all our

1    lives.

2    **Q.**  And in 2020, were you in contact with Lana Haley?

3    **A.**  Yes.

4    **Q.**  Did there come a point in time in 2020 when you bought

5    anything from Lana?

6    **A.**  Yes, I bought a motorcycle helmet from her.

7    **Q.**  And where did you put that helmet?

8    **A.**  I had it on my boat.

9    **Q.**  Did there come a point in time where something happened to

10   that helmet?

11   **A.**  Yeah, it was stolen.  My boat was broken into and it was

12   stolen.

13   **Q.**  Was that the only thing stolen?

14   **A.**  No, there was a drone that was taken.

15   **Q.**  And did you ever learn who stole those items?

16            MS. DE SALES BARRETT:  Objection.  Foundation.

17            THE COURT:  Sustained.

18   BY MS. STOKMAN:

19   **Q.**  So now I'm going to direct your attention to -- actually

20   let me ask you one question.

21            You said your boat.  Did you live on that boat or

22   something else?

23   **A.**  Yeah, I lived on it.

24   **Q.**  Okay.  I'm going to direct your attention around the time

25   of October 4th of 2020.  Where were you on that evening of

DX Bannick - S

2482

1    October 4th, 2020?

2    **A.**   I was -- I was on my boat and then, uh, in Lomita.

3    **Q.**   So you were on your boat first?

4    **A.**   Yeah.

5    **Q.**   Where's your boat located?

6    **A.**   In Redondo Beach.

7    **Q.**   At any point during the evening of October 4th, 2020, did

8    you speak with Justin Gray?

9    **A.**   Yes, I did.

10   **Q.**   And what was the means by which you were speaking with

11   him?

12   **A.**   He called me on the phone.

13   **Q.**   What did he say?

14   **A.**   He told me, he said that -- he asked if I could come meet

15   up with him, that he needed my help with something.

16   **Q.**   And did you know what he needed your help with?

17   **A.**   No.

18             MS STOKMAN:  If we can show just the witness

19   Exhibit 1294, please?

20   BY MS. STOKMAN:

21   **Q.**   Do you recognize that?

22   **A.**   Yes.

23   **Q.**   What is that?

24   **A.**   It's Facebook messages between me and Justin.

25   **Q.**   And are those accurate messages between and you Justin

2483

1   around the time frame of October 3rd and October 4th of 2020?

2   A.  Yes.

3         MS. STOKMAN:  Ask to admit 1294 and publish to the

4   jury.

5         THE COURT:  Any objections?

6         MS. DE SALES BARRETT:  No, Your Honor.

7         MR. REED:  No objection.

8         MR. VILLA:  Just the previous, with respect to the

9   certifications.

10        THE COURT:  Right.  That's overruled.

11        Anything, Mr. Reed?

12        All right.  That will be admitted.

13     (Government's Exhibit 1294 was received.)

14        MS. STOKMAN:  If we can go to page 2, please.

15  BY MS. STOKMAN:

16  Q.  In the first message where Justin's contacting you on

17  October 3rd, 2020, do you see where he says:  Get at me, we

18  have something to do, or We have to do something?

19  A.  Yes.

20  Q.  Did you ask him at that point what that was?

21  A.  No.

22  Q.  And it looks like there were a lot missed calls between

23  then and October 4th.  Is it -- is that accurate?

24  A.  Yes.

25  Q.  So when you received the call from Justin on October 4th,

Ex. 8 Resnick - S

2484

1   that's when he said again to you, We have something to go do?

2   A.   Yes.

3   Q.   Uh, where it says, in the middle, "Bam, I'm at the room.

4   Where are you at," what is that referring to?

5   A.   Uh, the hotel room in -- in Lomita, the Eldorado Inn.

6           MS. STOKMAN:   We can take this down, please.

7   BY MS. STOKMAN:

8   Q.   On October 4th, 2020, after you received the call from

9   Justin while on your boat, did you end up meeting him

10  somewhere?

11  A.   Yes, I met him at the Eldorado Inn.

12  Q.   And why did you go without knowing what you were doing?

13  A.   Because he's my friend.  He's asking for my help.

14  Q.   Did you receive a call before you went to the hotel from

15  any AB brothers?

16  A.   Yes.

17  Q.   Who did you receive a call from?

18  A.   From Frank.

19  Q.   And what did Frank tell you during that call?

20  A.   He told me that I needed to go help Justin and he said

21  that there's -- that's he's got a way for me to work off some

22  of the money that I owed them.

23  Q.   Did he say who you owed specifically?

24  A.   Well, I mean, I -- I owed Kenwood, so that's who I figured

25  he was referring to.

1          MR. VILLA:  Objection as to speculation.

2          THE COURT:  Sustained.

3          MR. VILLA:  Ask to strike.

4          THE COURT:  That will be stricken.

5   BY MS. STOKMAN:

6   Q.  So tell us again what -- what he said to you.

7          MR. VILLA:  Objection.  Asked and answered.

8          THE COURT:  Sustained.

9   BY MS. STOKMAN:

10  Q.  When you said that Frank said you needed to go meet up

11  with Justin and there was a way to work off your debt, who did

12  you owe money to at that point?

13         MR. VILLA:  Objection.  Asked and answered.

14         THE COURT:  Overruled.

15         THE WITNESS:  I owed Kenwood money.

16  BY MS. STOKMAN:

17  Q.  So what did you take that to mean, that conversation?

18         MR. VILLA:  Objection.  Speculation.

19         THE COURT:  Overruled.

20  BY MS. STOKMAN:

21  Q.  You can answer.

22  A.  Just that I needed to go -- go help Justin out with

23  something that would help reduce my debt.

24  Q.  And did you go meet up with Justin?

25  A.  Yes.

2486

1    **Q.**  Who was at the room when you arrived?

2    **A.**  Justin, Matt O'Day, and Sarah Castillo.

3    **Q.**  At some point in time when you were in the room, do you

4    recall whether or not Justin was on the phone?

5    **A.**  Yes.

6    **Q.**  And was he?

7    **A.**  Yes, he was.

8    **Q.**  At that point, did Justin give you any more details about

9    what you needed to do?

10   **A.**  Yes.

11   **Q.**  What did he tell you?

12   **A.**  Uh, he said that somebody -- somebody needed to get

13   killed.

14   **Q.**  Did he tell you why?

15   **A.**  Not at the time, no.

16   **Q.**  So he tells you someone needs to get killed, and does he

17   give you any more information beyond that?

18   **A.**  No.

19   **Q.**  So what happened after that?

20   **A.**  Uh, I mean, we were kind of just discussing, you know,

21   places where maybe it could be -- where it could happen.  Uh,

22   yeah.

23   **Q.**  At some point, did you leave the room?

24   **A.**  Yes.

25   **Q.**  And why did you leave the room?

2487

1    **A.**  Uh, well, he got a message, a message or a call -- I

2    don't -- that -- that the person was down the street.

3    **Q.**  And so at that point you left?

4    **A.**  Yes.

5    **Q.**  And what hotel was this again?

6    **A.**  The Eldorado.  Eldorado Inn in Lomita.

7    **Q.**  When you left the hotel, who did you leave with?

8    **A.**  Just me and Justin.

9    **Q.**  And what car were you in?

10    **A.**  In my BMW.

11    **Q.**  Where did you go from there?

12    **A.**  We drove down PCH to Oak and turned right.

13    **Q.**  And did you at some point come to a stop?

14    **A.**  Yeah.  We were kind of just driving up and down the street

15    until we saw a car, a black Volkswagen, and he said, "I think

16    that's" -- "I think that's him."

17         And he got out of the car and -- and over to the

18    person in the other car, and he told them to pull over

19    somewhere.  And he got back in the car.  And that's -- he told

20    me that there was two people.

21    **Q.**  So when you say he saw a car or he said that must be him,

22    who was saying that?

23    **A.**  That was Justin.  Justin said that.

24    **Q.**  And so Justin got out of the car and went to speak to the

25    person in the Volkswagen?

Di Barnick-5

2488

1    A.   Yes.

2    Q.   And that's when he returned.  And it was Justin who said

3    there's two of them?

4    A.   Yeah.

5    Q.   Okay.  And was there any more discussion at that point

6    about what that meant?

7    A.   No.

8    Q.   So between -- and at that point, what did Justin tell you

9    to do?

10   A.   He told me to drive down 255th, or whatever that street is

11   right there, and park.

12   Q.   And that location where you parked on 255th, about how far

13   was that from the hotel or motel that you came from?

14   A.   Maybe two blocks.

15   Q.   Okay.  So what happened when you parked your car?

16   A.   Uh, I saw that there was two individuals on the sidewalk.

17   Q.   Before you saw them on the sidewalk, what happened to that

18   Volkswagen that Justin had gone to speak with the person

19   inside?  Did they follow you or something else?

20   A.   Yeah.  They had followed us to -- down that street and

21   parked a little bit behind us.

22   Q.   Okay.  So you saw two individuals outside of that vehicle?

23   A.   Yes.

24   Q.   And what did you do?

25   A.   I just got out of the car and walked over to the sidewalk,

2489

1   and, uh -- and just kind of like, you know, said what's up to

2   them.

3   **Q.**  And what happened then?

4   **A.**  Uh, Justin walked around me, and -- and I just heard the

5   gunshot, and I saw one of them drop.  And I -- at that point,

6   I -- I was kind of surprised, you know.  I was startled

7   because I didn't know anything was going to happen right

8   there.  And I -- you know, so we just ran.  And I heard the

9   second gunshot, but we just ran back to the car.

10   **Q.**  Uh, where were you standing in relation to Justin when you

11   heard those -- those gunshots?

12   **A.**  I would be just to the left of him.

13   **Q.**  And did you see him fire the gun?

14   **A.**  I didn't see it, no.

15   **Q.**  But the gun -- the sound came from Justin's area?

16   **A.**  Yeah.

17   **Q.**  Okay.  Did you have a gun on you?

18   **A.**  Yes.

19   **Q.**  And where was that gun at that time?

20   **A.**  It was in my waistband.

21   **Q.**  And do you know what kind of gun Justin had?

22   **A.**  It was a 9mm.  I don't know the -- what kind it was.

23   **Q.**  The gun that you had, at any point did you fire it?

24   **A.**  No.

25   **Q.**  Did you take it out of your waistband?

1    A.  No.

2    Q.  How come?

3    A.  I -- I -- I had no reason to.  I didn't -- I didn't know

4    anything was going to happen right there.

5    Q.  Was there something about the location that caused you to

6    think that?

7    A.  Yeah.  I mean, we were right in the middle of a

8    neighborhood, and this was, you know, at 2:00 in the morning

9    or some-odd hour where it was just a -- you know, not a place

10   that I would call a place to do something like that.

11   Q.  So going into that meeting, were you aware of how many

12   people were supposed to show up?

13   A.  I mean, I just heard that it was one person.

14   Q.  And before you arrived at that area of Lomita, what was

15   your understanding about what your role was in being there

16   with Justin?

17   A.  Uh, I mean, I wasn't clear on it.  I mean, I was just

18   there to have his back, I guess, you'd say.

19   Q.  So you said that after the second shot, you both ran back

20   to the car.  What happened next?

21   A.  We drove back to the PCH and kept driving to the freeway

22   on-ramp in Harbor City, the 110 South.

23   Q.  Where did you ultimately end up?

24   A.  We ended up in San Pedro at Justin's mom's boyfriend's

25   house.

Di Bernick-E

2491

1    **Q.** At any point did Justin tell you why that shooting
2    happened?
3    **A.** Yeah.  He said that --
4            MR. VILLA:  Objection.  Hearsay.
5            THE COURT:  Ms. Stokman, your comments?
6            MS. STOKMAN:  Statement of a coconspirator.
7            THE COURT:  Overruled.
8            MR. VILLA:  After the conspiracy, Judge.
9            THE COURT:  I'm sorry.  I didn't hear you, Mr. Villa.
10           MR. VILLA:  It was after the murder took place.
11           THE COURT:  Overruled.
12   BY MS. STOKMAN:
13   **Q.** What did he say?
14   **A.** He said that a person had disrespected Frank.
15   **Q.** How long did you stay at the house in San Pedro?
16   **A.** About an hour.
17   **Q.** And then where did you go?
18   **A.** I drove -- I ended up in Laguna Beach.
19   **Q.** And did something significant happen to you there?
20   **A.** Yeah.  I was pulled over and arrested for DUI.
21   **Q.** And is that an arrest that occurred on October 4, 2020,
22   for a DUI, driving with a suspended license, and possess of
23   pills?
24   **A.** Yes.
25   **Q.** Okay.  I'm going to direct your attention now to 2022.

Dix Barnick - S

2492

1    Who were you mostly hanging out with around that

2    time, like the early part of 2022?

3    A.  Evan Perkins, Matt O'Day, James Yagle, Jimbo, and

4    Ronnie Ennis.

5    Q.  So you mentioned Matt O'Day.  How do you know him?

6    A.  He's a fellow PENI member.

7    Q.  And you mentioned Jimbo, or James Yagle.  How do you know

8    him?

9    A.  Uh, he's been my friend for a good amount of time, another

10   PENI member.

11   Q.  And what about Ronnie Ennis?  How do you know him?

12   A.  He's another PENI member.  I don't -- I wasn't as close to

13   him, but I've known him for a little while.

14   Q.  At any point around the early parts of 2022, were you

15   aware of whether or not Evan Perkins had owed a debt to anyone

16   in the AB?

17   A.  Yes.

18   Q.  And who did he owe money to?

19   A.  He owed Kenwood.

20   Q.  Do you know the circumstances around why he owed money?

21   A.  Yeah.  He was -- he was doing the EDD fraud, and he was

22   attempting to kick up money to -- to the brothers.  So he gave

23   Kenwood some profiles to do the EDD fraud with, and he offered

24   to do the fraud himself and then just give the money or the

25   cards to Kenwood.  But I guess Kenwood had somebody or some

2493

1   way to do it himself, so -- but --

2           MR. VILLA:  Objection as to speculation.

3           THE COURT:  Sustained.

4   BY MS. STOKMAN:

5   Q.  At any point, did Evan tell you why he owed money from --

6   from that EDD?

7   A.  Yes.

8   Q.  What did he say?

9   A.  Uh, that -- that they had -- Kenwood did the -- or

10  attempted to do the EDD fraud with those profiles and that it

11  didn't work.  So he fined Evan the maximum amount of money

12  that could have possibly been made from each profile.

13  Q.  And around how much money did Evan owe around the early

14  parts of 2022?

15  A.  Up -- almost a half a million dollars, I believe.

16  Q.  And was Evan, to your knowledge, paying that money back?

17  A.  No.

18  Q.  What was the consequence of that?

19  A.  He was in the hat.  He was --

20          MR. VILLA:  Objection.  Lack of foundation.

21          THE COURT:  Sustained.

22  BY MS. STOKMAN:

23  Q.  How do you know what the consequence was for Evan?

24  A.  I -- I mean, I know that he was in trouble.  That's --

25  Q.  And who told you that?

Parnick-S

2494

1   **A.**   The brothers, Kenwood.

2   **Q.**   What did they -- what did they tell you?

3   **A.**   Uh, just that he was in the hat and that until he made

4   things right, that that was it.

5   **Q.**   What does "being in the hat" mean?

6   **A.**   That means you're targeted for violence or death.

7            MS. STOKMAN:  Just one second.

8            If we can bring up Exhibit 1288 just for the witness,

9   please, at page 2.

10  BY MS. STOKMAN:

11  **Q.**   Do you recognize that photograph?

12  **A.**   Yes.

13  **Q.**   How do you recognize it?

14  **A.**   It's Ronnie, Jimbo, me, and Matt O'Day.

15  **Q.**   And is that an accurate depiction of how you-all looked

16  when you took that photograph?

17  **A.**   Yes.

18           MS. STOKMAN:  Ask to admit 1288, page 2, and to

19  publish to the jury.

20           THE COURT:  Any objections?

21           MS. DE SALES BARRETT:  No, Your Honor.

22           MR. REED:  No objection.

23           MR. VILLA:  No, Your Honor.

24           THE COURT:  That will be admitted.

25      (Government's Exhibit 1288, page 2 was received.)

2495

1    BY MS. STOKMAN:

2    **Q.**  So looking at that photograph, going from left to right,

3    tell us again who those individuals are?

4    **A.**  That's Ronnie Ennis, James Yagle, myself, and Matt O'Day.

5         MS. STOKMAN:  Around the earlier part -- and we can

6    take that down, please.

7    BY MS. STOKMAN:

8    **Q.**  Around the earlier part of 2022, did you know where Evan

9    was living?

10   **A.**  Yes.

11   **Q.**  And where was that?

12   **A.**  In an apartment in Bellflower off of Park Street.

13   **Q.**  Did you ever stay at that apartment?

14   **A.**  Yes.

15        MS. STOKMAN:  If we can please show Exhibit 1141.

16   It's already been admitted.

17   BY MS. STOKMAN:

18   **Q.**  Do you recognize what's in this photograph?

19   **A.**  Yes.

20   **Q.**  What is it?

21   **A.**  That's the stairs leading to Evan's apartment.

22        MS. STOKMAN:  And if we can show 1144, please.  It's

23   already been admitted.

24   BY MS. STOKMAN:

25   **Q.**  Do you recognize what's in that photograph?

DX Bannick-S

2496

1   **A.**  Yes.  It's Evan's living room and kitchen.

2           MS. STOKMAN:  And 1148, please.  It's also already

3   been admitted.

4   BY MS. STOKMAN:

5   **Q.**  What's being shown in this photograph?

6   **A.**  Uh, two hats, two Pittsburgh Pirates hats.

7   **Q.**  And is that with the "P" that you said is significant to

8   PENI?

9   **A.**  Yes.

10  **Q.**  Did you know where those hats were hanging?

11  **A.**  Yes.  Like, in the -- on the cupboard of Evan's apartment.

12  **Q.**  Did you -- uh, did you know whether or not James Field

13  ever went to Perkins' apartment?

14  **A.**  Yes, he did.

15  **Q.**  And around what time frame was that?

16  **A.**  Late February of '22.

17  **Q.**  When Field was in Evan's apartment, did he give you

18  anything?

19  **A.**  Yes.

20  **Q.**  What did he give you?

21  **A.**  He gave me a chopped-up barrel from a 9mm.

22  **Q.**  And what did you do with that?

23  **A.**  I threw it off the freeway into a body of water.

24  **Q.**  Did you know whether or not Field had used that gun?

25  **A.**  Yes.

2497

1   Q.  And had he?

2   A.  Yes, he had.

3   Q.  Did you know what it was used for?

4   A.  Yes.  For a -- for a homicide in Lancaster.

5   Q.  Were you aware of the facts surrounding that murder?

6   A.  Yes, some of them.

7   Q.  And were you aware --

8           MS. DE SALES BARRETT:  Objection.

9           THE COURT:  Sustained.

10          MS. STOKMAN:  Sorry.  It was --

11          MS. DE SALES BARRETT:  Foundation.

12          THE COURT:  -- foundation.

13  BY MS. STOKMAN:

14  Q.  How did you know about that?

15  A.  He told me.

16  Q.  And did he tell you about a robbery that occurred in

17  Hollywood?

18  A.  Yes.

19  Q.  Did you know about that robbery prior to James Field

20  telling you about it?

21  A.  Yes.

22  Q.  How?

23  A.  Frank had told us that we were going to be going out there

24  to help these guys rob a house in Hollywood.

25  Q.  Who was supposed to go?

1    **A.**  Me, Jimbo, Ronnie, and Joe Dirt.

2    **Q.**  Joe Dirt?

3    **A.**  Yeah.

4    **Q.**  Do you know -- is that a nickname?

5    **A.**  Yeah.  It's Joseph Brutton.

6        (Court reporter gains clarification.)

7    BY MS. STOKMAN:

8    **Q.**  And did you end up going to help with that robbery?

9    **A.**  Yes.  We went out there, but by the time we got near the

10   location, it was already called off.  Something had happened.

11        MS. STOKMAN:  Okay.  If we can look at Exhibit 1289,

12   for the witness only, page 2, please.

13   BY MS. STOKMAN:

14   **Q.**  Do you recognize that photograph?

15   **A.**  Yes.

16   **Q.**  How do you recognize it?

17   **A.**  That's a picture of me and James Field.

18   **Q.**  And does that accurately reflect how you looked on the day

19   this picture was taken?

20   **A.**  Yes.

21        MS. STOKMAN:  Can we please admit and publish to the

22   jury 1289, page 2.

23        THE COURT:  Any objections?

24        MS. DE SALES BARRETT:  No, Your Honor.

25        MR. REED:  No objection.

1      MR. VILLA:  No, Your Honor.

2      THE COURT:  That'll be admitted.

3    (Government's Exhibit 1289, page 2, was received.)

4  BY MS. STOKMAN:

5  **Q.**  And is that you again in the hat with the "P" on it?

6  **A.**  Yes.

7  **Q.**  Okay.  Where was this photo taken?  Do you recall?

8  **A.**  I believe Evan's apartment.

9      MS. STOKMAN:  And if we can show 1299.  It's been

10  admitted already.

11  BY MS. STOKMAN:

12  **Q.**  Do you know where this photograph was taken?

13  **A.**  Yes.  Evan's apartment.

14  **Q.**  And that's you and who else?

15  **A.**  Me and James Field.

16  **Q.**  Are you the one in the shirt with the "P" on it?

17  **A.**  Yes.

18  **Q.**  What hand gesture are you making?

19  **A.**  Uh, a "P."

20  **Q.**  What does that signify?

21  **A.**  For PENI.

22      MS. STOKMAN:  Thank you.  We can take that down.

23  BY MS. STOKMAN:

24  **Q.**  Do you know whether or not Evan Perkins had any issues

25  with Ronnie Ennis around the time of late February, early

Y. Barnick - S

2500

1   March 2022?

2   **A.**   Yes.

3   **Q.**   And did he?

4   **A.**   Yes, he did.

5   **Q.**   Did you ever have issues with Ronnie?

6   **A.**   Yes.

7   **Q.**   Did you have any issues around, then, with Jimbo?

8   **A.**   Disagreements, yeah.

9   **Q.**   And what were the cause of the issues you had with Ronnie

10  around that time?

11  **A.**   Well, Ronnie and -- Ronnie and Jimbo were trying to get me

12  to open the door -- get the door open to Evan's apartment so

13  they can go in and, you know, hurt him or rob him.

14  **Q.**   And how did that create issues for yourself?

15  **A.**   I got into a fight with Jimbo and Ronnie.

16  **Q.**   And did you have any injuries to your face from that

17  fight?

18  **A.**   Yes.

19  **Q.**   What did you have?

20  **A.**   I had a black eye and, like, some cuts on my face and

21  maybe a fat lip.

22  **Q.**   And at some point around that time, did you actually go to

23  Evan's apartment with Ronnie and Jimbo?

24  **A.**   Yes.

25  **Q.**   And what, if anything, did they do while they were in the

1  apartment?

2  **A.**  I mean, they just kind of made themselves at home, and

3  Ronnie started, like, filling in a duffle bag up with clothes

4  and stuff that belonged to Evan.  He was taking it for

5  himself.

6  **Q.**  Did you speak with Frank about this incident at any point?

7  **A.**  Yes.

8  **Q.**  What did he say?

9  **A.**  He said that Ronnie wasn't supposed to take anything.  And

10  that -- that the only reason why they were there was to secure

11  the apartment and make Evan -- put Evan back in contact with

12  them.

13  **Q.**  Who is "them"?

14  **A.**  The brothers.

15  **Q.**  After that incident at Evan's apartment, did Frank contact

16  you like around the early parts of March of 2022 with

17  something else that he wanted you to be a part of?

18  **A.**  Yes.

19  **Q.**  And what -- what did he say?  What was that?

20  **A.**  Uh, one -- another PENI member named Shifty, he had --

21  he -- his house -- or his apartment had gotten raided by law

22  enforcement, and they made a -- they put a newspaper article

23  out that showed a bunch of money and drugs being confiscated,

24  and I mean, I think Frank was just curious as to why, if he

25  was making all that money, why he wasn't paying anybody.

1    **Q.**  And what -- what did you do -- or what did Frank tell you

2    to do?

3    **A.**  He told us to get Shifty and -- and put him in contact

4    with him.

5    **Q.**  And did you do that?

6    **A.**  Yes.

7    **Q.**  At some point when you were in contact with Shifty, did

8    another individual come into the picture related to that

9    incident?

10   **A.**  Yes.

11   **Q.**  Who was that?

12   **A.**  Rick Rainey.

13   **Q.**  And who's Rick Rainey?

14   **A.**  He's an Aryan Brotherhood member.

15   **Q.**  What, if anything, happened to Shifty and Rick Rainey as

16   it pertains to this incident?

17   **A.**  I mean, we had them tied and held hostage in Evan's

18   apartment.

19   **Q.**  Who told you to do that?

20   **A.**  Frank.

21   **Q.**  And during this time, was Frank instructing you to do

22   anything else to Rick Rainey?

23   **A.**  Yes.

24   **Q.**  What was he telling you to do?

25   **A.**  Uh, I mean, if he was -- if he was asleep, you know, he

1  would -- you know, he would be -- he would be out in like a

2  video visit and tell me to wake him up by kicking him in the

3  face, and if he was smoking a cigarette, he would tell me to

4  put the cigarette out on his face.

5  **Q.** So you were saying "he" would tell you.  Who's telling you

6  that?

7  **A.** Frank.

8  **Q.** Who would have been the person you kicked or put the

9  cigarette on their face?

10  **A.** Rick Rainey.

11  **Q.** At any point in time, did you get an order to kill

12  Rick Rainey?

13  **A.** Yes.

14  **Q.** What was that?

15  **A.** We were told that we were going to have to give him a hot

16  shot of fentanyl.

17  **Q.** What does that do?

18  **A.** It's just a -- it would be a lethal dose of fentanyl,

19  given through a syringe.

20  **Q.** How did that order make you feel?

21  **A.** Very --

22            MR. VILLA:  Object to the relevance.

23            THE COURT:  Overruled.

24  BY MS. STOKMAN:

25  **Q.** Go ahead.

1    A.  Very uncomfortable.  Very uneasy.

2    Q.  Why?

3    A.  Uh, because he was -- Rick Rainey is an Aryan Brotherhood

4    member, and that's a big part of their rules and structure,

5    that, you know, a regular -- a regular convict or white man to

6    put his hands on a made member is a death sentence.

7    Q.  But this was an order coming from a brother himself,

8    right?

9            MR. VILLA:  Objection.  Leading.

10           THE COURT:  Sustained.

11   BY MS. STOKMAN:

12   Q.  So how does that work?  Why were you not wanting to follow

13   that order from Frank?

14   A.  Well, because that would have -- that would be something

15   that would have to be approved by the commission, and, you

16   know, other brothers.  And I -- I just didn't know if that was

17   something that they -- that they would all be in agreement on.

18   Q.  Did Frank tell you whether or not this had been approved?

19   A.  Yes.

20   Q.  And what did he say?

21   A.  He -- he just said that all the -- that it was sanctioned

22   by the brothers.

23   Q.  Uh, and that didn't cause you to still follow that order?

24   A.  No.

25   Q.  Why?

DX-Rannick-S

2505

1    **A.**  I mean, that's just something that's -- you know, I was --

2    uh, I mean, then once you do that, it's -- you know, you're

3    comitted and there's no going back from it, obviously.

4    **Q.**  Do you know of whether or not Rick Rainey was particularly

5    close to any other AB brothers?

6    **A.**  Yes.

7    **Q.**  Who was he close to?

8    **A.**  He was close to John.

9         MS. DE SALES BARRETT:  Objection.  Foundation.

10        THE COURT:  Sustained.

11   BY MS. STOKMAN:

12   **Q.**  How did you now that information?

13   **A.**  Uh, I just know through -- I mean, Rick has told me that

14   and --

15   **Q.**  And who is he close to?

16   **A.**  To John.

17   **Q.**  John Stinson?

18   **A.**  Yeah.

19   **Q.**  Okay.  So what ultimately happened to Shifty and

20   Rick Rainey?

21   **A.**  Well, I mean, we had them tied up and held hostage for,

22   like, four days and none of us were sleeping.  It was just a

23   really stressful time.  And me and Evan were trying to find

24   any way that we could, you know, get -- you know, find another

25   solution.  You know, we wanted to hopefully get in contact

Dykstra-Rennick

2506

```
 1    with maybe somebody else and see, you know, if that was really
 2    what we were supposed to do.
 3            And I told -- I gave Matt my gun and I -- and I told
 4    him to watch these guys while me and Evan were in the other
 5    room talking.
 6    Q.  Is that Matt O'Day?
 7    A.  Yes.
 8    Q.  And so did you leave Matt O'Day in the room with Shifty
 9    and Rick Rainey?
10    A.  Yes.
11    Q.  And what happened?
12    A.  I think Matt might have --
13            MS. DE SALES BARRETT:  Objection.
14            MR. REED:  Speculation.
15    BY MS. STOKMAN:
16    Q.  Just from what you know what happened?
17    A.  Well, Rick got his hands on the gun and --
18            MR. REED:  Objection.  Lack of foundation.
19            THE COURT:  Sustained.
20    BY MS. STOKMAN:
21    Q.  Did something happen that caused Rick Rainey and Shifty to
22    leave the apartment?
23    A.  Yes.
24    Q.  And when you had left him in the room with Matt, had they
25    been tied up?
```

1  **A.**  Yes.

2  **Q.**  Okay.  So did they -- did Rick Rainey and Shifty -- were

3  you able to catch up with them?

4  **A.**  Yes.

5  **Q.**  And what happened there?

6  **A.**  Rick started shooting at me.

7  **Q.**  And so then what did you do?

8  **A.**  I got in the car and left.

9  **Q.**  And did you tell Frank about what happened?

10  **A.**  Yes.

11  **Q.**  And what was his reaction?

12  **A.**  He was very suspicious.  He -- he thought that -- that we

13  had let them go.

14         MS. DE SALES BARRETT:  Objection.

15         THE COURT:  Sustained.

16  BY MS. STOKMAN:

17  **Q.**  Did he tell you anything during your conversation about

18  who was to blame for this?

19  **A.**  Yeah.

20         MR. REED:  Objection.  Calls for a conclusion of

21  another person, which he then testified to.  Lacks foundation.

22         THE COURT:  Overruled.

23  BY MS. STOKMAN:

24  **Q.**  Who did Frank say was to blame?

25  **A.**  Jimbo.

2508

1   **Q.**  And what about Ronnie?

2   **A.**  Uh --

3        MS. DE SALES BARRETT:  Objection.  Leading.

4        THE COURT:  Sustained.

5   BY MS. STOKMAN:

6   **Q.**  Did he say anything about Ronnie?

7   **A.**  No.

8   **Q.**  Turning your attention now to March 8, 2022, during the

9   evening hours of that day where were you?

10  **A.**  I was in Bellflower at Evan's apartment.

11  **Q.**  Who were you with there?

12  **A.**  Me, Evan, and Matt O'Day.

13  **Q.**  Did you leave the apartment at some point?

14  **A.**  Yes.

15  **Q.**  And where did you go?

16  **A.**  We went and met up with James Field at the Starlite Inn

17  Motel.

18  **Q.**  Where is that located?

19  **A.**  In Bellflower.

20        MS. STOKMAN:  If we can show previously admitted

21  Exhibit 1001, please.

22  BY MS. STOKMAN:

23  **Q.**  Who is that?

24  **A.**  That's Evan Perkins.

25        MS. STOKMAN:  And if we can show previously admitted

2509

1    Exhibit 1003, please.

2    BY MS. STOKMAN:

3    **Q.**  Who is that individual?

4    **A.**  That's James Field.

5         MS. STOKMAN:  And finally, already admitted

6    Exhibit 1014.

7    BY MS. STOKMAN:

8    **Q.**  Who is that?

9    **A.**  That's Matt O'Day.

10        MS. STOKMAN:  Okay.  We can take that down.  Thank

11   you.

12   BY MS. STOKMAN:

13   **Q.**  So the four of you are at the Starlite Motel?

14   **A.**  Yes.

15   **Q.**  And did you stay at that motel?

16   **A.**  Not for long.

17   **Q.**  Where did you go?

18   **A.**  We went to Jimbo's house.

19   **Q.**  Why did you go to Jimbo's house from there?

20   **A.**  To retrieve a couple of duffle bags that had some property

21   in it from Shifty.

22   **Q.**  What car did you go in?

23   **A.**  In Evan's Charger.

24   **Q.**  And who went with you?

25   **A.**  Me, Evan, Matt O'Day, and James Field.

2510

1          MS. STOKMAN:  If we can show 1161, which has already

2     been admitted into evidence, please.

3     BY MS. STOKMAN:

4     **Q.**  Do you recognize that vehicle?

5     **A.**  Yes.

6     **Q.**  And what is that?

7     **A.**  It's Evan's Charger.

8     **Q.**  Is that the car that you went in that night?

9     **A.**  Yes.

10          MS. STOKMAN:  Okay.  We can take that down.  Thank

11     you.

12          THE COURT:  All right.  Ms. Stokman, we're going to

13     go ahead and take our last break of the day.  Let's plan to be

14     back at ten minutes after the hour.

15      (Jury exits the courtroom at 11:54 a.m.)

16          THE COURT:  All right.  The jury has stepped out.

17     Let's take our break.

18      (Recess held.)

19          THE COURT:  All right.  Is everyone ready for the

20     jury?

21          MS. STOKMAN:  Yes.

22          THE COURT:  All right.  Let's go ahead and bring them

23     in.

24      (Jury enters the courtroom at 12:14 p.m.)

25          THE COURT:  All right.  We have everyone in their

2511

1    place.

2            Ms. Stokman, you may continue.

3            MS. STOKMAN:  Yes.  Thank you.

4    BY MS. STOKMAN:

5    **Q.**  So before we took the break, you were saying that after

6    you and Evan and James Field and Matt O'Day left the motel you

7    went to Jimbo's house.  Where is Jimbo's house located?

8    **A.**  In Lakewood, on Palo Verde Street.

9    **Q.**  And can you describe what his house looks like for us?

10   **A.**  It's the corner house.  It's got a -- it's got a garage

11   that's not attached, and yeah, like a cinder block wall around

12   the outside.

13   **Q.**  And what happened when you reached that location?

14   **A.**  We got the duffle bags.  And at that point, James Field

15   told us that Frank wanted Ronnie to come with us.

16   **Q.**  Where was Ronnie?

17   **A.**  Ronnie had been in -- in Jimbo's garage.

18   **Q.**  So James Field told you that Frank wanted Ronnie to come

19   with you?

20   **A.**  Yes.

21   **Q.**  Uh, and did you know why that needed to happen?

22   **A.**  Well, we knew that Ronnie was in trouble and that

23   something was going to happen to him.

24   **Q.**  So did you leave Jimbo's house at some point?

25   **A.**  Yes.

2512

1    Q.   And what car did you leave in?

2    A.   Myself and Evan and Ronnie left in Evan's Charger.

3    Q.   And were other people in another car?

4    A.   Yes.

5    Q.   And who -- who was in the other car?

6    A.   Suspect, Matt, and Jimbo left in another car.

7    Q.   Do you know what kind of car that was?

8    A.   Yes, a silver Mercedes.

9    Q.   Did you have a gun on you that night?

10   A.   Yes, I did.

11   Q.   What kind?

12   A.   I had a P80 Ghost Gun, a 9mm.

13   Q.   And do you know whether or not Evan Perkins had a firearm

14   on him?

15   A.   Yes.

16   Q.   What did he have?

17   A.   He had a 40 -- a 40 Cal.

18   Q.   And do you know what type of gun James Field had?

19   A.   Yes, he had a -- he had a 45 1911.

20   Q.   And did you see him possess any other gun that night?

21   A.   No.

22   Q.   Do you know whether or not Ronnie had a gun?

23   A.   Yes.

24   Q.   And what a kind of gun did he have?

25   A.   Ronnie had a -- a 9mm also, a P80.

2513

1    **Q.**  Do you know what happened to that gun?

2    **A.**  Yes.  Suspect had taken it.

3    **Q.**  Had taken Ronnie's gun?

4    **A.**  Yeah.

5    **Q.**  Do you know whether or not Matt O'Day had a gun with him

6    that night?

7    **A.**  I do not.

8    **Q.**  So after everyone went into those two vehicles, where did

9    you go?

10   **A.**  We went to Evan's apartment and dropped off our phones.

11   Me and Evan dropped off our phones there.

12   **Q.**  Uh, and do you recall Evan's apartment -- do you recall

13   ever going back to the motel at that point?

14   **A.**  Not at that point, no.

15   **Q.**  Okay.  Uh, how far way is Evan's apartment from the motel?

16   **A.**  Maybe a -- three blocks.

17   **Q.**  Okay.  So you remember going back to the Bellflower area

18   and dropping your phone off and Evan's phone got dropped off?

19   **A.**  Yes.

20   **Q.**  Where did you go after that?

21   **A.**  We went out to Pomona.

22   **Q.**  And who went to Pomona?

23   **A.**  The same -- the same group in the same cars.

24   **Q.**  Who was driving the lead?

25   **A.**  Evan.  We were in the front.

2514

1    **Q.**  Do you know whether or not Evan had another phone on him,

2    besides the one he dropped in Bellflower?

3    **A.**  I don't know if he did.

4    **Q.**  At some point, uh, did you know what was going to happen?

5    **A.**  I mean, I had a -- I had a feeling that --

6              MR. REED:  Objection.  Nonresponsive.

7              THE COURT:  Sustained.

8    BY MS. STOKMAN:

9    **Q.**  Did you know what was going to happen?

10   **A.**  No.

11   **Q.**  Had James Field mentioned anything to you about Ronnie

12   before heading to Pomona?

13   **A.**  Yes.

14   **Q.**  What did he say?

15   **A.**  Uh, well, when -- when we were leaving, before we left

16   Jimbo's house, Suspect said that Frank wanted Jimbo to come

17   too.

18   **Q.**  And did he say why?

19   **A.**  No.

20   **Q.**  And --

21   **A.**  But --

22   **Q.**  Go ahead.

23   **A.**  But Suspect knew that that was worrying me because Jimbo

24   was my friend and, you know, I didn't want anything to happen

25   to him.  So we kind of agreed at that point, that he --

2515

1   Suspect made a comment.  He said, Well, if anything, we'll

2   just -- Jimbo is going to have to take care of Ronnie.

3   **Q.**  What did you take that to mean?

4   **A.**  That Jimbo would have to kill Ronnie.

5           MS. STOKMAN:  If we can bring up Exhibit 1837,

6   please.  It's already been admitted.  And we can play that.

7       (Video played in open court.)

8   BY MS. STOKMAN:

9   **Q.**  And at any time you see something that you recognize, let

10   us know.

11   **A.**  Yes.  That's Evan's Charger and the Mercedes following it.

12   **Q.**  Was this on their way or within Pomona?

13   **A.**  Yes.

14   **Q.**  So what happened when you arrived at Pomona?

15   **A.**  We pulled over on a really dark street, like in a

16   residential area.  And I -- I got out of the car, and I

17   started walking back towards the other car because I wanted to

18   make sure that everything was okay with Jimbo.  And --

19   **Q.**  And what happened?

20   **A.**  I saw Jimbo and -- and Suspect behind the car, and I heard

21   the gunshot, and -- and I saw Jimbo drop.

22   **Q.**  And did you see who shot him?

23   **A.**  Yeah.

24   **Q.**  Who was that?

25   **A.**  Suspect.

1    **Q.**   What did you do at that point?

2    **A.**   Uh, I started walking back towards the other car because I

3    heard a -- I heard, like, some screaming.  And I saw Ronnie.

4    Ronnie was screaming on the -- in the dirt.  And -- and, yeah,

5    I saw Evan, like, kind of messing with his gun, and he told me

6    that it had jammed.

7    **Q.**   And at this point, could you tell if Ronnie was hurt?

8    **A.**   Yeah.

9    **Q.**   Was he?

10   **A.**   Yeah, he was hurt.

11   **Q.**   Could you tell if he had been shot?

12   **A.**   Yeah.

13   **Q.**   And had he?

14   **A.**   Yeah.

15   **Q.**   But did you see who shot him?

16   **A.**   No.

17   **Q.**   So what did you do?

18   **A.**   I -- I pulled my gun out, and -- and I shot Ronnie three

19   times.

20   **Q.**   Why did you do that?

21   **A.**   Because, I mean, he was lying on the floor screaming.

22   **Q.**   And then what happened after that?

23   **A.**   We got back in the car.

24   **Q.**   And did you shoot your gun any more after that first few

25   times that you shot Ronnie?

PX Barnick S

2517

1    **A.** Yeah. I -- I -- we got in the car. I saw that he was

2    still moving. And -- and I rolled down the window, and I shot

3    three more times.

4    **Q.** What did you do at that point?

5    **A.** We -- we drove and got back on the freeway and drove back

6    to Bellflower.

7          MS. STOKMAN: If we can show the witness -- I'm

8    sorry -- show everybody the display 1839, which has already

9    been admitted into evidence. And go to around Minute 13:50.

10    (Video played in open court.)

11   BY MS. STOKMAN:

12   **Q.** Do you recognize anything in this video?

13   **A.** Yeah. It's the Charger, Evan's Charger.

14   **Q.** Is that where you were riding?

15   **A.** Yes. And that's the --

16   **Q.** You were -- yeah. Go ahead.

17   **A.** -- Mercedes.

18   **Q.** That was the Mercedes, you said?

19   **A.** Yeah.

20   **Q.** And at this point, do you know who was driving the

21   Mercedes?

22   **A.** Suspect was.

23   **Q.** Okay. So you said you went back to the motel?

24   **A.** Yeah.

25   **Q.** Which motel was that?

1   **A.**   Starlite.   Starlite Inn.

2   **Q.**   This was the one that you had previously been when you met

3   up with James Field initially?

4   **A.**   Yeah.

5   **Q.**   Okay.   Who were you with at that -- at that time?

6   **A.**   Uh, me and Evan were in the Charger, and Matt and Suspect

7   were in the Mercedes, and we met back at the hotel.

8   **Q.**   And did they meet back at the hotel at the same time as

9   you and Evan?

10  **A.**   Within -- within three minutes, four minutes, something

11  like that.

12  **Q.**   Do you know if they made any stops on the way?

13  **A.**   Yes.   They were running out of gas, and they stopped and

14  got some gas.

15  **Q.**   So what happened when you-all were back in the motel room

16  together?

17  **A.**   Uh, we were just kind of confused -- or, I mean, I was,

18  you know, about everything that happened.   And -- and Suspect

19  was on the phone with Frank, and --

20  **Q.**   Could you hear what Frank was saying?

21  **A.**   Yeah.

22  **Q.**   What did he say?

23  **A.**   I just heard him say, "Why did Jimbo get shot?"

24  **Q.**   And what, if anything, did Suspect say?

25  **A.**   He explained that he had given Jimbo Ronnie's gun, or a

1  gun, and he got worried that Jimbo was going to shoot him,

2  and -- and he panicked and he shot Jimbo.

3  **Q.**  Did he mention anything about Jimbo lying?

4  **A.**  Yeah.

5  **Q.**  What did he say?

6  **A.**  He said -- he said that Frank said that if he lies at all,

7  shoot him in the face.

8  **Q.**  What happened to the guns that everybody used that night?

9  **A.**  I put them in a backpack, and I took them down to the --

10  to the Redondo breakwall down at the ocean, and I disbursed

11  them, like, in -- in the caves in the rocks.

12  **Q.**  Do you recall what phone number you had around March 8,

13  2022?

14  **A.**  I don't.

15  **Q.**  Would it -- you recall what the area code might have been

16  on any phone you were using?

17  **A.**  It would be a -- it would be a 310 or 424.

18  **Q.**  Okay.  Do you know what the email address associated with

19  Shawn Lasley?  Do you know about that email address or the

20  name Shawn Lasley?

21  **A.**  Yeah, something that Evan would use.

22  **Q.**  Okay.  Have you ever had a phone subscribed to that name?

23  **A.**  Yeah.  I mean, I could have if Evan had given me a phone.

24        MS. DE SALES BARRETT:  Objection, Your Honor.  Move

25  to strike.

2520

1          THE COURT:  Sustained.
2     BY MS. STOKMAN:
3     **Q.**  Did you ever receive phones from Evan to use?
4     **A.**  Yeah.
5     **Q.**  And were those phones already working, or did you have to
6     set -- set the subscriber up?
7     **A.**  They would already be in service.
8     **Q.**  And when Evan would do that for you, was there any time
9     that he would use a name that wasn't your own, as far as the
10    subscriber?
11    **A.**  Yes.
12          MS. DE SALES BARRETT:  Objection, Your Honor.
13    Leading.
14          THE COURT:  Overruled.
15    BY MS. STOKMAN:
16    **Q.**  You said "yes"?
17    **A.**  Yeah.
18    **Q.**  And is there any relation to that, in your recollection,
19    to the Shawn Lasley name?
20    **A.**  Not -- not particularly a phone that he gave me under that
21    name, but, you know --
22    **Q.**  Okay.  But you know that Evan was using that name?
23    **A.**  Yeah.
24    **Q.**  Okay.  When you were in the room and Frank was on
25    speakerphone, did Frank say anything about Jimbo at that time?

DX Resnick S

2521

1    **A.**   Not -- not aside from asking -- asking why he got shot.

2    **Q.**   And was that before or after you heard James Field say

3    what he told you about shooting Jimbo?

4             MS. DE SALES BARRETT:  Objection, Your Honor.  Asked

5    and answered.

6             THE COURT:  Before or after hasn't been asked.

7    That's overruled.

8    BY MS. STOKMAN:

9    **Q.**   Did Frank say that before or after?

10   **A.**   He said that before -- before Suspect explained.

11   **Q.**   Okay.  You were arrested for these murders that you've

12   talked about here today at some point; is that true?

13   **A.**   Yes.

14   **Q.**   And are those the charges that you spoke of that you pled

15   guilty to?

16   **A.**   Yes.

17   **Q.**   Where were you housed when you came over on those charges?

18   **A.**   The Fresno County Jail.

19   **Q.**   And who were you with when you arrived at the

20   Fresno County Jail?

21   **A.**   When I arrived, it was just me and Frank and Kenwood.

22   **Q.**   And did someone else ever show up at the same cell

23   location as you?

24   **A.**   Yes.

25   **Q.**   Who?

2522

1   **A.**  Justin Gray.

2   **Q.**  Did you ever hear Frank and Justin speaking about Lomita

3   during the time at the Fresno County Jail?

4   **A.**  Not about the crime, no.

5   **Q.**  But Frank or Justin were talking about something

6   surrounding Lomita?

7           THE COURT:  I'm sorry.  What --

8           MR. VILLA:  Objection.  Hearsay.

9           THE COURT:  I'm sorry.  I didn't hear the question.

10  I didn't hear the objections.  Everybody was talking.

11          What was your objection, Ms. Barrett?

12          MS. DE SALES BARRETT:  Leading.

13          THE COURT:  Sustained.

14  BY MS. STOKMAN:

15  **Q.**  Did you ever hear Frank and Justin talking about the

16  victim or the circumstances around Lomita?

17          MS. DE SALES BARRETT:  Leading, Your Honor.

18          MR. VILLA:  Hearsay.

19          THE COURT:  Sustained --

20  BY MS. STOKMAN:

21  **Q.**  Okay.

22          THE COURT:  -- as to leading.

23  BY MS. STOKMAN:

24  **Q.**  Let's talk about you and the cooperation agreement that

25  you entered into.

1       Before you entered into that agreement, was that a
2   decision that you made easily?
3   **A.**   No.
4   **Q.**   Why not?
5   **A.**   I've been involved in this lifestyle for a long time, and
6   it's just something I never thought I'd ever do.
7   **Q.**   Why?  Explain that a little bit.
8   **A.**   It's -- uh, you know, you -- you -- it's a -- it's a --
9   it's a high-risk lifestyle, you know, and when you make
10  decisions, I mean, I've always felt that, you know, to be held
11  accountable for them is the right way to go about things.
12  **Q.**   So what made you decide to cooperate?
13  **A.**   I've let -- I've let these guys control my life for -- for
14  a long time now.  It's -- it's led me here.  I've lost people
15  that I care about.  It's ruined a lot of relationships with
16  people I care about.
17      And I mean, it's just taken me a while to learn
18  that -- that I'm not anything like these guys.  And -- and I
19  just wanted to make a decision for myself and for my family.
20  **Q.**   Do you have any safety concerns as you sit up here because
21  you're testifying?
22  **A.**   Yeah.
23  **Q.**   What are those?
24  **A.**   Well, I mean, I -- you know, I've put myself on the -- on
25  the other end, you know.  I'm -- I'm an enemy of them now.

1   **Q.**  And what could happen?

2   **A.**  I mean, I could be killed, you know.

3   **Q.**  Do you have safety concerns for just yourself or other

4   people as well?

5   **A.**  Yeah.  I mean, I think about my family, obviously.  Just

6   because, I mean, they're -- this has nothing to do with them,

7   obviously, but I mean, it's not -- you know, things have

8   happened like that.

9           MS. STOKMAN:  Okay.  Thank you.  I have no further

10  questions.

11          THE COURT:  Cross-examination.

12          MR. REED:  Your Honor, I could question, but can we

13  approach for a second, please?

14          THE COURT:  Sure.

15     (Sidebar commences.)

16          MR. REED:  I suspect that it was inadvertent, but

17  when the government first started with this guy, he was not

18  facing the death penalty when he -- by the time he cooperated,

19  and that's what it was left at.

20          Because that affects you, I don't want to -- I don't

21  want to do that myself, but I do think it needs to be dealt

22  with.  I don't know how to fix that.

23          MS. STOKMAN:  I can ask a follow-up question about at

24  the time of cooperation what he was facing.

25          MR. REED:  Because it makes it sound like that's his

1    benefit, and that is not his benefit.

2         THE COURT:  All right.  I will note that you asked a

3    maximum penalty question the other day as well, so --

4    that's -- if you're going to start off that way, then --

5         MS. STOKMAN:  Yeah, yeah.

6         MR. REED:  Because if I do it, it will be a fight,

7    and I'd rather --

8         THE COURT:  In this instance, it's a mandatory

9    minimum of life.

10        MS. STOKMAN:  Correct.  So I can clear that up.

11        THE COURT:  And you're right, he wasn't facing death

12   because death has been off the table for quite some time.

13        MR. REED:  Right.

14        THE COURT:  Okay.

15        MR. REED:  Thank you.

16     (Sidebar ends.)

17   BY MS. STOKMAN:

18   Q.  Just one thing I wanted to clear up, before you had

19   mentioned that you, at one point, there might have been a

20   potential sentence of a death penalty.

21        But that was not what you were looking at when you

22   decided to cooperate, right?

23   A.  Correct.

24   Q.  All right.  You were looking at a mandatory life sentence?

25   A.  Yes.

CX Barnick

2526

1          MS. STOKMAN:  Okay.  I have no further questions.

2          THE COURT:  Cross-examination?

3          MR. REED:  I have no questions, Your Honor.

4          MR. VILLA:  Yes, Your Honor.

5          THE COURT:  All right.  Mr. Villa.

6                         CROSS-EXAMINATION

7   BY MR. VILLA:

8   Q.  Good afternoon, sir.

9   A.  Good afternoon.

10  Q.  So I guess I'll pick up a little bit where you left off.

11  You said that you were housed at the Fresno County Jail, and,

12  in part, you were housed with Mr. Johnson, correct?

13  A.  Yes.

14  Q.  How long were you housed there?

15  A.  In the same pod as Mr. Johnson?

16  Q.  Yes, sir.

17  A.  About eight months.

18  Q.  Then after that, you were still housed in the

19  Fresno County Jail but in another part of the facility?

20  A.  Yes.

21  Q.  For how long?

22  A.  Over a year.

23  Q.  Roughly a year and eight months at the Fresno County Jail?

24  A.  Yeah, yeah.

25  Q.  And during that time, you were not assaulted or attacked,

CX Bannick-V

2527

1  correct?

2  **A.**  Correct.

3  **Q.**  You were also housed with -- at the Fresno County Jail --

4  Evan Perkins, "Soldier"?

5  **A.**  I was never in the pod with him, but, yeah, I mean, he

6  was -- he was at the Fresno County Jail at the same time that

7  I was, yeah.

8  **Q.**  For how long?

9  **A.**  Uh, probably a year, roughly.

10  **Q.**  You're saying you're just in different pods?

11  **A.**  Yes.

12  **Q.**  And to your knowledge, Mr. Perkins was never assaulted

13  while at the Fresno County Jail?

14         MS. STOKMAN:  Objection.  Calls for speculation.

15         THE COURT:  To his knowledge?  Is that what your

16  asking, Mr. Villa?

17         MR. VILLA:  To his knowledge, yes, Judge.

18         MS. STOKMAN:  To foundation.

19         THE COURT:  Foundation, sustained.

20  BY MR. VILLA:

21  **Q.**  Had you ever heard from any other -- anybody

22  that Mr. Perkins had been assaulted?

23  **A.**  No.

24  **Q.**  Let me talk to you now about Lomita, the October 4, 2020,

25  homicides.

CX - Barnick - V

2528

1     Kenneth Johnson never asked you to kill anybody in
2  Lomita, correct?
3  **A.** Correct.
4  **Q.** And he never talked to you before the murders about doing
5  those murders, correct?
6  **A.** Correct.
7  **Q.** You said you got a call from Justin Gray, essentially, to
8  meet up with you and you met up with him -- sorry, fighting a
9  cold -- at the Eldorado motel?
10 **A.** Yeah.
11 **Q.** And it was at the Eldorado hotel where, according to you,
12 there were discussions about meeting up with the individuals
13 that were ultimately killed; is that right?
14 **A.** Yes.
15 **Q.** I think you testified that, at the hotel, Matt O'Day was
16 there, a woman named Sarah, correct?
17 **A.** Yes.
18 **Q.** Yourself and Mr. Gray?
19 **A.** Yes.
20 **Q.** And that's it?
21 **A.** Yes.
22 **Q.** While you were there, you said that Mr. Gray got a phone
23 call, right?
24 **A.** Yes.
25 **Q.** And that phone call was in your presence, yes?

CX - Bannick - V

2529

1   A.   Yes.

2   Q.   Did you know who he was --

3   A.   Excuse me.  I don't -- I don't know if -- I mean, I -- I

4   can't recall the actual conversation, but he got a call.  I

5   don't know if he left the room.  I mean -- or to be more

6   clear, I didn't hear the discussion that was going on.

7   Q.   All right.  So you were -- you were present.  At some

8   point he gets a call.  You can say he got a call; you can't

9   say if you heard what was discussed or if he stayed in the

10  room for the whole time, right?  Is that a "yes"?

11  A.   Yes.

12  Q.   You don't know who he got a call from.  Is that what

13  you're saying?

14  A.   Right.

15  Q.   And that was phone call number one, and then later there

16  was a phone call or I think a -- a message that was a separate

17  phone call, correct?

18  A.   Yes.

19  Q.   Okay.  So phone call number one, Mr. Gray's on the phone,

20  according to you, with somebody but you don't know who, right?

21  A.   Correct.

22  Q.   And you weren't party to that phone -- first phone call,

23  correct?

24  A.   Correct.

25  Q.   Nobody on that first call overheard you talking in the

2530

1    background and spoke to you, correct?

2            MS. STOKMAN:  Objection.  Calls for speculation.

3            THE COURT:  Sustained.

4    BY MR. VILLA:

5    Q.  Whoever was on that phone call with Mr. Gray, you did not

6    talk to, correct?

7    A.  Correct.

8    Q.  They did not address you, like, through speaker phone or

9    through the phone, Hey, what's up man, nothing like that,

10   right?

11   A.  Right.

12   Q.  And then the second call that came in was a different call

13   that -- according to you, that Mr. Gray said, Okay, let's go.

14   We're going to go meet this guy, right?

15   A.  I don't know if it was a call or a text.

16   Q.  Okay.  Thanks.

17           So the first one was definitely a phone call.  Second

18   one might have been a text --

19   A.  Yes, correct.

20   Q.  -- yes?

21           And after that second text, you guys then leave, you

22   ultimately go and meet up with the people who get shot in

23   Lomita, according to you, right?

24   A.  Right.

25   Q.  To the best of your knowledge -- let me back up.

2531

1        You said, when the shooting happened, it was Mr. Gray

2   that shot them; you didn't shoot them?

3   A.  Correct, yes.

4   Q.  You never took your gun out, right?

5   A.  Right.

6   Q.  You -- if I understand your testimony correctly, you-all

7   met with these individuals in a black Volkswagen somewhere

8   down the road from where the shooting ultimately occurred,

9   correct?

10  A.  Yes.

11  Q.  Then, according to you, Mr. Gray got out, spoke to them,

12  got back in, and then you guys drive a few blocks down the

13  road?

14  A.  Uh, not even a few blocks.  Probably a block, half a

15  block, something like that.

16  Q.  The first place where you stopped, was that in a

17  residential neighborhood or somewhere else?

18  A.  Yes, it was in a residential neighborhood.

19  Q.  Where you drove approximately a block was also in a

20  residential neighborhood, yes?

21  A.  Yes.

22  Q.  I think if I understood it correctly, where the shooting

23  took place, that block down the road, you guys were in front

24  of the Volkswagen; is that right?

25  A.  Right.

CX Resnick-X

2532

1   **Q.**  Parked along the street?

2   **A.**  Right.

3   **Q.**  In front of a residential home?

4   **A.**  Yeah.

5   **Q.**  Yes?

6   **A.**  Yes.

7   **Q.**  Sorry, I just have trouble hearing you.

8           And both of you get out of the vehicle and meet with

9   the two individuals that are in this Volkswagon, the two

10  people who get shot, right?

11  **A.**  Right, yes.

12  **Q.**  You're standing on the sidewalk?

13  **A.**  Yes.

14  **Q.**  In front of the residential home?

15  **A.**  Yes.

16  **Q.**  That's, then, when, according to you, Mr. Gray shoots the

17  two people, right?

18  **A.**  Right.

19  **Q.**  And then you leave?

20  **A.**  Yes.

21  **Q.**  All that happens right there on the sidewalk in front of

22  the front yard of some residential house?

23  **A.**  Yes.

24  **Q.**  To the best of your knowledge, Kenneth Johnson didn't know

25  that those homicides were going to occur?

1    MS. STOKMAN:  Objection.  Calls for speculation.

2    MR. VILLA:  I think it's to the best of his

3 knowledge.

4    THE COURT:  Right.  Overruled.

5    MS. STOKMAN:  Lay the foundation.  Objection on

6 foundation.

7    THE COURT:  Foundation, sustained.

8 BY MR. VILLA:

9 **Q.** Nobody told you before the homicides occurred that

10 Kenneth Johnson knew those homicides were going to occur,

11 correct?

12 **A.** Correct.

13 **Q.** Nobody told you that he wanted those homicides to occur,

14 correct?

15 **A.** Correct.

16 **Q.** Or that they were being done at his request or on his

17 orders?

18 **A.** Correct.

19    MR. VILLA:  May I have just a moment, Your Honor?

20    THE COURT:  Yes.

21 BY MR. VILLA:

22 **Q.** So essentially, from everything you were told about these

23 homicides, you don't have knowledge that Mr. Johnson was

24 involved in the homicides?

25 **A.** Can you repeat the first part?

CX Barnick-V

2534

1   **Q.**  Essentially, from everything you know or were told about

2   these homicides, in the lead-up to them being committed,

3   you -- Mr. Johnson didn't have any knowledge that the

4   homicides were going to be committed?

5   **A.**  Right, to my knowledge.

6           MS. STOKMAN:  Objection.

7           THE COURT:  Overruled.

8           Go ahead.

9   BY MR. VILLA:

10  **Q.**  You said, after the homicides occurred, you went to

11  San Pedro where Mr. Gray's boyfriend -- mom's boyfriend lived?

12  **A.**  Yes.

13  **Q.**  So you didn't go to a hotel room that night after the

14  homicides were committed?

15  **A.**  No.

16  **Q.**  Did you ever have a meeting shortly after the homicides

17  were committed with an individual by the name of

18  James Whelchel or "Whelchel."

19  **A.**  Maybe a week later.  I -- you say a meeting about the

20  homicides?

21  **Q.**  Well, just did you meet with him first?

22  **A.**  Yeah.

23  **Q.**  Step one?

24  **A.**  Yeah, yes.

25  **Q.**  And you met with him, it's a week later?

1   **A.**  Yeah, roughly, a week.

2   **Q.**  Was Mr. Gray with you?

3   **A.**  Yes.

4   **Q.**  When you met with him, did you discuss with him the Lomita

5   homicides?

6   **A.**  Whelchel?

7   **Q.**  Yes.

8   **A.**  No.

9   **Q.**  You didn't talk him about that at all?

10  **A.**  No.

11  **Q.**  Were the Lomita homicides discussed to Mr. Whelchel in

12  your presence at that meeting?

13  **A.**  No.

14          MR. VILLA:  Just one more minute, Your Honor.

15          THE COURT:  Sure.

16          MR. VILLA:  That is all the questions I have.

17          THE COURT:  All right.  Thank you.  Ms. Barrett.

18                      CROSS-EXAMINATION

19  BY MS. DE SALES BARRETT:

20  **Q.**  Good afternoon, Mr. Bannick.

21  **A.**  Good afternoon.

22  **Q.**  Uh, in your direct examination the government asked you

23  some questions about your criminal history.  Do you remember

24  that?

25  **A.**  Yes.

CX-Bennick-DR

2536

1   **Q.**  And they -- the government also asked you about your

2   record as a minor; is that correct?

3   **A.**  Correct, yes.

4   **Q.**  And you -- you told us then that you were basically

5   arrested for drugs and truancy during that time; is that

6   right?

7   **A.**  Right.

8   **Q.**  Do you -- were you ever arrested for assault or battery

9   during that particular time?

10  **A.**  Yes.

11  **Q.**  How about obstruction of a police officer?

12         MS. STOKMAN:  Objection.  Improper impeachment about

13  arrests.

14         MS. DE SALES BARRETT:  Your Honor, the door -- the

15  government opened the door on this --

16         THE COURT:  Right.

17         MS. DE SALES BARRETT:  -- on direct.

18         THE COURT:  Objection is overruled.  Go ahead.

19  BY MS. DE SALES BARRETT:

20  **Q.**  How about obstruction of a police officer?

21  **A.**  As a juvenile?

22  **Q.**  Yeah.  In -- how about in December of 2006, were you still

23  a juvenile then?

24  **A.**  Yes, I would have been a juvenile then.

25         Yeah, it could have been.

CX-Bennick-DR

2537

1  **Q.**  Okay.  You don't -- you don't remember offhand right now?

2  **A.**  Right.

3  **Q.**  And during your -- what year did you turn an adult?

4  **A.**  2007.

5  **Q.**  2007?

6      And during 2007, 2008 you were arrested for -- and --

7  and were actually convicted of a couple of burglaries; is that

8  right?

9  **A.**  Just one.

10 **Q.**  One.  How about the one that -- in June of 2007, was that

11 a burglary?

12     MS. STOKMAN:  Objection.  If this is a conviction, I

13 mean, it's unclear.

14     THE COURT:  Ms. Barrett, is there a -- a conviction

15 that you were talking about?

16     MS. DE SALES BARRETT:  Yes.  He received 365 days.

17     THE COURT:  Overruled.

18 BY MS. DE SALES BARRETT:

19 **Q.**  Do you remember that?

20 **A.**  Yes.

21 **Q.**  And you also committed theft, and what was that about?

22     MS. STOKMAN:  Objection.  Improper impeachment.

23 BY MS. DE SALES BARRETT:

24 **Q.**  You were convicted of theft.  What did you steal?

25     MS. STOKMAN:  Objection.

CX Bernick DR

2538

1        THE WITNESS:  Uh --

2        THE COURT:  Sustained.

3        THE WITNESS:  If I --

4        THE COURT:  One second, sir.

5        Next question.

6   BY MS. DE SALES BARRETT:

7   **Q.**  Was the burglary of a house, a car or --

8        MS. STOKMAN:  Objection --

9   BY MS. DE SALES BARRETT:

10  **Q.**  -- what?

11  **A.**  A house.

12       THE COURT:  Yeah.  Overruled.

13  BY MS. DE SALES BARRETT:

14  **Q.**  In May of 2009, you were -- you went to prison for the

15  first time; is that right?  You committed a crime that lead to

16  you going to prison for the first time; correct?

17  **A.**  Correct.

18  **Q.**  And you were ultimately sentenced to four years; is that

19  right?

20  **A.**  Right.

21  **Q.**  And was that an armed robbery?

22  **A.**  No.

23  **Q.**  You were unarmed?

24  **A.**  I was unarmed, yes.

25  **Q.**  And you were eventually released from prison before that

CX1 Rennick DB

2539

1   four years lapsed, so I assume you got released on parole.

2   But you violated the parole, did you not?

3   A.  Yes.

4   Q.  And during the course of the -- did you go to prison on

5   the parole violation?

6   A.  No, county jail.

7   Q.  Okay.  How much time did you get in the county jail?

8        MS. STOKMAN:  Objection.

9        THE COURT:  Sustained.

10  BY MS. DE SALES BARRETT:

11  Q.  Were you convicted, once you got out, of fictitious

12  checks?

13  A.  Yes.

14  Q.  And firearm violations; is that right?

15  A.  Several of them.

16  Q.  Several firearm violations.  And CDS for sale, several of

17  them; is that right?

18  A.  Yes.

19  Q.  And fraud, was that EDD fraud?

20  A.  No.  No.

21  Q.  Was just an identification fraud?  You stole somebody

22  else's ID?

23  A.  I don't remember the exact circumstances of it, but yeah,

24  some sort of other fraud, not EDD.

25  Q.  And you were also charged, I think, in 2020, in

CX - Bennick - DB

2540

1    Redondo Beach in San Bernardino.  Were you convicted and

2    sentenced to time with those?

3    A.  The case out of San Bernardino was ultimately dismissed

4    for time restraint reasons.

5    Q.  Okay.  But the other felon in possession case?

6    A.  Uh, that also -- from Redondo Beach, the firearm?

7    Q.  Yeah.

8    A.  That was dismissed as well, I believe.

9    Q.  So but you were, during this course of time, carrying a

10   weapon almost all the time, right?

11   A.  Right.

12   Q.  And after you were then eventually paroled after your last

13   sentence, then you, once again, got arrested and ended up

14   going to prison again for another firearm's offense; is that

15   right?

16   A.  Yes.

17   Q.  And what about while in prison, did you engage in any

18   other acts of violence?

19   A.  Yes.

20   Q.  What kinds of acts of violence in prison?

21   A.  Assaults.  Assaults.  Yeah, mainly battery -- assault and

22   battery on a prisoner, and fighting, mutual combat-type

23   things.

24   Q.  Any stabbings?

25   A.  I never was caught for any stabbings, no.

1   Q.  Never caught?

2   A.  Right.

3   Q.  But actually committed some stabbings that you weren't

4   caught for?

5   A.  Yeah, I've comitting a stabbing in prison.  Yeah.

6   Q.  And do you recall an incident where you actually shot a

7   man in Redondo Beach?

8   A.  Yes.

9           MS. STOKMAN:  Objection.

10          THE COURT:  A legal basis?

11          MS. STOKMAN:  Improper impeachment.

12          THE COURT:  Overruled.

13  BY MS. DE SALES BARRETT:

14  Q.  Were you ever charged with that offense?

15  A.  No.

16  Q.  And do you know whether or not the person lived or died?

17  A.  Yes, he lived.

18  Q.  He lived?

19  A.  Uh-huh.

20  Q.  Was he seriously injured?

21  A.  I don't think so.

22  Q.  How many times did you shoot him?

23  A.  Twice.

24  Q.  Now, you were charged in this case, correct?

25  A.  Correct.

1    **Q.** And over the course of your time in this case, you had the
2    opportunity to review statements of other potential witnesses
3    in the case; did you not?
4    **A.** Yes, I did.
5    **Q.** And how many times did you meet with the government -- I
6    know you met with them before you signed your cooperation
7    agreement.  How many times after you signed your cooperation
8    agreement had you met with the government?
9    **A.** Once.
10   **Q.** When was that?
11   **A.** Uh, last week, I believe.  Or just, yeah, over the
12   weekend.
13   **Q.** And did they play videos for you, the videos that you
14   looked at today?
15         MS. STOKMAN:  Objection.  Relevance.
16         MS. DE SALES BARRETT:  He identified the videos.  I
17   want to know whether he saw them before.
18         THE COURT:  Which is why I overruled.
19         Next question.
20         MS. DE SALES BARRETT:  Oh, I didn't hear the
21   overrule.  I'm sorry, Judge.
22   BY MS. DE SALES BARRETT:
23   **Q.** Did they play videos for you?
24   **A.** Yes.
25   **Q.** And did they -- were you shown photographs that you've

1    been shown here today?

2    **A.**   Yes.

3    **Q.**   And so this is not the first time that you've heard the

4    questions that Ms. Stokman asked you to today; is that right?

5    **A.**   Right.

6    **Q.**   You had a rehearsal?

7    **A.**   I don't know if you call it that, but --

8    **Q.**   All right.  Maybe not a rehearsal, but you went over those

9    questions.

10            And you had lawyers who met with you during that

11   period of time; is that right?

12   **A.**   Yes.

13   **Q.**   And, in fact, they are sitting in the courtroom behind me,

14   right?

15   **A.**   Yes.

16   **Q.**   Before your cooperation agreement and after you had access

17   to that -- did the statements you had access to include Rage

18   and Suspect?

19   **A.**   Yes.

20   **Q.**   Now, I just want to go over your cooperation agreement

21   with you, briefly.  First of all, you know that a life

22   sentence in federal prison means no possibility of release,

23   correct?

24   **A.**   Correct.

25   **Q.**   And as a result of your cooperation, the government has

CX-Bernick-DR

2544

1   said that if you did cooperate and gave them substantial

2   assistance in prosecuting other people, that they would make a

3   motion so that the judge could impose a sentence less than

4   life; is that right?

5   **A.**   Yes.

6   **Q.**   And in addition to that, the government is going to file

7   an additional motion to ask the judge to give you a sentence

8   lower than would normally occur; is that right?

9            MS. STOKMAN:   Objection.   Calls for speculation.

10           THE WITNESS:   Yeah, I don't -- I don't know about

11   that.

12   BY MS. DE SALES BARRETT:

13   **Q.**   Well, do you expect to get a sentence that is lower than a

14   life sentence when you are sentenced?

15   **A.**   Yes, I hope so.

16   **Q.**   And do you expect the government to advocate on your

17   behalf to get you a lower sentence?

18   **A.**   I wasn't expecting that.   I don't know.

19   **Q.**   Well, what did they promise you in the cooperation

20   agreement?

21   **A.**   They didn't promise me anything, except that I -- I could

22   possibly get a time reduction.   Yeah.

23   **Q.**   And they said that you could get a time reduction after

24   you were sentenced in this case; is that right?

25   **A.**   Right.

2545

1  **Q.**  So you have the life sentence no longer in play, correct?

2  You have a go-home date to start with, you get sentenced in

3  this case with the government advocating for you, and then

4  after that sentence you could get an even lower sentence; is

5  that right?

6           MS. STOKMAN:  Objection.  Compound.  Calls for

7  speculation.

8           THE COURT:  Sir, do you understand that question?

9  There was a lot in there, but did you understand it?

10          THE WITNESS:  No, not after the -- or, yeah, I -- I

11  don't get the part where you're saying --

12          MS. DE SALES BARRETT:  It's too many.  I get it.

13          THE WITNESS:  -- I have a release date.

14          MS. DE SALES BARRETT:  Right.

15          THE COURT:  So let's have her ask you a different

16  question.

17          The objection is sustained.

18  BY MS. DE SALES BARRETT:

19  **Q.**  If you were sentenced in this case and you provide

20  cooperation to the government, will the government file a

21  motion for you to get less time?

22          MS. STOKMAN:  Objection.  Calls for speculation.

23          THE COURT:  Overruled.

24          THE WITNESS:  Yes.  I believe so.

25          MS. DE SALES BARRETT:  Thank you very much.

RDX Pennick S

2546

1          THE COURT:  Redirect?

2          MS. STOKMAN:  Just briefly.

3                    REDIRECT EXAMINATION

4    BY MS. STOKMAN:

5    **Q.**  You were asked about assaults that you committed in

6    prison, including some stabbings.  Were those assaults that

7    you --

8          MS. DE SALES BARRETT:  Leading.  Objection.

9          THE COURT:  Overruled.  I need to hear the entire

10   question.  I think she laid just a little background, and now

11   we're going to the questions.  I need to hear the question.

12   BY MS. STOKMAN:

13   **Q.**  Did you commit those assaults on your own, like, decision?

14   **A.**  No.

15   **Q.**  Why did you commit --

16   **A.**  Well, I mean, I suppose I did them on my decision, but it

17   was ordered to be done by somebody else.

18   **Q.**  And who ordered, what type of person, or where did those

19   orders come from?

20   **A.**  The person who had the key to the yard at that time.

21   **Q.**  Did that person, as far as you know, have any affiliation

22   with the AB?

23   **A.**  Yes.

24   **Q.**  They did?

25   **A.**  Yes.

RDX-Pannick C

2547

1  **Q.** The person that you shot that Ms. Barrett was asking about
2  you shooting, was there a reason why you shot that person, as
3  far as what type of person that was?

4          MS. DE SALES BARRETT:  Objection, Your Honor.

5          THE COURT:  Overruled.

6          THE WITNESS:  No.

7  BY MS. STOKMAN:

8  **Q.** Uh, why did you -- what type of person was it that you
9  shot?

10          MS. DE SALES BARRETT:  Objection.  Asked and
11  answered.

12          THE COURT:  Overruled.

13          THE WITNESS:  The person was a registered child
14  molester.

15  BY MS. STOKMAN:

16  **Q.** And are there --

17          MS. DE SALES BARRETT:  Foundation.

18          THE COURT:  Sustained.

19  MS. STOKMAN:

20  **Q.** How did you know -- let me ask you this:  You said you're
21  aware of the AB rules and codes of conduct.  Is there an
22  expectation among the AB about committing murder against
23  certain types of individuals?

24          MS. DE SALES BARRETT:  Objection.

25          THE COURT:  I need to hear the question first.  Is

RDX Pannick S

2548

1    the question finished?

2              MS. STOKMAN:  Yes.

3              THE COURT:  Your objection is what, Ms. Barrett?

4              MS. DE SALES BARRETT:  Leading.

5              MR. VILLA:  Outside the scope.

6              THE COURT:  Overruled.

7              Go ahead.

8    BY MS. STOKMAN:

9    Q.  Are there -- is there an expectation about killing certain

10   types of individuals?

11   A.  Well, yes.  A sex offender or a child molester definitely

12   would fall in the category of people who would be targeted for

13   violence, yes.

14   Q.  And were you aware of whether or not this individual you

15   shot fell into such a category?

16             MS. DE SALES BARRETT:  Objection.  Foundation.

17             MS. STOKMAN:  That's a "yes" or a "no" at this point.

18             THE COURT:  Overruled.

19   BY MS. STOKMAN:

20   Q.  You can answer "yes" or "no."

21   A.  Yes.

22   Q.  And how did you know that?

23   A.  I looked that person's name up on Megan's Law -- Megan's

24   Law.

25   Q.  Okay.  And so what did you believe this type of person was

RDX Bannick S

2549

1  that you shot?

2  **A.**  He was a child molester.

3  **Q.**  Have you ever testified in court before?

4  **A.**  No.

5  **Q.**  Have you ever testified against AB members before?

6  **A.**  No.

7  **Q.**  Did the thought of testifying cause you to feel a certain

8  way before you came into court today?

9       MS. DE SALES BARRETT:  Objection, Your Honor.  Asked

10  and answered on direct.

11       THE COURT:  Overruled.

12  BY MS. STOKMAN:

13  **Q.**  Go ahead.  You can answer.

14  **A.**  Yes.  It --

15  **Q.**  What was that?

16  **A.**  It made me very uneasy.  Uh, it's been -- it's a hard

17  thing.  It's extremely hard.

18  **Q.**  And when you were asked about the questions when you met

19  with the government, questions that you would be asked today,

20  do you know what the purpose of that session was for you?

21       MS. DE SALES BARRETT:  Objection, Your Honor.

22       THE COURT:  Sustained.

23  BY MS. STOKMAN:

24  **Q.**  So let me ask you this:  Has anyone ever told you what

25  your testimony should be?

1   **A.**  No.

2   **Q.**  Has reading any statements made by other people involved

3   in this case dictated what your testimony is here today?

4   **A.**  No.

5   **Q.**  What is your understanding about your obligation to tell

6   the truth?

7   **A.**  That that's -- this is the only way that it will work,

8   that -- I mean, everything would be for not if I were to --

9   you know, I would just discredit myself.  And that's also just

10  not why I chose to do this.

11  **Q.**  So when we talk about the truth, what does the truth mean

12  to you?  Whose truth is it?

13  **A.**  My own truth.

14        MS. STOKMAN:  I have no further questions.

15        THE COURT:  Recross?

16                    RECROSS-EXAMINATION

17  BY MR. REED:

18  **Q.**  Mr. Bannick, is it a true statement that you were a

19  criminal before you ever met anybody in the AB?

20  **A.**  Yes.

21  **Q.**  Okay.  You were committing crimes as a child, right?

22  **A.**  Yes.

23  **Q.**  You were committing crimes as an adolescent, correct?

24  **A.**  Yes.

25  **Q.**  Okay.  And you were going in and out of county jail for a

2551

1   while, correct?

2   **A.**   Correct.

3   **Q.**   Okay.  There's a certain lifestyle, certain set of rules

4   that go along with being a criminal; fair statement?

5   **A.**   Yes.

6   **Q.**   Okay.  One of the things, irrespective of color,

7   irrespective of race, how does everybody in jail feel about

8   child molesters?

9   **A.**   It's -- they're the lowest you could possibly be.

10  **Q.**   Did somebody from the AB have to tell you to go do

11  something to a child molester?

12  **A.**   No.

13  **Q.**   That was you, right?

14  **A.**   Yes.

15  **Q.**   Because of the life you chose; is that a fair statement?

16  **A.**   I mean, just -- that's how I feel.

17  **Q.**   Because of the life you chose?

18  **A.**   Yes.

19  **Q.**   Now, you would agree now, sitting behind the witness

20  stand, that killing somebody just because they committed a

21  crime, or shooting somebody, or beating them up because they

22  committed a crime, as you're sitting right now, you today, new

23  man, new mind, you would agree that's probably not the way to

24  handle things?

25  **A.**   Right, yes.

1    **Q.** Or are you saying, Me right now, on the 4th of February,

2    2025, I'd still do that if I had the chance?

3    **A.** No, I would not.

4    **Q.** All right. Now, you're going probably -- I don't know how

5    long, but you are probably not going to wear street clothes

6    for a significant amount of time, would you agree?

7    **A.** I'm not going to what?

8    **Q.** Street clothes, you're not going to wear a suit; you're

9    not going to wear a tie.

10   **A.** Right, right.

11   **Q.** You're going to dress kind of like you are, depending on

12   what prison you're at; fair statement?

13   **A.** Yes.

14   **Q.** Whatever kind of yard you're in, you're still going to be

15   in prison; is that correct?

16   **A.** Yes.

17   **Q.** And I don't know where you are now. I don't really care.

18   But you know there are places that people go who have

19   cooperated?

20          MS. STOKMAN: Objection. Relevance.

21          MR. REED: I'm getting there.

22          THE COURT: All right. Overruled.

23          Go ahead.

24   BY MR. REED:

25   **Q.** There are rules to prison. Would you agree?

1   A.  Yes.

2   Q.  Have you ever heard of anybody ever going to prison and

3   there were no rules?

4        MS. STOKMAN:  Objection.  Calls for speculation.

5        THE COURT:  Sustained.

6   BY MR. REED:

7   Q.  I forget the name of the person that you shot, but you did

8   that -- well, let me back up a second.  I'm assuming that you

9   did that on the street; is that right?

10  A.  Right.

11       MS. STOKMAN:  Objection.  Withdrawn.

12  BY MR. REED:

13  Q.  Okay.  So there was nobody there to force you to pull that

14  trigger; is that correct?

15  A.  Yes.

16  Q.  You pulled that gun yourself?  It was an automatic?

17  A.  Yup.

18  Q.  Okay.  You racked the slide yourself; is that correct?

19  A.  Correct.

20  Q.  At the time you pulled that trigger three times, you did

21  that yourself; is that correct?

22  A.  Two times.

23  Q.  Okay.  Forget the third.  Two times.

24       You, Brandon Bannick, same guy who committed the

25  crimes leading up to that point, the same guy who went in and

2554

1    out of county jail -- let me back up a second.  Went in and

2    out of juvenile hall to YA, went in and out of county jail,

3    and ultimately got himself into prison, right?

4    **A.**  Right.

5    **Q.**  You did that?

6    **A.**  Yes.

7    **Q.**  Okay.  And you chose to follow that particular lifestyle.

8    Nobody forced you to kill someone, would you agree?

9    **A.**  Yes.  To an extent, I would -- I would disagree.

10   **Q.**  Okay.  Well, the reason I can say that, and correct me if

11   I'm wrong, you had made a choice a couple of weeks ago to not

12   do things like that, i.e., you're in the witness stand.  You

13   could have done that years ago and you did not.

14          MS. STOKMAN:  Objection.  Argumentative.

15   BY MR. REED:

16   **Q.**  Could you have done that years ago and chose not to do it?

17          MS. STOKMAN:  Objection.  Relevance.

18          THE COURT:  Overruled.

19          THE WITNESS:  Chose to get on the witness stand?

20   BY MR. REED:

21   **Q.**  Chose not to do what you were doing before.

22   **A.**  Yes.

23   **Q.**  You chose that life and not whatever it is that you're

24   doing now, correct?

25   **A.**  Yes.

1   **Q.**  Okay.  But in your statement now is that you only did
2   those things because someone told you to; is that right?
3   **A.**  Yes.
4   **Q.**  You never spoke to John Stinson; is that also correct?
5   **A.**  Yes.
6   **Q.**  And the friend that you knew that knew John Stinson, that
7   person is dead now; is that correct?
8   **A.**  Yes.
9   **Q.**  And he killed himself in Costa Rica?
10          MS. STOKMAN:  Objection.  Relevance.
11          THE COURT:  Sustained.
12  BY MR. REED:
13  **Q.**  That person is dead now, correct?
14          MS. STOKMAN:  Asked and answered.
15  BY MR. REED:
16  **Q.**  No one, that you know of, killed him; is that correct?
17  **A.**  Correct.
18  **Q.**  Do you have any idea or any reason to believe that someone
19  in the AB killed that guy?
20          MS. STOKMAN:  Objection.  Calls for speculation.
21  Relevance.
22          THE COURT:  Sustained.
23          MR. REED:  I have no further questions.  Thank you.
24          THE COURT:  Any further recross?  Redirect?
25          MS. STOKMAN:  Nothing further.

1        THE COURT:  All right.  Ladies and gentlemen, if I

2    can ask you to step out for about ten minutes, and we'll get

3    right back to you.

4        (Jury exits the courtroom at 1:08 p.m.)

5        THE COURT:  All right.  Thank you, Mr. Bannick.

6    You're excused.

7            Is there another witness?

8        MS. STOKMAN:  Yes.  We would like to put the other

9    witness back on the stand for cross, but he -- so that he can

10   try to get out of here today.

11       THE COURT:  Well, Ms. Barrett is not prepared to do

12   that.

13           Mr. Reed or for Mr. Johnson, are you-all prepared to

14   do your cross of Mr. Rapinoe?

15       MS. LUEM:  No.

16       MR. REED:  No.

17       THE COURT:  He has to come back tomorrow.  I guess

18   there's no point.

19       MS. STOKMAN:  Judge, he can't be back tomorrow, and

20   he's coming from eight hours away, and he was here Friday and

21   had to come back today.  That's why we're trying to get him

22   back on the stand so that he doesn't have to make the drive

23   and then come back another day.

24       THE COURT:  Representation from counsel is that they

25   are not prepared to proceed, which, I'll be honest, I don't

1    understand, because this document, Ms. Luem pulled it up on

2    her cell phone, apparently.  So I don't know why this is such

3    a stumbling block, but are we -- but they are not prepared to

4    proceed.

5            So, unfortunately, he's going to have to come back.

6    When can he come back?

7            MS. STOKMAN:  I'm not sure, Judge.  We'll have to

8    figure out when that is.  And then the schedule, just have to

9    wait for him.  If that's the case for today, then we have no

10   further witnesses.

11           THE COURT:  All right.

12           Let's go ahead and call the jury back in and we'll

13   excuse them.  Well, let's wait for Mr. Clement to come back.

14           MS. DE SALES BARRETT:  Your Honor, just wondering

15   what happened to Ms. Garza.

16           THE COURT:  I wouldn't know that.  I guess she left.

17           MS. DE SALES BARRETT:  No.  She was going to get the

18   social security number.

19           THE COURT:  I did not understand that's what she was

20   going to do.  I know you said, Could you get it?  She said,

21   yeah, she could, but I didn't understand that you wanted her

22   back today.  And not only that, you're going to have to bring

23   her back.  There was never a request that she come back today.

24   We can look at the record, if I'm wrong.

25           MR. CONOLLY:  Your Honor, the Court's recollection

2558

1    matches the government's.

2            THE COURT:  Let's call the jury back in.

3        (Jury enters the courtroom at 1:12 p.m.)

4            THE COURT:  All right.  Great.  We have all our jury

5    members back.

6            I'm sorry to send you out just to bring you back to

7    tell you we're finished for today.

8            Yeah, so it's good and bad news.  If -- overnight, if

9    you would please not form any opinions about this case, please

10   don't discuss this case or allow anyone to discuss it with

11   you, and please don't do any independent research on your own,

12   please don't consult any media or allow yourself to be exposed

13   to any media.  Otherwise, I will tell you that we are moving

14   much faster than we thought.  We are going to be done much

15   faster than we thought, so I do appreciate all of your

16   attention over the last couple of weeks.  Thank you very much.

17   Have a good evening.

18       (Jury exits the courtroom at 1:13 p.m.)

19           THE COURT:  Anything for the record at this time?

20           MS. FISHER-BYRIALSEN:  We would just like to know the

21   witnesses for tomorrow.

22           THE COURT:  All right.  So you can do that after.

23   Anything else, then, for today?

24           MS. STOKMAN:  Nothing from the government.

25           THE COURT:  All right.  Thank you.

2559

1      (Proceedings were adjourned at 1:14 p.m.)

2

3

4

5

6

7      I, RACHAEL LUNDY, Official Reporter, do hereby certify the

8   foregoing transcript as true and correct.

9

10  Dated:  February 4, 2025              /s/ Rachael Lundy_____
                                          RACHAEL LUNDY, CSR-RMR
11                                        CSR No. 13815

12

13

14

15

16

17

18

19

20

21

22

23

24

25